## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | **CRIMINAL NO. 23-454-5** |
| SAIKEEN DIXON, | : | |
| a/k/a "SK," | | |
| a/k/a "Killa," | : | |
| a/k/a "Kil" | | |

### GOVERNMENT'S RESPONSE TO DEFENDANT SAIKEEN DIXON'S MOTION TO SUPPRESS ALL EVIDENCE OBTAINED FROM FOUR CELL PHONES SEIZED ON OCTOBER 4, 2023 AND REQUEST FOR *FRANKS* HEARING

Defendant Saikeen Dixon is charged in this case for his role in a cargo theft conspiracy, including his participation in the theft of over $230,000 worth of newly minted U.S. dimes in April 2023. Dixon was charged in the Superseding Indictment in this case, which was filed in December 2024. By then, Dixon had already been charged in another federal case—alongside his co-defendant in this case, Ronald Byrd—with carjacking a FedEx truck that had been carrying nine kilograms of cocaine on August 10, 2022. Byrd and Dixon were convicted after a six-day jury trial in June 2025. *See United States v. Ronald Byrd et al.*, Crim. No. 23-209 (E.D. Pa.).

When Dixon was arrested on the carjacking charges in October 2023, the FBI recovered four cell phones: one on Dixon's person, and three more in the trunk of his car. The Honorable Craig M. Straw issued a warrant a few days later authorizing a search of the phones in connection with the carjacking investigation, and the Honorable Pamela A. Carlos issued an additional warrant in July 2024 authorizing a further search of the phones in connection the cargo-theft investigation at issue in this case.

Dixon now challenges the warrant issued by Judge Straw. Dixon's motion is without merit and should be denied without further proceedings.

1

Dixon buries the lede (in a footnote at page 9 of his memorandum of law): Dixon previously challenged the same warrant in the carjacking case, moving to suppress evidence seized from his four cell phones. Dixon claimed among other things that the affiant, FBI Special Agent Joseph Donahue, "deliberately withheld critical evidence from the Affidavit" about cooperator P.A.,[1] just as Dixon claims here. *See* Ex. A, at 8-9.[2] Judge Weilheimer denied Dixon's motion after a two-day evidentiary hearing, during which Agent Donahue testified regarding the warrant affidavit. *See* Order on Pretrial Motions ¶ 9, *United States v. Ronald Byrd et al.*, Crim. No. 23-209 (E.D. Pa. June 2, 2025), ECF No. 230.

Dixon fails to establish that a different result or a further hearing is warranted here. He fails to carry his burden of showing that any material fact was deliberately or recklessly omitted from the warrant affidavit. Dixon contends that Agent Donahue omitted statements by P.A. that "exonerate" him, but not only does he fail to support his motion with any evidentiary submissions, he ignores the evidence introduced at his trial and the evidentiary hearing on his prior motion to suppress indicating that P.A. never made those statements. Dixon also fails to show that any purported deficiency would have been material to Judge Straw's finding of probable cause. Dixon claims that P.A.'s identification of Dixon in surveillance footage from the August 2022 carjacking "was the only evidentiary link connecting Mr. Dixon to the carjacking."

---

[1] The government refers to P.A. and the victim of the August 10, 2022 carjacking, J.H., by their initials in lieu of filing this response under seal. Both P.A. and J.H. testified at trial, and all of the facts recited in this memorandum were discussed in open court at Dixon's trial as well as pre-trial evidentiary hearings. As such, the government respectfully submits that using the witnesses' initials sufficiently addresses ongoing concerns for their safety. Because certain exhibits to this response, including FBI-302 reports, are subject to protective orders, those exhibits will be submitted under seal.

[2] A copy of Dixon's motion to suppress from Crim. No. 23-209 and the government's response, which were filed under seal in that case, will be filed under seal here as Exhibit A. Because the motion was filed without page numbers, citations to Exhibit A refer to the page numbers stamped at the bottom of each page ("Page ___ of 129").

Mem. 2.[3] Far from it. Dixon entirely ignores all of the other evidence supporting Judge Straw's finding of probable cause, including text messages between Dixon and Byrd on the day of the FedEx truck carjacking and cell-site location evidence putting Dixon at the same location as Byrd before the carjacking. Indeed, that is precisely why Judge Weilheimer denied Dixon's previous motion to suppress. The motion should be denied here, too.

## I.    BACKGROUND

### A.    *United States v. Ronald Byrd et al.*, Crim. No. 23-209 (E.D. Pa.)

#### 1.    August 10, 2022 Carjacking

This Court is familiar with the FedEx truck carjacking from the motion to suppress previously filed by Byrd in this case, which the Court denied on April 26, 2024. *See* Dkt. No. 79. Evaluating Dixon's motion here requires an overview of some of the evidence and proceedings in Dixon's carjacking case.

In July 2022, Byrd and others developed a plan to obtain cocaine shipped by Federal Express.[4] Byrd contacted P.A., who had worked as a driver for FedEx Ground and FedEx Express and sold Byrd packages that P.A. would steal off of his FedEx truck. Byrd asked P.A. if he could help Byrd obtain a package off of a FedEx truck. P.A.—despite having been fired from FedEx months earlier for stealing packages—told Byrd he could, and he told Byrd to have the package sent to Temple Hospital. P.A. did so because he knew the FedEx Express driver who normally drove the route servicing Temple Hospital.

The package containing the cocaine was scheduled for delivery to Temple Hospital on

---

[3] Citations to "Mem." are to the memorandum of law submitted in support of Dixon's motion.

[4] This factual summary is derived from Agent Donahue's warrant affidavit, which is attached as Exhibit 1 to Dixon's motion, as well as the evidence presented at the June 2025 trial in the carjacking case. The trial transcript is on file with the Court in the carjacking case. *See United States v. Byrd et al.*, Crim. No. 23-209 (E.D. Pa. Feb. 18, 2026), ECF Nos. 347-353. Pertinent excerpts of the trial transcript are attached as exhibits to this response, as noted below.

August 10, 2022. The night before, P.A. met Byrd and his associate, Ramon Hankins a/k/a "Pop," on Gratz Street in North Philadelphia, where they gave him a "burner" cell phone to use to communicate about the package.

Things did not go according to plan on August 10, 2022. That morning, P.A. spoke with his FedEx contact, who informed him that he was not delivering packages to Temple Hospital that day, rather, J.H. was driving the route that delivered to Temple Hospital. P.A. called and texted with J.H. to ask him for the package, and P.A. drove to Temple Hospital to ask for the package in person. J.H. refused.

Byrd met P.A. at Temple Hospital and told him to keep asking for the package. Byrd told P.A. that his "young boul" was about to pull up to Temple Hospital in a "Johnny"—i.e., a stolen car—and Byrd returned a few minutes later in a black Jeep Grand Cherokee being driven by defendant Saikeen Dixon. Byrd had a gun in his lap and told P.A. to keep trying to get the package.

J.H.'s supervisors from FedEx arrived at the Temple Hospital loading dock driving a FedEx van. They took the package P.A. was asking for onto their FedEx van.

After finishing his deliveries, J.H. drove his FedEx truck south on Broad Street towards the FedEx distribution center at 3600 Grays Ferry Avenue. The supervisors followed behind in their FedEx Van. Byrd and Dixon followed the FedEx truck in the black Jeep Grand Cherokee. P.A. also drove south on Broad Street in his silver Nissan Pathfinder. P.A. spoke to "Pop" on the phone, who told him that Byrd was going to "take the truck." P.A. turned off Broad Street around Spring Garden street, but Byrd and Dixon continued following the FedEx truck.

At approximately 11:15 a.m., at a red light about a block from the FedEx facility at 3600 Grays Ferry Avenue, Dixon pulled the black Jeep Grand Cherokee in front of the FedEx truck. Byrd got out of the passenger side of the Jeep, pointed a black semi-automatic pistol at J.H., and

4

approached the driver's side of the FedEx truck. J.H. jumped out of the passenger side door and ran into oncoming traffic toward the FedEx facility. Byrd climbed into the FedEx truck and drove westbound across the Grays Ferry Bridge before pulling over at 47th and Linmore in Southwest Philadelphia. Dixon also pulled the black Jeep Grand Cherokee over there. Byrd tried to open the back of the FedEx truck but could not, so he abandoned the FedEx truck, got back into the Jeep with Dixon, and fled the scene.

P.A. met Byrd and "Pop" near Park Avenue and William Street after the carjacking. They took P.A.'s cell phone and the "burner" phone they had given him. Byrd told P.A. there were drugs (a/k/a "work") in the package. Byrd told P.A. that P.A. would likely be arrested, but that Byrd would pay for his lawyer.

The package that FedEx seized was turned over to law enforcement and searched pursuant to a search warrant. Nine packages of white powder, individually packaged in plastic, stamped with the label "DSQUARED2" and covered in a masking agent (mustard) were recovered. Testing by the Philadelphia Police Department Chemistry Unit later confirmed that the packages contained a total of approximately 9.005 kilograms of cocaine.

### 2.     Investigation and Identification of Saikeen Dixon

P.A. was identified by J.H. and the FedEx supervisors as the individual who contacted J.H. in an attempt to intercept the package. P.A. was subsequently arrested by Philadelphia Police. When he was arrested, P.A. told detectives he was trying to obtain the package on behalf of an individual known as "Ty." Later, in interviews in September and October 2022, P.A. told investigators that the person he identified as "Ty" was actually someone he knew as "Bird" or "Bird Man," which are known aliases for defendant Byrd. P.A. then identified defendant Byrd as the person who carjacked the FedEx truck on August 10, 2022.

Byrd was indicted in May 2023. The investigation continued after Byrd's indictment,

including to identify the second carjacker in the yellow shirt. Investigators obtained defendant Byrd's iCloud backup data pursuant to a search warrant and found that Byrd sent his GPS location to Dixon (who used a number ending in x6970, saved in Byrd's contacts as "Kil") around 10:19 a.m. and 10:22 a.m. on the day of the carjacking, showing that Byrd was at Temple Hospital. Byrd did not send his location to anyone else besides Dixon.

Investigators then obtained phone records and cell site location data for Dixon's number pursuant to another search warrant, which indicated not only that Byrd and Dixon were in frequent contact by both phone call and text message, but also that Dixon was at Temple Hospital with Byrd (and P.A.) shortly after Byrd sent Dixon his GPS location—and shortly before the carjacking.

In addition, during a proffer in April 2023, P.A. was shown, for the first time, the surveillance footage from the carjacked FedEx truck showing the carjacker in the yellow shirt. P.A. told investigators that the carjacker in the yellow shirt looked like a person he knew as "SK." P.A. was then shown a single image of Dixon, and he indicated that Dixon was the person he knew as "SK." P.A. later told investigators that Dixon's Instagram account was "dolo.sk," and Instagram records obtained pursuant to a subpoena confirmed that the account is associated with defendant Dixon's phone number (ending in x6970).

A comparison of the surveillance footage from the FedEx truck and photos from Dixon's Instagram account indicates that Dixon has the same approximate height, weight, build, skin tone, and head shape as the second carjacker, and both have the same distinctive scar-like mark on their right arm[5]:

---

[5] Additional photos and videos recovered from Dixon's cell phone show the same distinctive mark. These photos and videos were presented at trial.

6



### 3.     Arrest of Defendant Dixon and Recovery of Dixon's Phones

Dixon was charged in a superseding indictment in the carjacking case in late September 2023. A few days later, on October 4, 2023, Dixon was arrested at a Bucks County Magisterial District Court following a scheduled court appearance on local charges. Agents saw Dixon arrive in a Ford Fusion. He got out of the car and put some small items in the trunk. He then went

inside the courthouse. Agents arrested Dixon inside the courthouse after his appearance and recovered a cell phone from Dixon's person.

After Dixon was arrested, Agent Donahue informed Dixon's significant other, who was sitting in the Ford Fusion that Dixon had arrived in, that Dixon was being arrested for carjacking, and that Dixon had been seen putting items in the trunk of the car. Agent Donahue asked for her consent to search the vehicle, and she provided both written and verbal consent to search her car. Agent Donahue recovered three more cell phones from the trunk of Dixon's car.

### 4.    Search Warrant for Defendant Dixon's Cell Phones

The FBI then sought a warrant to search the four phones recovered during Dixon's arrest, all of which are Apple iPhones.[6] Agent Donahue submitted an affidavit in support of the application. The affidavit set out the facts that led to the indictment of Dixon, including the text messages with GPS location that Byrd sent to Dixon, the cell site data showing that Dixon was at Temple Hospital with Byrd before the carjacking, P.A.'s statement that the carjacker in the yellow shirt looked like "SK" (i.e., Dixon), and the similarities between publicly available photos of Dixon and the surveillance footage of the carjacker in the yellow shirt, including the distinctive scar. *See* Aff. ¶¶ 20-23.[7] The affidavit disclosed that P.A. had been fired from FedEx Express before agreeing to help Byrd illicitly obtain a package off a FedEx truck, that P.A. was arrested by Philadelphia Police for his role in the offenses under investigation, that P.A. was

---

[6] A copy of the warrant and supporting affidavit are attached as Exhibit 1 to defendant Dixon's motion. Citations to "Aff." refer to Agent Donahue's affidavit.

[7] Dixon claims that Agent Donahue "change[d]" his description of the carjacker's scar, because Agent Donahue explained in grand jury testimony that, in the surveillance footage of the carjacker, "there appears to be something on his arm, which looks like it could be a scar," and in his affidavit, Agent Donahue described the carjacker as having "a distinctive scar." Mem. 12. Dixon's counsel already cross examined Agent Donahue about this at the evidentiary hearing on Dixon's prior motion to suppress. Agent Donahue explained that these statements meant the same thing, and there was no "change." *See* May 30 Tr. at 75-76. Excerpts of the transcript of the May 30, 2025 evidentiary hearing are attached hereto as Exhibit B.

cooperating with investigators, that P.A. pled guilty to an information charging him with violating 21 U.S.C. §§ 841(a)(1)(A), 846 and 18 U.S.C. § 2 (aiding and abetting the attempted possession with intent to distribute 5 kilograms or more of cocaine) pursuant to a plea agreement, and that P.A. had relayed many of the facts set forth in the affidavit over the course of multiple interviews and proffers. *See* Aff. ¶¶ 8, 17 & n.1.

The affidavit also explained the facts that led to the seizure of Dixon's cell phones. The affidavit recounted how Dixon arrived at the Magisterial District Court in Bucks County to appear on charges related to an earlier arrest, placed items in his trunk, and went inside the courthouse; how Dixon asked agents if he could lock his phone after he was arrested; and how Dixon's significant other consented to a search of the Ford Fusion she and Dixon were traveling in. Aff. ¶¶ 25-27.

The affidavit further explained why Dixon's cell phones were likely to contain evidence relevant to the August 10, 2022 carjacking. The affidavit explained how, like many drug and carjacking offenders, Byrd and Dixon communicated with their co-conspirators using cell phones before, during, and after the commission of the crime. Aff. ¶ 32. The affidavit also explained that the number of phones Dixon had (one on his person and three in the trunk), and his attempt to conceal three of them in his trunk before going into a government building, indicated that one or more of the phones was being (or had been) used for illicit activities. *Id.* The affidavit explained how individuals involved in drug distribution will "sometimes use separate telephones to conduct their drug trafficking activities with different individuals," and how using "separate telephones" can "serve as a means of avoiding law enforcement monitoring and detection." Aff. ¶ 29. Further, the affidavit explained how drug and carjacking offenders often possess relevant photographs in their phones, including photos of themselves and their co-conspirators, clothing worn during the carjackings, firearms and other items used during the carjackings, and the

proceeds of their carjackings or drug sales. *Id.* It also explained that phones like Dixon's may retain GPS location data showing whether one of the phones was at a crime scene or other location at a particular time. Aff. ¶ 30. And the affidavit explained that cell phones can store information for long periods of time, that deleted information can be recovered, and that information viewed using the internet can be stored on the device. Aff. ¶ 31.

Magistrate Judge Straw issued the requested warrant to search defendant Dixon's phones on October 6, 2023. A search of the phones determined that one of them was assigned the x6970 number defendant Dixon used to communicate with Byrd on the day of the August 10, 2022 carjacking (and at other times). The phones contained a number of photographs, videos, and text messages, some of which contained Dixon's GPS location information, that were relevant to the carjacking investigation.

### 5.    Dixon's Motion to Suppress, Trial, and Post-Trial Proceedings

Dixon moved to suppress the evidence recovered from his phones on several grounds. Dixon argued that the FBI lacked probable cause to seize Dixon's phones and that his significant other did not actually consent to a search of her vehicle.[8] Dixon also argued that Judge Straw erred in finding probable cause. Ex. A, at 7. As relevant here, Dixon further argued that Agent Donahue "deliberately withheld critical evidence from the Affidavit" and "hid the truth about eyewitness [P.A.]" such that the "good faith" doctrine should not apply. *Id.* at 7-8. Dixon assembled a list of 12 purported omissions, including the majority of the 8 purported omissions Dixon claims here. *Compare* Ex. A, at 13-16, *with* Mem. 13-14.

Judge Weilheimer held an evidentiary hearing on Dixon's motion to suppress and other

---

[8] Dixon's significant other testified that, although her signature was on a consent to search form, she did not sign it—she signed another document, and somebody must have transferred her signature to the consent to search form. Judge Weilheimer found this testimony was not credible. *See* May 30 Tr. at 192-194.

pretrial motions on May 28 and 30, 2025. Agent Donahue testified and was subject to cross examination, including about the purported omissions about P.A.'s identification of Dixon. *See* May 30 Tr. at 8-114.[9]

Judge Weilheimer denied Dixon's motion. She found testimony by Agent Donahue (as well as FBI Task Force Officer Donald Liebsch) credible. *See* May 30 Tr. at 193. Judge Weilheimer found that P.A.'s "identification of [Dixon] is one very small aspect of the collective investigation that was conducted by law enforcement when providing the foundation for probable cause for the search." *Id.* at 194. Based on the "totality of the evidence included in the search warrant that was provided to Judge Straw," the Court found "there is probable cause." *Id.* at 195.

The case proceeded to trial the following week. P.A. testified, and Agent Donahue and multiple other law enforcement witnesses were subject to cross examination about their interactions with P.A. Dixon was convicted of carjacking and aiding and abetting, in violation of 18 U.S.C. §§ 2119 and 2, and using, carrying, and brandishing a firearm during and in relation to a crime of violence and aiding and abetting, in violation of 18 U.S.C. §§ 924(c) and 2. Dixon filed a motion for a new trial, which was denied on September 4, 2025. *See* Mem. Op. on Mot. for New Trial, *United States v. Byrd et al.*, Crim. No. 23-209 (E.D. Pa. Sep. 4, 2025), ECF No. 274.

---

[9] Thus, while Dixon did not style his motion in the carjacking case as a request for a *Franks* hearing, he effectively got one, particularly given that a motion for a *Franks* hearing and the good-faith arguments Dixon raised are "overlapping" in nature. *United States v. Harris*, 884 F. Supp. 2d 383, 392, 399 (W.D. Pa. 2012) (denying *Franks* hearing and discussing "overlapping nature" of good faith analysis). As explained below, Dixon fails to show a basis for another hearing regarding the same warrant, or that any evidence should be suppressed.

### B.       Cargo Theft Investigation

While investigators were reviewing Dixon's phones pursuant to Judge Straw's warrant, including the messages, call records, contacts, photographs, and videos stored in the phones, investigators located numerous messages, photographs, and videos indicating that Dixon participated in the cargo theft conspiracy charged in this case.

For example, investigators searched for messages containing the search term "Byrd" and located a text message exchange between Dixon and co-defendants Rakeim Savage, Malik Palmer, Haneef Palmer, Douglas Mathis, Aikeem Palmer, and Morris Kanneh. In that exchange, on April 1, 2023, Savage asked, "How we taking care of Byrd," and Dixon replied, "We all get one Byrd get one." This exchange occurred just a few hours after the April 1, 2023 Hobbs Act robbery of a tractor trailer carrying stolen refrigerators charged in this case, and the context of these text messages indicates that Dixon, Savage, and the other participants in the conversation were talking about stolen refrigerators: Shortly before Savage said, "how we taking care of Byrd," Savage shared pictures of serial numbers on commercial refrigerators that match those stolen in the April 1, 2023 robbery, as well as links to refrigerators of the same make and model for sale online (showing how much the stolen refrigerators were worth). The same thread included texts about the April 13, 2023 dime theft.

These messages led the FBI to apply for an additional warrant authorizing a further search of Dixon's phones for evidence of the cargo-theft conspiracy charged in this case. FBI Special Agent Donovan Miles submitted an affidavit in support of the application, which was signed by the Honorable Pamela A. Carlos on July 15, 2024. Dixon's motion does not raise any independent challenge to Agent Miles's affidavit or Judge Carlos's warrant.

## II.      DISCUSSION

Dixon argues, as he did before Judge Weilheimer, that Agent Donahue deliberately or

recklessly omitted material facts from the warrant affidavit submitted to Judge Straw. Dixon fails again to show that suppression of his cell phones is warranted, and he fails to carry his burden of showing that a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), is warranted.

"To obtain a search warrant, the government must present probable cause that evidence of criminal activity will be found in the place to be searched." *United States v. Alexander*, 54 F.4th 162, 171 (3d Cir. 2022). In reviewing a probable cause determination by a magistrate who issued a search warrant, this Court is not "asked to judge a probable cause showing in the first instance." *Id.* "A magistrate's determination of probable cause should be paid great deference by reviewing courts." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993) (quotation marks omitted). "The duty of the reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . concluding' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (quoting *Jones v. United States,* 362 U.S. 257, 271 (1960)). "If a substantial basis exists to support the magistrate's probable cause finding," a reviewing court "must uphold that finding even if a 'different magistrate judge might have found the affidavit insufficient to support a warrant.'" *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Conley,* 4 F.3d at 1205). "When the defendant challenges the probable cause determination, the defendant bears the burden of showing the magistrate judge lacked a 'substantial basis' to issue the warrant." *United States v. Wilburn*, No. 2:18-CR-115, 2021 WL 1310423, at *19 (W.D. Pa. Apr. 8, 2021) (citing *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995)).

A probable cause finding does not require that it be "more likely true than false" that the evidence will be found in the place described. *Texas v. Brown,* 460 U.S. 730, 742 (1983). "Probable cause is a 'fluid concept' that 'turns on the assessment of probabilities in particular factual contexts,'" along with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Stearn*, 597 F.3d at 554 (quoting *Gates*,

462 U.S. at 231-232); *see also United States v. Ventresca*, 380 U.S. 102, 109 (1965) (explaining that because affidavits are "normally drafted by nonlawyers in the midst and haste of a criminal investigation, . . . [t]echnical requirements of elaborate specificity . . . have no proper place in this area"). When presented with an application for a search warrant, a magistrate must simply "'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Stearn*, 597 F.3d at 554 (quoting *Gates*, 462 U.S. at 238).

Agent Donahue's affidavit more than supported Judge Straw's finding of probable cause. The affidavit detailed evidence showing that Dixon committed the August 10, 2022 carjacking with Byrd, including Byrd's text messages to Dixon (and only Dixon) containing Byrd's GPS location, Dixon's cell site data, the similarities between photos of Dixon and the surveillance footage of the carjacker in the yellow shirt (including the distinctive scar), and P.A.'s statement that the carjacker in the yellow shirt looked like "SK" (i.e., Dixon). *See* Aff. ¶¶ 20-23.

Dixon does not seriously challenge this finding and instead focuses on Agent Donahue's October 2023 affidavit in support of the warrant to search Dixon's phones. An affidavit supporting a search warrant is presumed valid. *Franks*, 438 U.S. at 171. It is well settled in this Circuit that a *Franks* hearing is not warranted where the supposed misrepresentations are based on speculative or otherwise unsupported assertions. Rather, to overcome the presumption of validity and to obtain a hearing to challenge the warrant, a defendant must make a "substantial preliminary showing" that the affidavit contained a false statement or omission, made "knowingly or with reckless disregard for the truth," that is "material to the finding of probable cause." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). The defendant bears the burden to make this "substantial preliminary showing," and cannot "rest on mere conclusory allegations or a mere desire to cross-examine, but rather must present an offer of proof contradicting the

affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." *United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022) (quotation marks omitted) (citing *Yusuf*, 461 F.3d at 383 n.8). The requirement of offers of proof including "affidavits or otherwise reliable statements of witnesses" is essential "in order 'to prevent the misuse of a veracity hearing for purposes of discovery or obstruction.'" *United States v. Harrison*, 400 F. Supp. 2d 780, 785 (E.D. Pa. 2005) (quoting *Franks,* 438 U.S. at 170).

Dixon does not claim Agent Donahue made any false statements. Instead he bases his challenge on claimed omissions from the probable cause affidavit. Dixon therefore must show that the affidavit omitted facts "with reckless disregard for the truth" and that the omitted facts were "material." *See United States v. Alford*, No. 4:22-CR-00010, 2025 WL 297705, at *29 (M.D. Pa. Jan. 24, 2025) (citing *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000)). On the first element, "[t]o determine whether information was recklessly omitted, the Court asks whether the officer 'withheld a fact in his ken that any reasonable person would have known was the kind of thing the judge would wish to know.'" *United States v. Lucidonio*, 592 F. Supp. 3d 381, 388 (E.D. Pa. 2022) (quoting *Wilson*, 212 F.3d at 787) (alterations and quotation marks omitted). "The term 'reckless' carries weight here, because the Supreme Court has specifically cautioned that 'negligence' or an 'innocent mistake' is not sufficient." *Id.* (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). "When evaluating a claim of reckless omissions, a court must first determine whether the agent, at the time of the swearing of the affidavit of probable cause, actually had knowledge of the information allegedly omitted. If so, then a further determination must be made with respect to whether the information was material." *Id.* (citing *Franks*, 438 U.S. at 171).

On the second element, a defendant must show "that the omissions were 'material, or necessary, to the probable cause determination.'" *Id.* at 390 (quoting *Wilson*, 212 F.3d at 789).

15

To do so, the court must "reconstruct the original affidavit by first 'excising offending inaccuracies and inserting the facts recklessly omitted, and then determining whether or not the 'corrected' warrant affidavit would establish probable cause' and thus whether the omitted facts were material." *Id.* at 390-391 (quoting *Wilson*, 212 F.3d at 789) (alterations and quotation marks omitted). If the Court concludes that omitted facts were not material, it need not address whether the purported omissions were "reckless." *See, e.g.*, *United States v. Lampley*, 615 F. Supp. 3d 289, 296 & n.47 (M.D. Pa. 2022) (court's finding that omitted statements were not material "finishes off [the defendant's] *Franks* claim without any need to delve into whether [the affiant] was reckless"); *see also United States v. Sanchez*, 246 F. App'x 803, 805 (3d Cir. 2007) (concluding that case "turns on the second prong" (i.e., materiality)).

Dixon's challenge fails on both elements. He does not support his claims of deliberate or reckless omissions with any affidavits, witness statements, or other evidence—in fact, his motion contradicts much of the testimony and evidence submitted during the evidentiary hearing and trial in his carjacking case. He therefore falls short of his burden to show a *Franks* hearing is warranted. *See United States v. Marranca*, 98 F. App'x 179, 182 (3d Cir. 2004) (upholding denial of *Franks* hearing where defendant "offered no evidence"). Dixon also fails to show that any purported omissions were material, as all of his arguments address only P.A.'s identification of Dixon, and he does not address *any* of the other evidence supporting Judge Straw's finding of probable cause.

### A.    Dixon Fails to Show that Agent Donahue's Affidavit Deliberately or Recklessly Omitted any Material Facts.

None of Dixon's list of eight purported omissions is supported by evidence. *See* Mem. 13-14. To the contrary, many of Dixon's claims flatly contradict the evidence from the carjacking case. None of Dixon's claims can withstand scrutiny.

16

### 1.    Claims about "Pop"

Dixon claims that Agent Donahue recklessly omitted two facts that "exonerated" Dixon. Mem. 13. Both assertions are contrary to the evidence.

As an initial matter, Dixon states that P.A.'s September 23, 2022 statement to Philadelphia Police was videotaped. Mem. 7. That is wrong. Dixon's October 21, 2022 statement was videotaped, the September 23, 2022 statement was not. The parties, especially Dixon, discussed and played the October 21, 2022 video extensively at trial. *See, e.g.*, June 4 Tr. at 58-61; June 5 Tr. at 80; June 9 Tr. at 147; June 10 Tr. at 97.[10] This error in Dixon's motion renders many of his factual assertions incorrect, and it is only the start of the factual inaccuracies therein.

Turning to the purported "exonerating" statements, Dixon first claims that, in the September 23, 2022 proffer, P.A. said that Ramon Hankins, a/k/a "Pop", was driving with Byrd in the black Jeep Grand Cherokee on August 10, 2022 before the carjacking, such that Dixon was not in the Jeep. Mem. 13. P.A. never said that. P.A. explained that, after leaving Temple Hospital, while driving down Broad Street, P.A. saw Byrd in the black Jeep Grand Cherokee while P.A. was talking to "Pop" on the phone. P.A. testified to this at trial. *See* June 4 Tr. at 224-229; *see also* June 4 Tr. at 254-256 ("Q: Did you ever tell police that Pop was driving the Jeep? A. No."). P.A. explained the same facts in the videotaped October 21, 2022 proffer with Philadelphia Police and in subsequent proffers with the FBI. *See* June 10 Tr. at 106-112; *see also* Ex. G, at 3 [USA052518].[11]

Dixon urges that notes taken by Philadelphia Police Detective Christopher Maitland from the September 2022 proffer indicate that P.A. said Hankins was driving the Jeep. Mem. 13. But

---

[10] Excerpts of the trial transcript from June 4, 5, 9, and 10, 2025, are attached as Exhibits C through F, respectively.

[11] A copy of an FBI-302 report from P.A.'s April 2023 proffer with the FBI will be filed under seal as Exhibit G.

evidence gathered during the FBI investigation and presented at trial showed that Detective Maitland's notes do not "exonerate" Dixon. Detective Maitland himself explained at trial that, when speaking with P.A. on September 23, 2022 about communications P.A. had with "Pop" before the carjacking, Detective Maitland thought at the time (and wrote in his notes) that P.A. meant that "Pop" was "the second occupant of that Jeep Grand Cherokee," but Detective Maitland then clarified during the October 21, 2022 videotaped proffer with P.A. that "Pop" was *on the phone* with P.A., not in the Jeep. *See* June 4 Tr. at 59-60. Detective Maitland made clear in his trial testimony that P.A. never actually told police that "Pop" was in the Jeep. *See id.* at 60-61 ("Q. Did [P.A.] ever say to you that Pop was in the Jeep? A. No."). Thus, there was no "exonerating" statement by P.A. during the September 23, 2022 proffer that could have been omitted from Agent Donahue's affidavit. Dixon simply ignores all of the evidence to the contrary.

Moreover, while Dixon does not address what knowledge Agent Donahue actually had at the time of his October 2023 affidavit regarding Detective Maitland's notes from the September 23, 2022 proffer (let alone offer evidence on this point), Agent Donahue explained, during the May 30, 2025 evidentiary hearing, how he investigated this issue. Agent Donahue testified that he spoke with Detective Maitland about his notes from the September 23, 2022 proffer, and Detective Maitland explained that he may have misunderstood what P.A. said at that time, since P.A. later said that he was speaking with "Pop" on the phone while Byrd was in the Jeep, including in the recorded October 21, 2022 proffer. May 30 Tr. at 104-106. Agent Donahue documented these facts in an FBI-302 report dated December 20, 2023—that is, *after* the October 2023 affidavit was submitted. *See* Ex. H.[12] So not only was there no "exonerating"

---

[12] A copy of this FBI-302, which was introduced as an exhibit at the May 30, 2025 hearing, will be filed under seal as Exhibit H.

statement from P.A. to omit, Dixon fails to show that Agent Donahue had knowledge of anything that could have been material in Detective Maitland's notes at the time he completed his October 2023 affidavit. Agent Donahue did not recklessly omit or "hide" anything. Mem. 17.

Next, Dixon claims that P.A. stated again in his October 21, 2022 proffer with Philadelphia Police that "Pop" was with Byrd in the black Jeep Grand Cherokee before the carjacking. Mem. 13. Again, P.A. never said that. As discussed above, the October 21, 2022 proffer was videotaped. The parties, including Dixon's counsel, played that video repeatedly at trial. P.A. stated in the video (at 3:35 and at 25:45) that "Pop" was on the phone with P.A., not in the Jeep with Byrd. *See* June 10 Tr. at 106-108.

As with the September proffer, Dixon ignores this evidence and urges that handwritten notes taken by Detective Andrew Gallagher during the October 21, 2022 proffer indicate that P.A. said "Pop" was in the Jeep with Byrd. Mem. 13. But again, Detective Gallagher explained at trial (when called *by the defense*) that he and Detective Maitland asked follow-up questions during the videotaped October 21, 2022 proffer to clarify P.A.'s statements about where "Pop" was on August 10, 2022, and P.A. stated that "Pop" was on the phone, on a FaceTime call, and he appeared to be in bed, inside of a house—that is, *not* in the Jeep with Byrd. *See* June 10 Tr. at 109-112. Indeed, as Judge Weilheimer found in denying Dixon's post-trial motion for a new trial: "The probative value of Gallagher's notes . . . was limited because in both the videorecorded investigative statement they were based on [i.e., the October 21, 2022 proffer] and at trial, P.A. unambiguously stated that Pop was on the phone and not in the car with Byrd." Mem. Op. on Mot. for New Trial at 6, *United States v. Byrd et al.*, Crim. No. 23-209 (E.D. Pa. Sep. 4, 2025), ECF No. 274. The evidence again shows there was no "exonerating" statement by P.A. from the October 21, 2022 proffer that could have been omitted from Agent Donahue's affidavit.

19

Dixon also again does not address *when* Agent Donahue might have learned of any purported "exonerating" statement in Detective Gallagher's notes from the October 21, 2022 proffer so as to establish that Agent Donahue recklessly omitted such a statement in his October 2023 affidavit. In fact, Agent Donahue testified at trial in June 2025 that, while he had watched the video of the October 21, 2022 proffer, he had *not* previously reviewed Detective Gallagher's notes from that proffer. June 9 Tr. at 146-150. Detective Gallagher testified that he reviewed his notes with the government a few weeks before trial. June 10 Tr. at 104.[13] Thus, even if Detective Gallagher's notes were somehow material, Agent Donahue did not recklessly omit discussion of those notes in his October 2023 affidavit, as he did not have knowledge of them at the time.

Dixon also claims that Agent Donahue "made no efforts to identify where Pop (Ramon Hankins) was located before, during, or immediately after the carjacking." Mem. 14. Wrong again. The evidence at trial indicated that, in addition to obtaining P.A.'s statements about "Pop," the FBI attempted to identify a phone number for "Pop," including by investigating a phone number belonging to his significant other, and obtained recordings of "Pop's" jail calls when "Pop" was in state prison for a narcotics offense. The government played a recorded jail

---

[13] Dixon's motion discusses his motion to compel production of Detective Gallagher's notes. *See* Mem. 9 n.4. For the Court's reference, the government's position in the carjacking case was that Detective Gallagher's notes of the October 21, 2022 proffer with P.A. were not discoverable. The notes (which were not signed or reviewed by P.A.) did not constitute Jencks Act or *Giglio* material because the government produced the video of the proffer, and the government did not intend to call Detective Gallagher as a witness (whereas the government *did* produce Detective Maitland's notes from the September 23, 2022 proffer, as that proffer was not videotaped, and the government did intend to call Detective Maitland as a witness). Consistent with *United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994), however, the government submitted the notes for *in camera* review when directed by Judge Weilheimer. After review, Judge Weilheimer "instructed the Government" to produce Detective Gallagher's notes, reasoning that the notes, "while possibly duplicative of material already produced by the Government, nonetheless appear[ed] to be material to the Defense." Order on Pretrial Motions ¶ 10, *United States v. Ronald Byrd et al.*, Crim. No. 23-209 (E.D. Pa. June 2, 2025), ECF No. 230. The government did so immediately after the conclusion of the hearing on Friday, May 30, 2025 (Judge Weilheimer's written Order was entered on Monday, June 2, 2025, and trial began on Tuesday, June 3, 2025).

call in which *Dixon* alerted "Pop" of Byrd's arrest on the carjacking charges. *See* June 9 Tr. at 12-14, 83-87, 190-192, 195. In any event, nothing suggests that "Pop" could have been a plausible suspect as the driver of the black Jeep Grand Cherokee. The evidence at trial indicated that "Pop," who stands about 5'10" and 230 pounds, is several inches taller and significantly heavier than the driver seen in surveillance footage—and Saikeen Dixon. *See* June 5 Tr. at 103-104. P.A. also testified that "Pop" and Dixon have different skin complexions, and that P.A. can tell them apart. June 4 Tr. at 256. As Judge Weilheimer found in denying Dixon's post-trial motion, "there is scant evidence that Pop was the driver as compared to Dixon. Nonetheless, authorities did investigate Pop, attempting to identify a phone number associated with him and obtaining recordings of his prison calls." Mem. Op. on Mot. for New Trial at 6, *United States v. Byrd et al.*, Crim. No. 23-209 (E.D. Pa. Sep. 4, 2025), ECF No. 274. There was nothing reckless about omitting the extent of the FBI's investigation of "Pop" from the October 2023 warrant affidavit, as it would not have affected the evaluation of probable cause to search Dixon's phones.

### 2.    Additional claims

The remainder of Dixon's claims were all presented in his original motion to suppress before Judge Weilheimer. *See* Ex. A, at 13-16. They fare no better here.

Dixon claims that Agent Donahue's affidavit omitted that P.A. "repeatedly stole packages from FedEx, his then employer." Mem. 13. But the affidavit expressly stated that "FedEx Express had terminated [P.A.'s] employment" before Byrd asked him for help getting a package off of a FedEx truck. Aff. ¶ 8. The omission of additional details was neither reckless nor material.

Dixon claims that Agent Donahue's affidavit omitted that P.A. had a "years-long drug addiction." Mem. 13; *see also* Mem. 14. Dixon fails to show that Agent Donahue (or anyone else

from the government) knew about P.A.'s opioid addiction at the time the affidavit was submitted in October 2023. Dixon claims this information was in an FBI-302 prepared regarding P.A.'s April 2023 proffer. It is not. *See* Ex. G. Rather, P.A.'s addiction was disclosed in an interview in November 2024—over a year after the warrant was submitted.[14] Indeed, Dixon's counsel cross examined Agent Donahue about this in the carjacking case in the evidentiary hearing on May 30, 2025. Agent Donahue testified: "I don't think I learned about the extent of his drug abuse until . . . in the last year." May 30 Tr. at 57-58. The evidence again belies Dixon's assertion of a reckless omission.

Dixon points to P.A.'s statement in his initial August 10, 2022 interview with Philadelphia Police after arrest that he was acting at the direction of an individual he named as "Ty," rather than Byrd. Mem. 13. P.A. did not identify Byrd (whom he knew as "Bird," "Bird Man," or "BM") until later interviews because he feared retaliation. This is not uncommon, and as such, the omission is not reckless or material, particularly with respect to Dixon (rather than Byrd). *See, e.g.*, *Helm v. Palo*, No. CIV.A. 14-6528, 2015 WL 437661, at *6 (E.D. Pa. Feb. 3, 2015) (finding that omission of victim's prior identification of a person beside the defendant did not defeat probable cause (citing *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997)); *Lasko v. Leechburg Police Dep't*, 63 F. Supp. 3d 522, 535-536 (W.D. Pa. 2014) (finding that omission of victim's prior inconsistent statement (about suspect having a knife rather than a gun) did not defeat probable cause). Indeed, as this Court is aware from Byrd's motion to suppress in this case, P.A.'s statement about an individual named "Ty" *was* included in an earlier affidavit submitted to Judge Sitarski in support of a search of Byrd's iCloud, and both Judge Sitarski and this Court on review found probable cause (as did Judge Padova, in denying Byrd's similar challenge in the carjacking case). *See* Dkt. No. 79, at 2-3 (discussing P.A.'s statement that he

---

[14] A copy of an FBI-302 from this interview will be filed under seal as Exhibit I.

knew suspect as "Ty" and denying motion to suppress); *see* Op. Denying Mot. to Suppress at 18-19, *United States v. Byrd et al.*, Crim. No. 23-209 (E.D. Pa. June 4, 2024), ECF No. 93 (same).[15] As the investigation progressed, the recitation of earlier investigative steps was streamlined in subsequent affidavits while additional sources of evidence (like the data from Byrd's iCloud and Dixon's cell-site data) were added.

Dixon's last purported omissions are statements by P.A. (one in his post-arrest statement, one in his videotaped proffer, and one in grand jury) that, on the day of the carjacking (August 10, 2022), P.A. did not see the person driving with Byrd in the black Jeep Grand Cherokee used in the carjacking. Mem. 13. As P.A. told detectives in his initial interview, he "wasn't paying attention to the guy [i.e., the driver]" at Temple Hospital—because (as P.A. would later explain and testify to at trial) he was talking to Byrd, who had a gun. As a result, P.A. could not give more than a general description of the driver (dark skinned, probably in his mid-30's). Dixon urges that these statements by P.A.—in essence, that P.A. did not get a good look at the driver of the black Jeep Grand Cherokee *on August 10, 2022*—contradict P.A.'s statement in his April 2023 proffer that a *surveillance photograph* of the driver, while wearing a mask, looks like the person P.A. knew as "SK", which P.A. confirmed was Dixon by identifying a single image of him. Mem. 13.

There is no contradiction, because despite Dixon's efforts to conflate them, the statements pertain to two separate observations. On the day of the carjacking (August 10, 2022), P.A. did not have the opportunity to see the driver well enough to identify him. During the April 2023 proffer, P.A. was shown the surveillance photograph of the driver for the first time, and he *did* have the opportunity to see the person in the photograph, so P.A. could tell that the driver

---

[15] The carjacking case was reassigned from Judge Padova to Judge Weilheimer in February 2025.

looked like someone he knows. P.A. did not then assert that the driver he had seen briefly on

August 10, 2022 was, in fact, the person he knew as "SK"—because he candidly acknowledged

he did not get a good look at that person. Rather, he stated only that he was able to recognize

someone—"SK," or defendant Saikeen Dixon—in the surveillance footage he was shown (who,

as mentioned, has the same approximate height, weight, build, skin tone, and head shape as the

driver, as well as the same distinctive scar). This is not a situation where a witness *did* have a

chance to see the defendant—e.g., in a photo array—and failed to identify him. *Cf. Wilson*, 212

F.3d at 791-792 (fact that witness "with ample opportunity to view the robber failed to identify

[the defendant] when shown a photo array" was improperly omitted from affidavit, but still

immaterial in light of other evidence). P.A.'s inability to *see* defendant Dixon at a particular time

does not undermine his ability to identify a picture of Dixon that he *can* see. Judge Weilheimer

recognized as much when Dixon raised the same argument in his post-trial motion:

> Dixon's core contention—that P.A.'s identification of Dixon in the photograph is irreconcilable with his failure to recognize him at the scene—is a fallacy. P.A. testified at trial that he wasn't paying attention to the driver on the day of the crime, his focus being drawn to Byrd in the passenger seat, who was speaking with him and holding a gun. True, the jury heard that P.A. told investigators at one point that he'd never seen the driver before, but the overwhelming thrust of his testimony at trial and in all previous statements was that he simply wasn't paying attention. There is nothing inherently contradictory about P.A. failing to recognize Dixon under those circumstances, yet recognizing him in the surveillance still based on their prior acquaintance.

Mem. Op. on Mot. for New Trial at 3-4, *United States v. Byrd et al.*, Crim. No. 23-209 (E.D. Pa.

Sep. 4, 2025), ECF No. 274. As such, omitting P.A.'s statements about not seeing the driver of

the suspect black Jeep Grand Cherokee was neither reckless nor material.

In sum, Dixon's claimed omissions cannot withstand scrutiny. Beyond misstating facts

about P.A.'s statements to law enforcement, Dixon fails to show that the omission of any facts

displays a "reckless disregard for the truth." *Lucidonio*, 592 F. Supp. 3d at 390. An affiant

"cannot be expected to present a judge with complete background," and even the omission of

information that would be "best practice" to disclose does not show recklessness. *Id.* (citing

*Wilson*, 212 F.3d at 788); *see also Lasko v. Leechburg Police Dep't*, 63 F. Supp. 3d 522, 530-531

(W.D. Pa. 2014) (citing *Wilson*, 212 F.3d at 787-788)). Moreover, a claim of recklessness falls

short where an agent "provide[s] significant details bearing upon the informants' credibility" that

"buffers" any omissions, as the affidavit did here by disclosing P.A.'s termination by FedEx,

cooperation, and plea to serious federal charges. *Lucidonio*, 592 F. Supp. 3d at 390. Dixon's

motion should be denied.

> **B.      None of the Purported Omissions Would Defeat Judge Straw's Finding of Probable Cause.**

Dixon also cannot come close to showing that any of the claimed omissions were

"material," meaning that, after "inserting [any] facts recklessly omitted," the affidavit would lack

probable cause. *Lucidonio*, 592 F. Supp.3d at 390-391. The information that Dixon urges would

destroy P.A.'s credibility would add little to the information already in the affidavit. And the

additional details about P.A.'s prior statements would not undermine his observation that the

carjacker in the yellow shirt that he saw looked like "SK." *See* Mem. 14-15.

Most importantly, however, P.A.'s statement about "SK" was only one piece of evidence

supporting the finding of probable cause. None of the purported omissions would weaken the

other evidence in Agent Donahue's affidavit if included, like the text messages Byrd sent to

Dixon with his GPS location, the cell site data putting Dixon at Temple Hospital shortly

thereafter, or Dixon's Instagram photographs showing he shares several physical features with

the carjacker in the yellow shirt, including a distinctive scar. Dixon insists that the "photo

identification by [P.A.] is the only evidence in the Affidavit connecting Mr. Dixon to the

commission of the carjacking." Mem. 12. But his refusal to address any of the other evidence in

the affidavit does not make it go away. Indeed, P.A.'s statement about "SK" could have been

excised from the affidavit altogether, and the affidavit would have still supported a finding of

probable cause. *See Bircher v. Pierce*, 610 F. App'x 194, 198 (3d Cir. 2015).

This is precisely why Judge Weilheimer denied Dixon's last challenge to the warrant to search his cell phones. As Judge Weilheimer explained, P.A.'s "identification of SK [i.e., Dixon] is one very small aspect of the collective investigation that was conducted by law enforcement when providing the foundation for probable cause for the search. . . . When looking at the search warrant and the totality of the evidence included in the search warrant that was provided to Judge Straw, there is probable cause." May 30 Tr. at 194-195. This remains true.

In short, because inserting the purportedly omitted facts would not defeat a finding of probable cause, Dixon's challenge fails, and his motion can be denied for this reason alone.

### C. The "Good Faith" Doctrine Applies.

Because Dixon cannot meet his burden to show error in Judge Straw's issuance of the challenged warrant, or to show that a *Franks* hearing is warranted, the Court need not address the "good faith" doctrine. However, the doctrine would apply if the warrant had in fact lacked probable cause.

The Fourth Amendment does not bar the use of evidence "obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *United States v. Leon*, 468 U.S. 897, 900 (1984). This rule balances the "substantial costs" associated with the "extreme sanction of exclusion" with the benefit of the exclusionary rule: "deterring official lawlessness." *Stearn*, 597 F.3d at 560 (discussing *Leon*). "If an officer obtains a warrant and executes it in good faith, 'there is no police illegality and thus nothing to deter.'" *Id.* (quoting *Leon*, 468 U.S. at 921). Accordingly, "a court should not suppress evidence seized under a warrant's authority, even if the warrant is subsequently invalidated, unless a 'reasonably well trained officer would have

known that the search was illegal despite the magistrate's authorization." *Id.* (quoting *United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002)).

Ordinarily, the "mere existence of a warrant . . . suffices to prove that an officer conducted a search in good faith," and will obviate the need for "any deep inquiry into reasonableness." *Stearn*, 597 F.3d at 561 (citing *United States v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001); *Leon*, 468 U.S. at 922 n.23). The Third Circuit has made clear that police are not "expect[ed] nor require[d] [] to perform complex legal analysis in the field, for they are untrained in the law and are often called to make 'hurried judgments.'" *Id.* (quoting *Zimmerman*, 277 F.3d at 436). Exclusion is only warranted in certain narrow circumstances: (1) the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; (2) the magistrate "issued the warrant in reliance on a deliberately or recklessly false affidavit"; (3) the warrant was "so facially deficient that it failed to particularize the place to be searched or the things to be seized"; or (4) the magistrate "abandoned [his or her] judicial role and failed to perform [his or her] neutral and detached function." *Id.* at 561 & n.19 (quotation marks omitted); *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010).

None of these circumstances are present here. Dixon argues only that Agent Donahue's affidavit was deliberately and recklessly false. *See* Mem. 16-17. It was not, for the same reasons discussed above. *See Harris*, 884 F. Supp. 2d at 392, 399 (denying *Franks* hearing and discussing "overlapping nature" of good faith analysis). Thus, even if there were any deficiencies with Judge Straw's warrant, Dixon's motion would fail because the agents executed the search of Dixon's phones in good faith reliance on the warrant.

## III.   CONCLUSION

Judge Straw had a "substantial basis" to conclude there was a "fair probability" that a search of defendant Dixon's phones would reveal contraband or evidence of a crime—as it did.

*Stearn*, 597 F.3d at 554. Dixon does not seriously challenge that finding, and he fails to show that Agent Donahue omitted any material facts with reckless disregard for the truth that would have altered Judge Straw's finding, which was based on not only on P.A.'s identification of Dixon, but also on text messages, cell site location data, and other evidence, none of which Dixon addresses. Therefore, Dixon's motion to suppress should be denied.

Because Dixon does not carry his burden to submit affidavits or other evidence supporting his request for a *Franks* hearing—and in fact, his assertions are contrary to the record developed at the evidentiary hearing on his prior motion to suppress and at trial in the carjacking case—the motion can be denied without further proceedings.

Respectfully submitted,

Date: March 6, 2026

DAVID METCALF
United States Attorney

*/s/ Alexander B. Bowerman*
ALEXANDER B. BOWERMAN
CHRISTOPHER DIVINY
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing has been served by electronic mail on all counsel of record.

*/s/ Alexander B. Bowerman*
ALEXANDER B. BOWERMAN
Assistant United States Attorney

Date: March 6, 2026