# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Case No. 2:23-cr-00209-1, 2 |
| Plaintiff, | : | |
| | : | U.S. Courthouse |
| vs. | : | 601 Market Street |
| | : | Philadelphia, Pennsylvania |
| RONALD BYRD and | : | |
| SAIKEEN DIXON, | : | May 30, 2025 |
| | : | |
| Defendants. | : | 9:30 a.m. |

. . . . . . . . . . . . . . . . . . . :

TRANSCRIPT OF MOTIONS HEARING/FINAL PRE-TRIAL CONFERENCE
BEFORE THE HONORABLE GAIL A. WEILHEIMER
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For Plaintiff: | Alexander R. Bowerman, Esq. |
| | Timothy M. Lanni, Esq. |
| | U.S. Attorney's Office |
| | 615 Chestnut Street, Suite 1250 |
| | Philadelphia, PA  19106 |
| | (215) 861-8662 |
| | |
| For Defendant Byrd: | Jessica Consuela Mann, Esq. |
| | Law Offices of Shaka Johnson, LLC |
| | 1420 Walnut Street, Suite 806 |
| | Philadelphia, PA 19102 |
| | (215) 732-7900 |
| | |
| For Defendant Dixon: | Jason Bologna, Esq. |
| | Maxwell Ruocco, Esq. |
| | Buchanan, Ingersoll & Rooney PC |
| | Two Liberty Place |
| | 50 South 16th Street, Suite 3200 |
| | Philadelphia, PA 19102 |
| | (215) 665-3928 |
| | |
| Audio Operator: | R. BURTON-HOOP |
| | |
| Transcription Service: | Weber Reporting Corporation |
| | 2755 Commercial Street SE, #101-336 |
| | Salem, OR  97302 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

said, is he's going to take your concerns to your attorney --

DEFENDANT BYRD:  Okay.

THE COURT:  -- so she's aware of them today, and then you and she will make a decision on what to do with these concerns before we begin the jury on Tuesday.

DEFENDANT BYRD:  Okay.

THE COURT:  Okay?  All right.  So with that, Mr. Bologna, is your witness still sequestered?

MR. BOLOGNA:  Yes, Your Honor.

THE COURT:  Okay.  Then, United States, you'll call your next witness.

MR. BOWERMAN:  Thank you, Your Honor.  We call Special Agent Joseph Donahue.

THE COURT:  And you'll come in here.

JOSEPH DONAHUE, PLAINTIFF'S WITNESS, SWORN

THE CLERK:  Thank you.  You may be seated.  And please state your name for the record.

THE WITNESS:  My name is Joseph Donahue, D-O-N-A-H-U-E.

THE COURT:  You may proceed when you're ready, Counsel.

MR. BOWERMAN:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BOWERMAN:

Q    Good morning, sir.

A    Good morning.

Q    Could you please tell us what you do for a living?

A    I'm a special agent for the FBI in Philadelphia.

Q    And what's your current assignment within the FBI?

A    I'm currently assigned to the Joint Terrorism Task Force.

Q    And what other assignments have you held with the FBI?

A    Prior to this, for about six years, I was on the Violent Crimes Task Force.

Q    And is that the task force you were a part of around August 10th, 2022?

A    Yes.

Q    How long have you been with the FBI?

A    Since 2015.

Q    And do you have any other law enforcement experience?

A    Yes.

Q    What's your other experience?

A    I was a police officer in the town of Northborough, Massachusetts, for approximately two and a half years.

Q    What kinds of cases do you work on in your role as a special agent?

A    So when I was in the Violent Crimes Task Force, I investigated robberies, carjackings, firearms offenses, kidnappings.

Q    And what kind of offenses do you work on now?

A    Currently, I work on imminent and exigent threats, people

who call in to the FBI about something that's suspicious, or when social media companies receive information about users that might have bomb threats, school shooting threats. I investigate those.

Q    As part of your duties, do you execute arrest warrants?

A    Yes.

Q    And how often would you say you execute arrest warrants?

A    Almost every week.

Q    I'd like to turn your attention to October 2023. Were you present for the arrest of Defendant Saikeen Dixon?

A    I was.

Q    Did that take place on October 4th, 2023?

A    Yes.

Q    Were you involved in the investigation that led to his arrest?

A    Yes.

Q    Were you also involved in the investigation that led to the arrest of his co-defendant, Ronald Byrd?

A    I was.

Q    Did you testify in the grand jury for the indictment of Mr. Dixon?

A    Yes.

Q    At the time of the arrest, had you been present for interviews with Prince Alston about the crimes under investigation?

A    Yes.

Q    Were you familiar with evidence obtained from Ronald Byrd's iCloud?

A    Yes.

Q    Did that include text messages between the defendants?

A    Yes.

Q    Did that include text messages between them on the day of the August 10th, 2022 carjacking?

A    It did.

Q    Were you familiar with the evidence gathered by Philadelphia Police related to that carjacking?

A    Yes.

Q    Were you familiar with cell site location evidence regarding cell phones used by the defendants?

A    Yes.

Q    Were you present for the search of Ronald Byrd's rental car at the time of his arrest?

A    Following his arrest, yes.

Q    Was it a few days after the arrest?

A    It was.

Q    What was found during that search?

A    Among other things, a firearm, cell phones, and shoes.

Q    And where was Mr. Byrd arrested?

A    Mr. Byrd was arrested at 9th and Market, the passport agency.

Q    And where was his car parked when you served --

A    His car was parked in the lot adjacent to it.

Q    Now, at the time of Mr. Dixon's arrest, had you reviewed jail calls made by Ronald Byrd?

A    Yes.

Q    Did that include jail calls from Ronald Byrd to Saikeen Dixon?

A    Yes.

Q    Let's talk about Mr. Dixon's arrest.  Where was he arrested?

A    He was arrested at the Bucks County Magistrate Court in Bensalem.

Q    And how was the plan for that arrest developed?

A    So prior to his arrest, he had been involved in an incident with the Bensalem Police Department involving fleeing and looting and having a stolen plate on his car.  We learned of that incident from the Bensalem Police Department and learned that he had a court date for that incident at that court on October 4th at 8:45 a.m.

MR. BOWERMAN:  Your Honor, may I approach the witness?

THE COURT:  You may.  Still have standing permission.

MR. BOWERMAN:  Thank you, Your Honor.

BY MR. BOWERMAN:

Q    Agent Donahue, I'm going to hand you Binder 6.  I'd like

you to turn to the first half, please.  Do you recognize the document marked as Government Exhibit 1?

A    I do.

Q    Could you tell us what that is?

A    It's a report on that incident that I just described.

Q    And is that a report from the Bensalem Police Department?

A    Yes.

Q    Did the FBI receive that from the Bensalem Police Department?

A    We did.

Q    And had you reviewed that report at the time of Mr. Dixon's arrest on October 4th, 2023?

A    I had.

Q    At the time of Dixon's arrest, were you familiar with Dixon's criminal history?

A    Yes.

Q    How did you become aware of his criminal history?

A    I ran it through NCIC and also probably looked at his Pennsylvania court dockets.

Q    Could you please turn to Tab 2 in that binder?  Do you recognize the document marked as Government Exhibit 2?

A    Yes.

Q    Could you tell us what it is?

A    It is Saikeen Dixon's court docket.

Q    And is this --

A    From the State of Pennsylvania.

Q    Is this obtained from the Pennsylvania court system?

A    Yes.

Q    Does this document list prior convictions of Mr. Dixon?

A    It does.

Q    And did you review this document before Mr. Dixon's arrest?

A    Yes.

Q    What kind of prior convictions does this document list for Mr. Dixon that you reviewed before you arrested him?

A    Intent.  Possession with intent to deliver narcotics, possession of a firearm, possession of a firearm prohibited, and others.

Q    Let's talk about what happened on October 4th, 2023.  When did you arrive at the Bucks County Courthouse that day?

A    Around 8:15 a.m.

Q    What time is the court appearance you mentioned scheduled for?

A    8:45.

Q    And did you see Mr. Dixon arrive?

A    Yes.

Q    About what time did he arrive?

A    Approximately 9:15.

Q    And what did you see when he arrived?

A    So the vehicle he was in was a Ford Fusion, pulled into a

parking spot in front of the courthouse. Mr. Dixon got out of the driver's seat, went to the trunk, and put some small items in his hand into the trunk, and then he proceeded to enter the courthouse.

Q    Now, did you see the license plate on the vehicle that he arrived in?

A    Yes.

Q    Did you see what the license plate was?

A    Yes.

Q    And was it the same license plate mentioned in the Bensalem Police Department report we looked at earlier?

A    Yes, it was the valid plate for that vehicle.

Q    Was it significant to you that you saw him put items in the trunk of his car?

A    Yes.

Q    Why was it significant?

A    The courthouse is a secure government facility, so contraband, weapons, other stuff is going to be prohibited from being taken into there.

Q    And was it significant to you that he put the items in the trunk of the car as opposed to the passenger compartment?

A    Yes.

Q    Why was that significant?

A    Trunk is a more secure area, less likely to be discovered.

Q    Now, what did you do after he arrived?

A    So when he went into the courthouse, I approached the car while -- yeah, while he was in the courthouse, I approached the car on the passenger side to see if there's anybody else in there.  I was able to see through the tinted windows that there was another person in there, so I knocked on the window and made my presence known.

Q    What happened after you knocked on the window?

A    I displayed my credentials, the window went down, and I began a conversation with Shawnnae Beverly, and she had her one-year-old son on her lap.  I told her to not call Saikeen. I told her not to text him, and I said that she shouldn't leave, and I asked for her car keys, which she gave to me.

Q    Did she cooperate when you made those requests?

A    She did.

Q    So what happened next after you talked to Ms. Beverly and she gave you the key to her car?

A    So not long thereafter, I think Saikeen was taken into custody in the courthouse, and he was locked up.

Q    And did you see other agents that you were with that day come out of the courthouse after -- at that point?

A    Yes.

Q    And who else was there -- was present besides you from law enforcement that day?

A    I don't remember exactly who was outside of me, but I do know that also present inside the courthouse was Detective Don

Liebsch, another special agent, John Stasney and one of the detectives from Bensalem Police Department, Connor Farnan.

Q    So was the FBI being assisted by the Bensalem Police Department that day?

A    Yes.

Q    And when you saw the officers come out, did you speak with any of them?

A    Yes.

Q    What did you speak about?

A    How the arrest went inside, that he was cooperative, that he handed over his phone.  He asked if it was about homicide, if he was looking at 10 to 20.  And he also asked if he could lock the phone that was in his hand.

Q    And so what did you do after speaking to the officers inside?

A    So I began talking more with Shawnnae Beverly and asked her for consent to search the car.

Q    Now, did you talk with her about whose car was?

A    I did.

Q    What did she tell you?

A    And she said it was her cousin's.

Q    Did she tell you why she was driving it?

A    I don't recall.

Q    Did she say she was renting the car?

A    Yes, she did.  She was renting it from him or borrowing it

from him.  And she showed me some transactions on her phone from Cash App with transactions to her cousin, indicating that she paid $350 or $400 on a couple occasions.

Q    All right.  So you said that you asked her for consent to search the car?

A    Yes.

Q    Could you tell us how you asked her for consent?

A    Just in a normal tone of voice.  The way I'm talking to you right now, I said, Ms. Beverly.  I told her why we arrested Saikeen, that he was suspected of carjacking, and that we were going to search the car with her consent.  And if she didn't give consent that we would be holding the car and she would have to arrange for alternate transportation and that we'd be towing the car and applying for a search warrant.

Q    And what kind of tone of voice did you use when you spoke with her?

A    Talking just like this.

Q    Did you -- and you mentioned you told her that Mr. Dixon was under arrest?

A    Yes.

Q    Did you tell -- did you talk to her about seeing him put items in the trunk?

A    I did.  I asked her what he put in the trunk, and she said she didn't know.

Q    So what happened when you asked her for consent?

A     She consented.  She says yes.

Q     And did she say that verbally?

A     She did.

Q     Did you also try to obtain written consent?

A     I did.

Q     And how did you go about doing that?

A     So I did not have one of the federal FBI consent forms with me at the time.  So I asked Detective Farnan for one of their Bensalem Police Department ones.  When he gave that to me, I began filling out the vehicle information.  And then I handed the consent form to Ms. Beverly.  I explained the points of consent on that form and asked her if she consented to sign it, which she did.  She dated it and put the time down as well.

Q     Would you turn to tab three in that binder, please?  Do you recognize the document marked as Government Exhibit 3?

A     I do.

Q     Can you tell us what that is?

A     That's the consent form that I was just speaking about.

Q     And who signed this form?

A     Shawnnae Beverly, Detective Farnan, and myself.

Q     Could you tell us the statements that are marked off on this form with check marks?

A     Yes.  So I checked off the vehicle and listed the description.  It's a 2023 Ford Fusion, license plate LTK5844. I checked off that I said the property that is listed above is

owned by me or is presently in my possession or my control.  I checked off I have been advised and fully understand that I have the right to refuse to give my consent to search.  I checked off I have also been advised that I may withdraw my consent at any time.  And I checked off I freely and voluntarily consent to the requested search and indicate consent by my signature below.

Q    You mentioned that you marked those off.  Did you --

A    I did.

Q    -- read each one of those to Ms. Beverly before checking it off?

A    Yes.

Q    Did you talk about what it meant with her?

A    Yes.

Q    And how did she respond when you went over each of those points with her?

A    She signed the form.

Q    And did she say that she understood what was on the form?

A    Yes.

Q    Did you tell her any point that she had to consent to the search?

A    No.

Q    Did anybody point a weapon at her while you were asking for consent to search?

A    No.

Q    Who wrote the time that's listed on the form?

A    That's Ms. Beverly's handwriting.  She wrote it.

Q    Now, the time on the form says 9:43.  Was that before or after you started your search of the trunk of her car?

A    Before the search.

Q    Is it your routine practice to get a consent form signed before or after you begin a search before?

A    Before.

Q    Now, how long after the form was signed did you start your search?

A    Immediately.

Q    Where were you when Ms. Beverly signed the form?

A    We were standing next to the car.

Q    And did you already have the key to the car when Ms. Beverly signed the form?

A    I did.

Q    So what did you do when she signed the form?  How did you start your search?

A    She signed the form.  I put the -- gave the form to somebody else or put it on top of the car.  I clicked the clicker on the fob to open the trunk and began the search.

Q    And what did you see when you opened the trunk?

A    Immediately in plain view were three phones stuck inside of a slide, a sandal.

Q    And did you take photos when you conducted the search?

A    Yes.

Q    I'd like you to turn to Exhibit 4 in that binder.  All right.  Do you recognize the photographs that are contained in Exhibit 4?

A    I do.

Q    Did you take those photographs?

A    I did.

Q    And did they fairly and accurately represent things you saw on October 4th, 2023?

A    They do.

Q    Could you walk us through what each one of those photos is?

A    Yeah, so page 1 of Exhibit 4, some payment history from Ms. Beverly's Cash App that I asked her to show me, and with her permission, took pictures to show that she was making -- receiving payments for the rental of the car, along with the second page as well.  The third page is one specific payment that she indicated was a rental payment that she paid to Mr. Beverly for renting and using the car.  And on page 4 is the back of the car showing its identification, the license plate, and its location in the parking lot.  And page 5 is taken as soon as I opened the car, showing what the trunk looked like. page 6 shows the cell phones that I saw in the sandal.  And then pages 7 and 8 are the cell phones after I pulled them out of the sandal to catalog them.

Q    All right.  I'd like you to turn to Exhibit 5 now.

A    Yeah.

Q    Do you recognize the document marked as Exhibit 5?

A    I do.

Q    Could you tell us what it is?

A    So after taking those photos, sometime later, closer to the date of this hearing, there was a need to identify what time the photos were taken.  So to help satisfy that request, I pull up the photo on my cell phone in the photos app.  And when you scroll up a little bit, it pulls up some of the data about that photo in the phone.  So when you do that, you can see the date and the time that the phone registered that the photo was taken.  Some of them, you can actually see the entire photo name, which also incorporates some data about the time and date that the photo was taken.

Q    So you took the photos in Exhibit 4 using your cell phone; is that right?

A    Exhibit 4 was the cell phone photos, and Exhibit 5 was screenshots of those photos on the phone.

Q    Understood.  And do the screenshots in Exhibit 5 accurately represent the information displayed by your phone about those photos?

A    They do.

Q    All right.  could you walk us through the pages in Exhibit 5 and tell us when each one of the photos was taken?

A    Yep.  So Page 1, which is a picture of Ms. Beverly's phone in my hand, was taken at 9:34.  Page 2, same description, also taken at 9:34.  Page 3, same description, also taken at 9:34. Page 4 is a photo of the $350 payment to Keyon Beverly, taken at 9:35.  Page 5, a picture of the back of the car showing the license plate, was taken at 9:38.  Page 6, which is a photo of the trunk open, was taken at 9:45.  Page 7, 8, and 9 are all photos of the phones, and those were all taken at 9:45.

Q    Now, I wanted to ask you about the photo of the closed trunk, the one stamped 9:38.  Do you see that photograph?

A    I do.

Q    Could you tell us what you were doing around the time you took that photograph?

A    I was standing around, probably waiting for the --

MR. BOLOGNA:  Objection to probably.

THE WITNESS:  I was standing around, waiting for the consent to search form to be produced by the detective.

BY MR. BOWERMAN:

Q    So how long did it take you to see the phones inside the shoe once you opened the trunk?

A    I saw them immediately.

Q    And how long did it take you to take the phones out of the shoe once you saw them in there?

A    I probably -- not probably.  It was less than two minutes.

Q    Less than two minutes?  How long did it take you to line

up the phones for these photos?

A    Seconds.

Q    And what did you do with the phones after you photographed them?

A    I put them in airplane mode to prevent any calls from coming in or any -- you can delete phones remotely sometimes, so I was concerned about that.

Q    I'm sorry, could you explain what you mean by that?

A    Yeah.  So anybody with access to the iCloud account can remotely wipe the phone.  And I wanted to preserve any data that was on the phone.

Q    Had you identified a number for Defendant Dixon at the time of his arrest?

A    Yes.

Q    Do you remember what that number is?

A    Not off the top of my head.

Q    Does it end in 6970?

A    It does.

Q    Did you try calling that number after finding these phones?

A    I did not.

Q    Why not?

A    Because phones can have -- you can link accounts across multiple phones.  So an iCloud account with information that might be of interest to me or the investigation, doesn't

necessarily have to reside on a phone whether it ends in 6970 or 1234. So it was my intention, once I realized there were multiple phones, to seize those phones and apply for a search warrant.

Q Now, I just want to take you back to Exhibit 5 for a moment. So you mentioned that the phone of the trunk being -- excuse me, the photo of the trunk being opened was taken at 9:45?

A Yes.

Q And then the photos showing the phones, the next three pages, those were all also taken at approximately 9:45?

A Yes.

Q So from start to finish, how long did it take you to take the photo where you saw the phones inside the shoe and to take the photo where the phones were all lined up?

MR. BOLOGNA: Objection. The evidence speaks for itself.

THE COURT: Overruled. He can also testify to it.

THE WITNESS: Less than a minute.

BY MR. BOWERMAN:

Q Does it surprise you to learn that those photos were all taken in the span of a minute?

A No.

Q Does it take you more than a minute to take photos of phones in those circumstances?

A    No.

Q    And you mentioned that Bensalem Detective Connor Farnan also signed the consent form that we looked at, Exhibit 3, right?

A    He did.

Q    I'd like you to turn to Exhibit 7 in your binder.

A    Okay.

Q    Do you recognize the document marked as Government Exhibit 7?

A    I do.

Q    What is it?

A    It is Detective Farnan's report regarding their assist in arresting Saikeen Dixon.

Q    And is this a Bensalem Township Police Incident Report form?

A    Yes.

Q    And does this report indicate it was created on October 4th, 2023?

A    Yes.

Q    And down at the bottom of each page, does it indicate that it was approved on October 4th, 2023?

A    Yes.

Q    So that's the same date as the arrest, right?

A    Yes.

Q    Does Page 2 of the report set out a narrative about what

happened?

A    It does.

Q    And that was prepared by Detective Farnan?

A    Yes.

Q    Does this report, just to summarize what's in there, does it mention that Defendant Dixon asked if he was being charged with a homicide, requested police to lock his phone, and asked if he was looking at 10 to 20 years?

A    Yes, in paragraph 3.

Q    And does this report indicate that agents obtained written and verbal consent --

A    Yes.

Q    -- from Mr. Dixon's girlfriend?

A    In paragraph 5.

Q    And does it then say that agents recovered phones in the trunk?

A    Yes.

Q    Did you also complete a report about the arrest of Mr. Dixon?

A    I did.

Q    Is that referred to as an FBI 302 report?

A    It is.

Q    I'd like you to turn to Exhibit 8.  I'm sorry.  It looks like I have the wrong one.

A    10.

Q    It's 10?  Thank you.  All right.  Do you recognize the document marked as Government Exhibit 10?

A    I do.

Q    Can you tell us what it is?

A    This is my FD 302 or report of investigation regarding the arrest of Saikeen Dixon on October 4th.

Q    When did you draft this report?

A    I started the draft on October 4th, and it was officially entered into the record on October 17th.

Q    Could you explain what you mean by officially entered into the record?

A    So once I start writing it, it records the time that I start writing it.  And then once my supervisor approves it, meaning they've checked it for spelling, coherency, and other, you know, stuff like that, they approve it.  So it was finally approved by my supervisor on October 17th.

Q    And does this report include the statements by Defendant Dixon we mentioned before about whether he was -- this was about a murder, whether he could lock the screen on his phone, whether he was looking at 10 to 20?

A    It does.

Q    Is that on the second page in the middle paragraph?

A    Yes.

Q    And does this report also talk about when you obtained consent from Ms. Beverly to search the car?

A    Yes.

Q    And does it say whether you obtained the consent before you searched the car?

A    Yes.

Q    What does it say?

A    Before the car was searched.

Q    Now, after you recovered the phones from Defendant Dixon on the day of his arrest, did you apply for a search warrant for those phones?

A    I did.

Q    I'd like you to turn to Exhibit 6 in this binder.  Do you have before you the document marked as Government Exhibit 6?

A    I do.

Q    And can you tell us what it is?

A    It is a warrant for the four iPhones that were seized from Saikeen Dixon and his car on October 4th, 2023.

Q    And does the warrant include an affidavit in support of the search warrant application?

A    It does.

Q    Does that begin at Bates number USA044535?

A    Yes.

Q    Who submitted this search warrant as your affidavit?

A    I did.

Q    And who signed it?

A    I did.

Q    Did you submit this application and this affidavit to Magistrate Judge Straw?

A    Yes.

Q    And in submitting this affidavit, did you swear or affirm that the statements in the warrant were true and correct?

A    Yes.

Q    In the affidavit, did you explain why you believe that the phones seized on the day of Mr. Dixon's arrest would contain relevant evidence?

A    I did.

Q    Can you point us to where you did that in the affidavit? Here, let me rephrase the question a little bit and break that up some.  Did you give an overview of your investigation in the affidavit?

A    I did.

Q    Did you do that in paragraphs 20 to 23?

A    Yes.

Q    And in there, did you discuss some of the things you mentioned before, text messages between Byrd and Dixon?

A    I did.

Q    Did you mention cell site data for Defendant Dixon's phone?

A    Yes.

Q    Did you also include photographs showing a scar on the surveillance footage of the carjacker from August 10th, 2022,

and a scar on Mr. Dixon's arm in an Instagram picture?

A    I think so.  I'm just looking through to see where that is.  I don't see where the scar photo is.  I know the one you're referring to, but there's definitely a photo of the defendants in the -- in Figure 1 in the FedEx vehicle.

Q    So allow me to rephrase.  Did you mention that Mr. Dixon and the person in the photo both had a distinct scar?

A    Yes.

Q    Did you also discuss in the affidavit where you found the phones that were the subject of the affidavit?

A    Yes.

Q    Did you discuss in the affidavit how Mr. Dixon asked to lock his phone when he was arrested?

A    I did.

Q    Did you describe how Mr. Dixon kept --

        MR. BOLOGNA:  Your Honor, I'm going to object.  At this point, the four corners of the affidavit speak for itself. We don't need to go through and summarize it all through questioning and answering.

        THE COURT:  Okay, we have the search warrant and the efforts this agent took.

        MR. BOWERMAN:  Thank you, Your Honor.

BY MR. BOWERMAN:

Q    Agent Donahue, did you explain in the affidavit how Mr. Dixon had his -- the phone -- three of the phones that were

described in the affidavit in the trunk of his car rather than in the passenger compartment?

A    Yes.

Q    And did you explain how they were in the trunk of his car when he went into the courthouse?

A    Yes.

Q    And did you explain in the affidavit how a person may keep phones in their car rather than bringing them into a secure area if they're worried about illicit content being found on them?

A    Yes.

Q    Was that in paragraph 32?

A    Yes.

Q    Did you explain in your affidavit how phones used by carjackers, drug traffickers, and other offenders can contain photos of relevant evidence?

A    Yes.

Q    How they can contain relevant GPS location data?

A    Yes.

Q    Did you explain how traffickers and other criminals can use multiple phones?

A    Yes.

Q    Did you explain that data can be stored for a long time on a cell phone?

A    Yes.

Q    It can be stored for a long time after it's downloaded or viewed on the internet?

A    Yes.

Q    Is that in Paragraphs 28 to 32 of the affidavit?

A    Yes.

Q    Now, do these facts that you included about how phones are used and data is stored mean that relevant photos can be found on devices that Dixon didn't use to communicate with Ronald Byrd?

A    Yes.

Q    And does it mean that relevant GPS data can be found on any device Dixon had on his person at a particular time?

A    Yes.

Q    Can data also be synced across devices?

A    Yes.

Q    Can that happen when a user gets a new phone and loads data from their old phone?

A    Yes.

Q    Is that something you know in your capacity as an FBI agent?

A    It's common knowledge I think at this point.  Whenever somebody gets a new phone, they want their old information, their contacts, their emails, their accounts transferred over to the new phone and Android and Apple do a very good job of making that easy.

Q     In the affidavit, did you include any facts regarding Prince Alston's arrest?

A     Yes.

Q     And did you also include facts about his cooperation with authorities?

A     I did.

Q     Is that at paragraph 8 and Footnote 1 of the affidavit?

A     Yes.

Q     And also in paragraph 17 of the affidavit?

A     Yes.

Q     In the affidavit, did you include the fact that Prince Alston was fired from FedEx?

A     Yes.

Q     Is that in paragraph 8 of the affidavit?

A     Yes.

Q     At the time you executed this affidavit, had you watched the videos of Prince Alston's prior statements to Philadelphia Police?

A     Yes.

Q     When was the last time you reviewed those videos before this hearing today?

A     So his initial statement that he provided to police upon his arrest, I watched probably over a year ago, and the proffer statement that he gave where he's wearing a yellow shirt that says Marvel on it, I reviewed that last night actually.

Q    At the time you submitted the affidavit, were you aware that in Alston's first statement to police in August 2022, he told police he was working with someone named Ty and not Byrd?

A    Yes.

Q    In your investigation, how did you weigh the fact that Alston originally said Ty and not Byrd?

A    I weighed facts based on my ability to corroborate them. So at that point that I was involved in the investigation, he provided a lot of information that was corroborable [sic], and the fact that he had identified the person initially as Ty is not surprising as often people will leave stuff out or minimize or sometimes even lie because they're afraid for their safety or they don't want to be labeled a snitch or safety of their family.

Q    Now, did you discuss in this affidavit how Alston originally said Ty and not Byrd?

A    Not in this one, no.

Q    Did you include it in other affidavits earlier in the investigation?

A    I did.

Q    Which affidavit was that?

A    It was the first one warrant applied for, Ronald Byrd's iCloud account.

Q    And why didn't you include it in this affidavit?

A    At this point we were streamlining the affidavit with new

facts and took it out because it seemed irrelevant at the time or not -- it didn't help.  It wasn't -- it just wasn't necessary at that point.  We'd already mentioned it before.

Q    And had you obtained additional evidence in your investigation between the two affidavits?

A    Yes.

Q    Did the affidavit in front of you mention that Prince Alston identified a person he knows as SK in surveillance footage from the carjacking?

A    He did, yes.

Q    At the time you submitted the affidavit, were you aware that Alston had made statements to police about whether he could see the driver of a black Jeep that Defendant Byrd was in at Temple Hospital before the carjacking?

A    Yes.

Q    What was your understanding of what Alston said about whether he could see the driver of that black Jeep?

A    My understanding was that he was unable to identify based on what he had seen.

Q    And were you aware that he said in an October 2022 proffer he couldn't see who was driving the Jeep?

A    Yes.

Q    Were you aware that he said he couldn't tell police who was driving the Jeep?

A    Yes.

Q    Were you aware that he said in his original August 2022 interview that he said he wasn't paying attention to the driver?

A    Yes.

Q    Were you aware that he said in that same interview that he had never seen the driver before?

A    Yes.

Q    How did you weigh those statements in your investigation?

A    With the additional information he gave over time, particularly once I've been involved in the case, the way I weighed it was that he was unable to see the person or identify them based on just what he was seeing at that time.  I didn't think that he was saying that he'd never seen the person before or ever or just couldn't.  It was just what he saw, he wasn't able to say who it was.

Q    And then how did that affect your weighing of him seeing the surveillance footage and saying it was someone he knew as SK?

A    I considered it a separate observation.

Q    What do you mean by that?

A    So at the time of the carjacking and the initial interviews, him saying, I don't know who that is, means he couldn't see them well enough or he was focused on other things, like perhaps Mr. Byrd, or the gun that he had.  And then upon us showing him the still image on the video from the

surveillance truck -- surveillance camera in the truck, that was a separate observation, so he was able to see it more clearly, his attention was not divided, and he was in an environment where he was able to actually observe it instead of, you know, a tense moment out on the street.

Q    Let's talk some more about that April 2023 proffer where Prince made that identification.  As part of your investigation, did you participate in proffer interviews with Prince Alston?

A    Yes.

Q    And was one of those on April 5th, 2023?

A    Yes.

Q    Was that the first time you met Prince Alston?

A    I think so, yes.

Q    Where was the proffer that occurred on April 5th, 2023?

A    It was at the Office of the U.S. Attorney, 615 Chestnut Street.

Q    Who was present?

A    You were present; Special Agent Brown was present.  He was there in observation capacity as a new agent and as part of his new agent duties, he has to observe interviews, so he was there to observe this interview.  His attorney, Mr. Hughes, was there.

Q    Prince does -- Prince Alston's attorney?

A    Yes.

Q    And was anybody else present?

A    I think -- I'd have to look at the 302 to make sure.

Q    Was Detective Liebsch present?

A    Yes, yeah.  Yeah, he was there.

Q    During the proffer, did you show Alston surveillance footage from the car-jacked FedEx truck during the interview?

A    Yes.

Q    All right.  Would you please turn to Exhibit 8 in your binder?  Do you have Exhibit 8 in front of you?

A    I do.

Q    Can you tell us what that is?

A    That's a still image from the carjacking on August 10th of 2022.

Q    And does this Exhibit 8 accurately represent a still image of surveillance footage obtained from FedEx?

A    Yes.

Q    Is this the photo that you showed to Prince Alston during the April 5th, 2023 proffer?

A    Yes.  I would have shown it to him on his phone.  I don't think we had a print up at that time.

Q    Was it shown to him on a laptop computer to the best of your recollection?

A    Yes.  Could have been.  I don't --

Q    And how did Mr. Alston respond when you showed him this picture?

A    He looked at it and he said that looks like "SK".

Q    How long did he look at it before he said that?

A    A few seconds at the most.

Q    And did you tell him that he needed to look at it quickly?

A    No.

Q    Did anybody rush him to look at the picture?

A    No.

Q    At the time he looked at the picture, had anybody said anything to Mr. Alston about someone named "SK"?

A    No.

Q    Did you say anything to Mr. Alston about Saikeen Dixon before showing him that picture?

A    No.

Q    Did anybody else in the room say anything about Saikeen Dixon before he was shown that picture?

A    No.

Q    What was the status of your investigation of Saikeen Dixon at the time of this April 5th, 2023 proffer?

A    There was none.

Q    Had you heard of Saikeen Dixon before that proffer?

A    No.

Q    Had you heard of anyone referred to as "SK" before that proffer?

A    No.

Q    At the time of this proffer, did you have text messages

from Ronald Byrd's iCloud data?

A    No.

Q    Did you obtain those text messages pursuant to a search warrant?

A    Yes.

Q    Please turn to Exhibit 12 in your binder.  Do you see the document marked as Exhibit 12?

A    I do.

Q    Could you tell us what that is?

A    It's a search warrant for the iCloud accounts of carpediem2800@icloud.com and carpediem1319@icloud.com, and others.

Q    And is this what we see here, and particularly the affidavit in support of that search warrant application?

A    Yes.

Q    Who completed this affidavit?

A    I did.

Q    And if you'll turn to the last page, it's page 23 with Bates stamp USA006038.  Who signed the affidavit?

A    I did.

Q    And was this submitted to Judge Sitarski?

A    Yes.

Q    Did she sign the affidavit as well?

A    Yes.

Q    What date was this affidavit signed?

A    May 16th, 2023.

Q    Is that after the April 5th, 2023 proffer?

A    Yes.

Q    At the time of the April 5th, 2023 proffer, did you have Saikeen Dixon's Instagram account?

A    No.

Q    Approximately when did you identify Saikeen Dixon's Instagram account?

A    I want to say August of that year, 2023.

Q    And what did you do after Prince Alston said the person in the photo looks like "SK"?

A    So as soon as he said that I had a few other documents with me at the time.  When I first became involved with this case, just prior to its opening, I had gone to a meeting with a number of other investigators from the Bureau of Narcotics Investigation, Philadelphia Police, and some others, and some intelligence briefings were handed out about members of the Dirty Block gang.  So when he said the name "SK" and knowing that Mr. Byrd was part and parcel of the Dirty Block gang, I figured it's a possibility that "SK" could be somebody else involved with that gang.

So as I was looking through a list of names of other involved members, I saw, among other names, Saikeen Dixon and with the prominent syllables of "SK", Saikeen, I thought this person could be who Prince knows as "SK".

Q    So what did you do next?

A    I called over to the FBI office to our operations center, and I asked them if they could expedite getting a driver's license photo based on the name and date of birth.  So I gave them that name and date of birth.  I also emailed them with another possible spelling for the name.  And shortly thereafter they responded with a photo of Saikeen Dixon.

Q    Can you please turn to Exhibit 14 in your binder.  See a photograph marked as Exhibit 14?

A    I do.

Q    Can you tell us what that photograph is?

A    That's Saikeen Dixon.

Q    And where is that photograph from?

A    It's a driver's license photo that was supplied by PennDOT.

Q    And is that the driver's license photo you obtained during the April 5th, 2023 proffer?

A    Yes.

Q    And what did you do after you obtained this?

A    I showed the single image to Prince Alston.

Q    And what did he say?

A    He said, that's him.

Q    Now, does the image that you showed him have any other information on it besides the photo?

A    No.

Q    Was there a name?

A    No.

Q    Any other identifying info?

A    No.

Q    Did you continue investigating "SK" or Saikeen Dixon after that proffer with Alston?

A    Yes.

Q    How'd you do that?

A    Search warrants on phone numbers.  Researching. Eventually when -- in August, when we got the -- when we got the Instagram name, I think we did some subpoenas to Instagram.

Q    Did you obtain phone records for numbers that you believe would be associated with Mr. Dixon?

A    Yes.

Q    Did you look through Ron Byrd's iCloud data when you received it?

A    Yes.

Q    And around when did you receive the data?

A    I want to say June.  Late June.

Q    Was it two weeks after you did the search warrant?

A    Yes.

Q    And did you look for a connection between Mr. Byrd and Mr. Dixon?

A    I did.

Q    As you mentioned, you obtained cell site data for Mr.

Dixon?

A    Yes.

Q    And did you discuss Dixon further with Alston in later proffers?

A    Yes.

Q    Thank you, Special Agent Donahue.

MR. BOWERMAN:  I have no further questions at this time, Your Honor.

THE COURT:  Okay.  Mr. Bologna?

MR. BOLOGNA:  Thank you.

CROSS-EXAMINATION

BY MR. BOLOGNA:

Q    Good morning, sir.

A    Good morning.

Q    I wanted to get with your affidavit, I believe it's marked as Government Exhibit 6.  Do you have that in front of you?

A    I do.

Q    With respect to the affidavit, this was a document that you prepared; am I right?

A    Yes.

Q    All right.  And when you prepared this affidavit, you had been working on this matter for a number of months; is that correct?

A    Yes.

Q    All right.  And you do your best in describing the

incident to the judge, Judge Straw, in paragraphs 1 through 15 of the affidavit, you describe what you had learned in the probable cause section.  Am I right?

A    Yes.

Q    All right.  Do you agree with me that in paragraphs 1 through 15 you never mentioned my client Saikeen Dixon at all?

A    Correct.

Q    All right.  In paragraph 16, you mentioned that there was video from the FedEx truck and it depicted the two people, one in an orange T-shirt, one in a yellow T-shirt, shown in figure 1.  Is that right?

A    Yes.

Q    All right.  And then you go in to describing in paragraph 17 that Mr. Alston identified the man in the orange T-shirt as Mr. Byrd; am I right?

A    Yes.

Q    All right.  You did not mention that Mr. Alston had previously identified someone different as the gunman, a person by the name of Ty?

A    I wouldn't say it's somebody different.  He didn't say -- mean Byrd, but he used the name Ty.  I don't know if Ty's an actual person.  I understand it might be semantic, but he didn't -- he didn't say Byrd, but.

Q    Do you know this man, Mr. Byrd, to ever be referred to as Ty in any part of your investigation?

A    No.

Q    Your sworn testimony is that he is or is not the Ty who was identified on August 10th of 2022 by Mr. Alston in his first statement?  Yes or no?

A    Yes.

Q    He's Ty or he's not Ty?

A    Well, his name is Byrd, but he -- he was referred to as Ty.

Q    So did Mr. Alston lie on August 10th or not lie on August 10th when he said the gunman was named Ty?

A    Oh, he lied.

Q    Okay.

A    About the name.

Q    All right.  So did you include in your affidavit in paragraph 17 that he lied about the name of the gunman?

A    No.

Q    I think you testified, make sure I got this down right, that you were "streamlining the affidavit."  Did I hear that right?

A    Yes.

Q    That it "didn't seem relevant" to include that kind of detail.  Did I hear that right?

A    You did.

Q    And then a "did not help" to be including that sort of information.  Did I hear that right?

A    You heard it.

Q    All right.  You've been an agent for almost 10 years?

A    Correct.

Q    You were a police officer before that.

A    Yes.

Q    You've sworn out many affidavits for many search warrants, correct?

A    Yes.

Q    Many arrest warrants, correct?

A    Yes.

Q    You're familiar with the concept of reliability?

A    Yes.

Q    The information that an affidavit is based on needs to be reliable, correct?

A    Yes.

Q    Credible, correct?

A    Yes.

Q    Trustworthy, correct?

A    Yes.

Q    And you had information that Mr. Alston had lied about the identity of one of the participants in this carjacking when you prepared the affidavit and you chose to exclude that.  That was your choice, correct?

A    Yes.

Q    That's not all you excluded though, is it?

A    I would have to know what you're referring to.

Q    Let's look at the next -- let's look at --

A    Because in paragraph 3, I clearly state the affidavit is intended to show that there's some probable cause. It does not set forth all of my knowledge. For a warrant, I don't have to include every fact that I know.

Q    I want to go to the paragraph where you talked about the identification of my client, Mr. Dixon. See paragraph 20?

A    Yes.

Q    All right. In paragraph 20, it reads, "In a proffer with investigators in April 2023 -- it's redacted, but that's Mr. Alston, was shown the picture identified in figure 1 above. Alston told investigators that the masked individual in the yellow shirt looks like a person he knows as "SK's". Investigators showed a single image of Saikeen Dixon, and Alston indicated that Dixon was the person he knew as "SK". Did I read that correctly?

A    Yes.

Q    All right. Part of an identification, sir, is whether the person has failed to identify an individual on a prior occasion, do you agree?

A    I don't think I understand the question.

Q    Sure. If Mr. Alston identifies Saikeen Dixon in April of 2023, we want to go back in time and see did he fail to make an identification before that date?

A    I see what you're saying, yes.

Q    You agree that's important?

A    Yes.

Q    Okay.  You agree it's also important to know what before April of 2023 Mr. Alston said about the driver, right?

A    Yes.

Q    Whether he knew the driver, right?

A    Yes.

Q    A physical description of the driver?

A    Yes.

Q    If he knew the driver's name?

A    Yes.

Q    All that's important, right?

A    Yes.

Q    And you kept all that out of your affidavit?

A    Yes.

Q    Because it wouldn't help.

A    I would say it was because it -- I didn't think -- I didn't think it was as important as the identification he did make.

Q    Well, you just told us that the failure to ID is important as part of your analysis, right?

A    Yes.

Q    You would agree with me that on August 10th, within hours of the carjacking, when asked about the identity of the driver,

Prince Alston said he could not identify the driver, right?

A    Yes.

Q    Further, he said he had never seen the driver before, correct?

A    Yes.

Q    So the driver was a stranger to him.

A    As I explained on direct examination, I didn't think that he was actually a stranger based on the totality of my experience with Mr. Alston and talking to him about who that driver could or could not be.  I just think that at the time he was unable to say who it was, whether it was because he didn't know who he was, or it was because he couldn't just see into the car clearly or it's because his attention was divided.

Q    Let me give you an example.

A    Sure.

Q    You worked in Massachusetts before you came down to Philly to work with the FBI, right?

A    Yes.

Q    You've never worked in North Carolina, have you?

A    No.

Q    Prior to coming into court on Wednesday, did you know the man seated at the far end of the table, Mr. Ruocco, wearing the blue suit?

A    No.

Q    He's a stranger to you, right?

A    He was.

Q    Isn't it accurate to say if you've never seen the person before, it means they're a stranger?

A    Correct.

Q    And that's exactly what Prince Alston said about the driver.

A    On one -- on one occasion.

Q    There's no question.

A    Sorry.

Q    On August 10th, videotaped statement, I have never seen the driver before, right?

A    Yes.

Q    All right.  When you write your affidavit and submit it to Judge Straw, you include the fact that Prince Alston says, that looks like "SK", right?

A    Yes.

Q    Returning to my example with Mr. Ruocco.  Today, Friday, you can say I know that guy, he's one of the defense attorneys. It's Mr. Ruocco, right?

A    Yes.

Q    Because you know him now, right?

A    Yes.

Q    If I asked you the same question a week ago, you wouldn't have been able to tell me his name because you never met him before, right?

A    Yes.

Q    He was a stranger to you then, right?

A    Yes.

Q    You're a smart guy, right?

A    I believe that's debatable, but sure.

Q    All right.  You're smart enough to know if someone says to you, the driver is a stranger and then says to you, yeah, that's "SK", those two things are inconsistent.

A    Not necessarily.

Q    Not necessarily?

A    Because the first statement was based on, I don't know what his -- because I'm not Mr. Alston, I don't know exactly what view he got.  I do know what he said, and I do know on the first occasion he said he's a stranger.  On a second occasion, taped, he said, I couldn't see.  And then given a third opportunity to view something clearly with time and opportunity, he was able to make an accurate -- not an accurate.  He was able to make an assessment as to who that person was based on his knowledge.

Q    You just told us you're not Mr. Alston.  I agree with you, all right.  One of the things I noticed in your affidavit that was missing is there's many times that affiants will say, I find this witness to be credible.  You never said that about Mr. Alston in your affidavit, did you?

A    I've never written that in any affidavit.

Q    Okay.  You never said you found him to be reliable in your affidavit?

A    Correct.

Q    You never said you found him to be trustworthy in your affidavit?

A    Correct.

Q    All right.  I'm going to ask you something else. Detective Liebsch testified earlier this week.  You were outside, right?

A    I was.

Q    Have you guys talked since he testified?

A    We've talked, yes.

Q    Talked about this case?

A    No.

Q    What'd you talk about?

A    Drinking, and what we're doing on the weekend.

Q    Did you talk to him face-to-face?

A    Yes.

Q    Talk to him over the phone?

A    Yeah, I talked to him yesterday about evidence in this case, about getting a firearm tested or something.

Q    Did you talk to him via text or email?

A    I'd have to check.  I don't think we texted since then.

Q    Okay.  Do you know what he testified to in front of this Court on Wednesday about Mr. Alston?

A    I don't know his specific testimony, but I can guess based on the nature of this questioning.

Q    Okay.  Do you know that he characterized Mr. Alston as a thief?

MR. BOWERMAN:  Objection, relevance, of whether he knows what he categorized him as.

THE COURT:  Overruled.

BY MR. BOLOGNA:

Q    Are you aware of that?

A    I'm not aware that he testified to that, but I wouldn't say he's wrong if that's what you're telling me.

Q    So you agree that Mr. Alston is a thief.

A    Yes.

Q    Are you aware that he testified that Mr. Alston is a liar?

A    He has lied, yes.

Q    Do you agree that Mr. Alston is a liar?

A    I believe he has a capability to, yes.

Q    But you not only have -- example.

A    Yeah.

Q    You have multiple examples of him lying, correct?

A    I have multiple examples of him telling the truth too.

Q    Not my question, sir.

A    Okay.  Correct.

Q    You understand my question.

A    You're correct, yes.

Q    Okay.  You also know him to be a -- well, let me ask it this way.  Detective Liebsch also testified that he knew Mr. Alston to be a drug abuser.  Do you agree with that characterization?

A    He was, yes.

Q    Okay.  For eight years?

A    Yes.

Q    Oxy?

A    I know he was using narcotics.  I can't remember exactly which ones.  He could have been using Percocets, too.  He also used weed.

Q    Okay.  Three hundred dollars a day between Oxy and weed just to fulfill his habit, right?

A    Yes.

Q    All right.  So you agree he was a longstanding drug abuser, right?

A    Yes.

Q    Did you think it was relevant, sir, to tell Judge Straw the source of information Mr. Alston is a liar, a thief, and a drug abuser?  Did you think that was relevant for the Court to know?

        MR. BOWERMAN:  Objection.  Assumes facts about when he knew about the drug abuse.

        THE COURT:  Overruled.

        Did you think it was relevant to mention those

factors to Judge Straw in your affidavit?

THE WITNESS:  I didn't think it was relevant at the time.  I don't think I remember -- if I remember correctly, I don't think I learned about the extent of his drug abuse until one of those recent -- in the last year.

BY MR. BOLOGNA:

Q    You knew about his lying?

A    I did.  Yeah.

Q    You knew about stealing, right?

A    I did.

Q    All right.  Speaking of stealing, you heard counsel say, hey look, you did tell Judge Straw that he had been fired from FedEx, right?

A    Yes.

Q    You read that? What you left out, sir, was why he got fired from FedEx, right?

A    Correct.

Q    You left that part out?

A    Yes.

Q    Because it didn't help.

A    Sure, yes.

Q    And what it didn't help was he got fired not once, but twice for stealing, right?

MR. BOWERMAN:  Objection.  Form of the question.

THE COURT:  I'm sorry, what was the objection?

MR. BOWERMAN:  Form of the question?

THE COURT:  Overruled.

THE WITNESS:  Once from each company, but twice in total, yes.

BY MR. BOLOGANA:

Q    Okay.  And it's different to get fired for --

THE COURT:  I'm sorry.  Once for each company.  Did he work for different FedEx?

THE WITNESS:  Yes.  It was FedEx and FedEx Express where FedEx Ground and FedEx Express are different entities.

THE COURT:  Okay.

THE WITNESS:  So he was fired from one, then somehow got a job with the other and got fired from the other one.

THE COURT:  Got it.  Thank you.

BY MR. BOLOGNA:

Q    It's different to be fired because you show up, wait for work than to get fired because you stole, isn't it?

A    Correct.

Q    You understood, when you were putting your affidavit together and trying to streamline it, that if you included the fact that he had been twice for stealing, that was not going to help you?

A    I didn't put it in there because I didn't think it was going to help me.  It was for streamlining purposes.

Q    Do you agree when someone is watching something happen,

the degree of their attention matters?

A    Matters to what?

Q    Making a positive identification?

A    Yes.

Q    Prince Alston spoke about how much he was paying attention to the driver in interviews with law enforcement, didn't he?

A    I can't remember exactly off the top of my head.

Q    All right.  If I told you that on the August 10th, 2022 interview, when asked if he could describe the driver of the Jeep, he indicated that the driver had dark skin, but he could not tell how old the driver was because, quote, I was not paying attention to the guy, end quote.  Do you recall hearing him say that?

A    As I mentioned on direct examination, it's been well over year since I've seen that interview.  If -- if purportin that's what it says without me seeing that, then I would agree, but without seeing -- seeing that video again to confirm, I can't say I necessarily agree, but I don't want to drag out the video and -- and take more time.  If that's what it actually said then that makes sense?

Q    What I think about whether it makes sense or not, doesn't matter, sir.

A    My response is not -- not -- the question is to the response.

Q    Sir, did you have a chance to read the motion that I filed

on behalf of Saikeen Dixon prior to testimony today?

A    Yes.

Q    Did you have a chance to talk to counsel about what I was alleging was wrong here?

A    Yes.

Q    And you know that I was alleging time and time again what was in the August and in the October interviews of Prince Alston, right?

A    Yes.

Q    And it's your testimony to this Court, to Her Honor, that you didn't bother to go back and watch that video before you took the stand?

         MR. BOWERMAN:  Objection.  Argumentative.

         THE COURT:   Overruled.

         THE WITNESS:  Yes.

BY MR. BOLOGNA:

Q    If you had watched the video, sir, maybe you'd remember this.  Mr. Alston said on August 10th, "I don't know when "he", referring to the armed carjacker, said, I'm in the Johnny or with Johnny."  Do you remember him saying that?

A    I remember him mentioning the Johnny, meaning the stolen car.

Q    Okay.  Do you remember him mentioning that he wasn't certain if he said, I'm in the Johnny or with Johnny?

A    I don't remember that.

Q    All right.

A    Can we -- can we watch the video?

Q    We'll watch the video, sir.  But my point is, you out this affidavit after you locked up Mr. Dixon, right?

A    Yes.

Q    You had watched the video close in time to that, right?

A    It was closer in time, yes.

Q    Yeah.  You had just gone into grand jury and testified about a week before, to get his indictment, right?

A    Yes.

Q    And you had met with the prosecutors before you went in to testify in grand jury.  You were up to speed on the case, right?

A    Yes.

Q    It is a big difference for someone to say, I'm in the Johnny, driving a stolen car, versus, I'm with Johnny -- meaning I'm with another person whose name is Johnny.  Big difference, right?

A    Yes.

Q    As you sit here today, has anyone ever referred to Saikeen Dixon as Johnny?

A    No.

Q    If the gunman said, I'm with Johnny, that would exonerate Mr. Dixon, wouldn't it?

A    If he had said that, yes.

Q    Right.  You didn't include it in your affidavit, did you?

A    No, because I don't -- he said, I'm in the Johnny.

Q    That's not all he said, sir, is it?

A    Again, without seeing the video, I can't --

Q    Okay.  You have seen, and you testified earlier today that you watched the October 21st video more recently.  Last night I think you said, right?

A    Yes.

Q    Do you recall seeing the portion where Mr. Alston is asked, by the police, who was driving the black Jeep, and he said not once, but twice, I don't know who.

A    Yes.

Q    When asked to provide a description of the person driving the Jeep, Mr. Alston said, I cannot, right?

A    Yes.

Q    Would you agree with me that the person standing outside the FedEx truck is wearing a bright yellow t-shirt?

A    Yes.

Q    Stands out?

A    Yes.

Q    Never described by Mr. Alston?

A    Correct.

Q    You would agree that the police actually asked Mr. Alston to describe the kind of clothes the man was wearing or if anything stood out, and Mr. Alston said, no.  Right?

A    Correct.

Q    It is your theory that the man in the yellow t-shirt is the driver of the stolen Jeep, right?

A    You can see in the video it's not a theory, it's a fact.

Q    Okay.  So the man in the yellow T-shirt is the driver of the stolen Jeep?

A    Yes.

Q    You are aware that Mr. Alston, between video one and video two, in the middle, spoke to members of the Philadelphia District Attorney's Office and Philadelphia Police Department and identified two people in that stolen Jeep -- Byrd and Pop, correct?

A    Correct.

Q    Not Mr. Dixon, correct?

A    Correct.

Q    You did not include any of those details for Judge Straw to consider in evaluating the photo identification of Mr. Dixon.  You left them all out?

A    Yes.

Q    And the reason you left them out is because they didn't help your case?

A    No.

Q    They do help your case?

A    Again, no.

Q    Oh, so they actually hurt your case.  Is that your

testimony?

A    That's just not the reason I left it up.

Q    Well, do you agree that those facts hurt your case, sir?

MR. BOWERMAN:  Objection.  Relevance.

THE COURT:  Sustained and asked multiple times.  So just keep going.

BY MR. BOLOGNA:

Q    You talked about reviewing Mr. Dixon's criminal record; am I right?

A    Yes.

Q    Did you review Mr. Alston's?

A    Yes.

Q    And you saw that he had used two aliases in his past; am I right?

A    Yes.

Q    One was Germaine Alston and the second was Mitchell Davis?

A    I haven't looked at his -- in a while, so --

Q    Yes?

A    I know he used aliases.  I knew one of them was Jermaine.

Q    Okay.  Now, Counsel has raised a question about whether that's relevant.  Sir, am I right that when someone uses an alias, what that means is they look at a member of law enforcement and they lie about who they really are?

A    Yes.

Q    So you know me to be Jason Bologna, right?

A    I do.

Q    If I stood up here and told you I was Bob Shepherd, that would mean I was lying about my identity, right?

A    I think it depends on the context, but yes.

Q    Okay.  Is it relevant, sir, that the person who you are relying upon has lied in the past to members of law enforcement about their identity?

A    Yes.

Q    Okay, and you didn't include that either in your affidavit?

A    Not in that one, no.

Q    Did you ever include it?

A    In the first affidavit for the iCloud.  I included that he misidentified Mr. Byrd's tie.

Q    Now, I'm talking about Mr. Alston using a fake name in past.

A    No.

Q    Okay.  Now, there's also issues about a cooperation plea agreement that I want to talk to you about.  When Mr. Alston came to see you and other members of law enforcement in April of 2023, he had been arrested by the Philadelphia Police Department and charged with a series of felonies; am I right?

A    Yes.

Q    Carjacking, robbery, drug distribution, conspiracy and so on, right?

A    Yes.

Q    He was trying to get the Feds to pick up his case and have the State dismiss the charges; am I right?

A    I think that's what happened.  I don't know if he was trying or not.  I can't speak to his -- I think he preferred that nothing was charged against him, to be honest.

Q    Okay.  Sir, is one of the things you have to pay attention to as an investigator, the motive of a person when they're giving you information --

A    Yes.

Q    -- what they have to gain from it?

A    Yes.

Q    And as you talked to Mr. Alston on April -- in April of 2023, did you consider what he had to gain by identifying the man in the yellow t-shirt?

A    Yes.

Q    That would mean that he could give information that would help the Government and the prosecution of two individuals, not one, right?

A    Yes.

Q    Further, you knew him to be someone who had falsely implicated Ty before, right?

        MR. BOWERMAN:  Objection.  Misstates testimony.  Ty's a real person.

        THE COURT:  Overruled.  Court's recollection

controls.

THE WITNESS:  Yes.

BY MR. BOLOGNA:

Q    So for Mr. Alston to out of nowhere identify that person looks like "SK", that was a surprise to you, right?

MR. BOWERMAN:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  I wasn't, like, oh, wow.  It wasn't, like, a surprise, surprise.  It was, like, okay, we'll investigate this.

BY MR. BOLOGNA:

Q    We'll investigate this.  All right.  So part of your investigation was to ask questions about "SK", right?

A    Yes.

Q    How long have you known him?

A    Correct.

Q    Where have you seen him before?

A    Correct.

Q    How many times have you seen him before?

A    Correct.

Q    When did you last see him?

A    Correct.

Q    Would you tell me where, in your 302 from that date, any of that information is recorded?

A    I didn't ask those things on that day.

Q    What?  The man has identified the other person in the carjacking.  And you didn't ask him a single question about who this "SK" person was?

A    Not to my recollection on that day, no.

Q    All right.  You would agree with me that Figure 1 shows a man wearing a baclava, covering a substantial portion of his face?

A    Yes.

Q    You can't see the man's hairline, whether he has hair, correct?

A    No.

Q    Cannot see his ears?

A    Correct.

Q    Cannot see whether his ears are pierced?

A    Correct.

Q    Cannot see the bottom part of his nose?

A    Correct.

Q    Cannot see his cheeks?

A    Correct.

Q    Cannot see his jawline?

A    Correct.

Q    Cannot see his teeth?

A    Correct.

Q    Cannot see whether he has any facial hair?

A    Correct.  You would agree that all of that -- all of that

is relevant and important to a person's ability to identify another individual's face?

A    That can be helpful, yes.

Q    All of that was missing from that photo?

A    Correct.

Q    Now, you had been to a meeting shortly before the April meeting with Alston, in which there was a discussion with members of law enforcement about the Dirty Block?

A    Correct.

Q    How long before the April meeting was the meeting with the police department?

A    I can't remember.  It was maybe a month or two at the most.  It could have been less.

Q    Where was the meeting?

A    I want to say over at the Philadelphia Police Department headquarters, but I can't remember.

Q    How long was the meeting?

A    About an hour.

Q    And when you left that meeting, you had something in your possession that you had not had before the meeting, right?

A    Could you be more specific?

Q    You had a list of people who were alleged Dirty Block members?

A    Correct.

Q    All right.  You believed that the person or persons

responsible for this carjacking were members of the Dirty Block?

A    I entertained that there was a strong possibility.

Q    All right.  Who created the list of Dirty Block members?

A    Members of the Philadelphia Police Department -- their Intelligence Unit detectives, narcotics detectives, patrol officers.

Q    Okay.  Did you look at the list?

A    The list of the members?

Q    Yeah.

A    Yes.

Q    All right.  How many names?

A    Between the typed list that I first showed -- or that I first identified Saikeen Dixon's name on, there was, I think 10 or less.  In total of all the intelligence bulletins I received, there was probably 50 or 60 names.

Q    All right.  So let's stick with your list because we're going to talk about the other stuff in a minute.

A    Okay.

Q    So the list is 10 names or fewer?

A    Yes.

Q    Do you know if the information in that list was accurate?

A    I don't.

Q    Do you know who it was that authored the list?

A    I think it was a work of many people.

Q    Do you know how relevant it was to that specific time? Meaning, was it made as of a month or so before April or was it years old?

A    I don't know.

Q    So you had no idea about the reliability of that list?

A    It was information provided by law enforcement.  And generally, when I get an intelligent bulletin, I do treat it with some amount of, you know, that some amount of work and -- and checking has gone into it. I don't take it as gospel though.

Q    Okay.  So let me just make sure I understand where you are.  You are assuming this investigation, Byrd's been ID'd. The question is whether you're going to get the other guy, right?

A    Yes.

Q    And you believe the guy in the yellow t-shirt was the driver of the car, he was involved in the carjacking, right?

A    Yes.

Q    And you legitimately wanted to make sure that everyone who is responsible is held accountable, right?

A    And anybody who's not responsible isn't falsely implicated, yes.

Q    I agree, sir.  I agree a lot with that one.  So what you did is you looked at the list when you got it, right?

A    Yes.

Q    Here are some of the people who might have been the man in the yellow t-shirt, right?

A    Yes.

Q    And you looked into them to see if they had a record?

A    No. I took that information, I put in a folder, and after that first time looking at it, I didn't look at it again until I remembered at the have -- Prince Alston that I did have a list of names and that's when I started looking down the list. I didn't know their criminal histories from NCIC or from the PA court dockets.  I didn't have anybody's name in my mind.  I didn't remember anybody's name off the list other than probably Ron Byrd's.

Q    So you didn't go and pull photos of the 10 or so names in the list to bring with you to meet with Prince Alston and ask him if he knew those people?

A    No.  That's what I had to call the officer, just have him email me or send a picture.

Q    So you indicated on direct that when you showed up to speak to Prince Alston, that you had never heard of Saikeen Dixon before.  Do you remember giving that testimony?

A    I do.

Q    That testimony is incorrect, because Saikeen Dixon's name is actually on that list, isn't it?

A    I'd put the folder -- the papers into a folder -- into my investigative packet.  I didn't look through them and be like,

oh, let's remember this name or this name.  So had -- had I seen the name on a piece of paper?  In the way that I'm looking at this page right now and I see letters on it, yes.  But it was a name that didn't mean anything to me, and it's nothing that I further investigated at that time, and there was no reason to.

Q    Okay.  You indicated also on direct that Saikeen Dixon has a distinct scar on his arm.

A    He does.

Q    Okay.  Did you ever testify in grand jury about that scar and maybe say something a little different?

A    You'd have to direct me to what you're talking about.

        MR. BOLOGNA:  Your Honor, I'm going to mark this as Defense Exhibit Number 3.  I have a copy for the Court.  I've shown it to Counsel.

        THE COURT:  Thank you.

BY MR. BOLOGNA:

Q    Sir, I want you to take a second and look at that.  You recognize that as your testimony?

A    I do.

Q    Is this sworn testimony you gave to the grand jury, specifically, on the date of September 27th of 2023?

A    Yes.

Q    All right.  So this was the date you went in to get an indictment for Saikeen Dixon, right?

A    Yes.

Q    All right.  Could you go to the bottom of page 7?

A    Okay.

Q    "Q.  Can you tell us what features about the carjacker in the yellow shirt, if any, were significant to your investigation?"

Your answer begins at the bottom of that page and continues to the top of the next page, and I'm going to read your entire answer.  Please let me know if I read it accurately.

"It appeared to be a similar size, skin tone, height, weight, and most importantly, on the gentleman's arm on the right -- well, the gentleman on the left in the yellow Aruba shirt, on his right arm -- so camera, left" --

Here's the key part, sir.

"So there appears to be something on his arm, which looks like it could be a scar".

Did I read that accurately?

A    You did.

Q    You submitted an affidavit to Judge Straw saying it was a scar, right?

A    Yes.

Q    And you gave sworn testimony, approximately a week before, saying it was something that appears to be "something on his

arm, which looks like it could be a scar".  In your mind, sir, are those things the same, or are they different?

A    They're the same, in my mind.

Q    Those two things are the same in your mind?

A    In regards to this, yes.

Q    Okay.  When you testified in front of the grand jury, you described for them that Prince Alston had made an identification of SK; am I right?

A    Yes.

Q    Could you turn to page 6?  Do you see line 3 beginning with this?  Please let me know if I read it accurately.

"Q.  During the course of your investigation, did you speak with Prince Alston?

"A.  I did.

"Q.  Did he identify the carjacker in the orange shirt as Ronald Byrd?

"A. Yes.

"Q.  And did you show Prince Alston a snapshot, showing the carjacker in the yellow shirt from this video?

"A.  I did.

"Q.  What did he say about the carjacker in the yellow shirt?

"A.  He said, that looks like SK.

"Q.  And did you show Prince Alston a single image of

the Defendant, Saikeen Dixon?

"A.  I did.

"Q.  Did Alston identify Quin Dixon as the person

known as SK?

"A.  Yes".

Did I read that accurately?

A    You did.

Q    Are you aware of DOJ policy in grand jury, sir?

MR. BOWERMAN:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

BY MR. BOLOGNA:

Q    Sir, do you believe you told the members of the grand jury what was relevant about the identification of my client?

MR. BOWERMAN:  Objection.  Relevance.

THE COURT:  Sustained.  I'll hear it for the limited purpose of the motion.

BY MR. BOLOGNA:

Q    Sir, you indicated that you obtained the information that went into this affidavit based on your investigation of the events of October 4th; am I right?  That was the date he was arrested, and the phones were seized.

A    Yes, that's correct.

Q    All right.  You would agree with me that what's been marked as Government Exhibit 6 seeks permission from the Court to seize four cell phones -- excuse me, to search four cell

phones?

A    Yes.

Q    And you would agree with me that one of the cell phones was taken off the person of Mr. Dixon when he was arrested and the other three were retrieved from the trunk of the car?

A    Yes.

Q    The affidavit spends considerable time talking about what is known as the -6970 phone; am I right?

A    Yes.

Q    You do not state anywhere in the affidavit that the -6970 phone is one of the four phones that were seized?

A    Correct.

Q    You do not state anywhere in the affidavit that you believe the -6970 phone is one of the phones that were seized?

A    Correct.

Q    You do not state anywhere in the affidavit anything you did to confirm whether the -6970 phone was being used between the date of the carjacking, August 10th, 2022, to the date that you seized these four phones from Mr. Dixon or the trunk; am I right?

A    Correct.

Q    You could have called the cell phone service provider and said, hey, is this phone still active?

A    Correct.

Q    Didn't do it.

A    Correct.

Q    All right.  The information that you put in this affidavit related to a carjacking that had occurred, do you know how many days before the seizure of these phones it occurred?  Do you know that detail?

A    From the carjacking to the seizure of Saikeen Dixon's phones?

Q    Yes.

A    A year and 20-something days.

Q    Okay.  I did the math.  It's 420 days.

A    Okay.

Q    So the last time that you have any evidence that Saikeen Dixon is using the phone connected in any way to the carjacking is 420 days old.

A    Okay.

Q    You don't have any evidence that any of those phones are being used between the date of the carjacking, August 10th, until the date that they're seized, do you?

A    No.

Q    Okay.  You don't list any of those phones as being a phone that Mr. Dixon was actually seen using -- whether he was calling, whether he was texting.  He simply was in possession of these things.  Am I right?

A    Yes.

Q    Okay.  Sir, you went to the Bucks County Courthouse that

day, intent on arresting my client with a valid warrant, agreed?

A    Yes.

Q    And you and Detective Liebsch were seated in a car some distance away when my client pulled into the driveway.

A    Some distance, yes.

Q    You've described that distance as approximately 200 feet in your 302; am I right?

A    Correct.

Q    All right.  My recollection is a basketball court's 94 feet in length.

A    Yes.

Q    Consistent with your memory?

A    I never knew that fact, but that's a good tidbit.

Q    Okay.  So we're talking two full-length basketball courts or more you were away from Mr. Dixon when he pulled in in the car?

A    Yes.

Q    All right.  He's the driver, agreed?

A    Yes.

Q    He's in the driver's seat, brings the car in, comes to a full stop, right?

A    Yes.

Q    Car is heavily tinted?

A    Yes.

Q    Did you know it was Mr. Dixon in the car before he got out of the car?

A    I didn't see him in the car, but I had a good reason to believe that it was him.

Q    Okay.  So you think it might be Dixon in the car?

A    Yes.

Q    Were you using any binoculars?

A    I have a monocular in the car.  Yes.

Q    Were you using it?

A    I can't remember.

Q    So if I'm Mr. Dixon, and I'm in the driver's seat, and the car comes to a stop, are you in front of him, behind him, to the passenger side, or the driver's side as you're making your observations?

A    I'm behind him and to the driver's side.

Q    Okay.  And you see him get out of the driver's seat and go to the trunk?

A    Yes.

Q    I think you described, he had -- on direct, you described he had small items in his hand, and he put them in the trunk.

A    Yes.

Q    Could you see how many items?

A    No.

Q    So it could have been one?

A    Correct.

Q    Could have been more than one?

A    Correct.

Q    Could you see what the item or items were made of?

A    No.

Q    Could have been paper, plastic, cloth, or metal?

A    Correct.

Q    He also was holding the items, or item, in his hands, right?

A    Correct.

Q    So he got out of the car, he walked to the back, he put them in the trunk, and then he went in the courthouse?

A    Yes.

Q    All right.  At that point, Detective Liebsch follows him into the courthouse, and you go straight to the car?

A    Yes.

Q    Your report and your testimony is, this is about 9:15 in the morning when this starts, right?

A    Correct.

Q    All right.  I want to get the times right here.  You did not wait in the car when Mr. Dixon walks to the courthouse. You got out of your vehicle and approached the parked car quickly?

A    Can't remember if it was quickly, but I approached it.

Q    Okay.  Within a minute of him walking to the courthouse, you're out of your car, walking over to the parked car?

A    Yes.

Q    All right.  And it takes you 30 seconds or so to get from where you are to where his car is parked, right?

A    Sure.

Q    I'm asking.  I wasn't there, sir.

A    I -- yes.  I -- I don't know how long it took, but it was walking across a parking lot 200 feet.

Q    Okay.  You knock on the window to get the attention of the person who's inside?

A    Yes.

Q    Ms. Beverly's inside?

A    Yes.

Q    Stranger to you?

A    Correct.

Q    She's there with one -- or it appears to be about a one year-old child?

A    Correct.

Q    All right.  You speak to her about who you are and what you want.

A    Yes.

Q    Was she free to leave?

A    At that time, no.

Q    Okay.  And you were asking her questions, right?

A    Yes.

Q    Did you Mirandize her?

A    No.

Q    Your testimony on direct is that you thought that the things that were put in the trunk may have been contraband, right?

A    That's what I said.

Q    So you were asking her questions, while she was not free to leave, that could incriminate her, right?

A    I never saw them in her hand.

Q    Well, they were in her car.

A    But she didn't put them in the trunk.

Q    Okay.  Sir, I don't want to get into an argument with you. You are familiar with joint constructive possession, right?

A    I am.

        THE COURT:  Hey, Counsel.  She's not being charged with anything here.

        MR. BOLOGNA:  I know.

        THE COURT:  Let's move on.

        MR. BOLOGNA:  All right.

BY MR. BOLOGNA:

Q    You asked her questions about the car; am I right?

A    Yes.

Q    She produced keys to the car to you relatively quickly?

A    Yes.

Q    And that was important to you, to get the keys quickly?

A    Yes.

Q    You got the keys within a minute or two of speaking to her?

A    Correct.

Q    And it's a key fob that both can lock and unlock the car; am I right?

A    Yes.

Q    It can also pop the trunk?

A    Yes.

Q    All right.  So if Mr. Dixon leaves the car at 9:15 in the morning to go into the courthouse, based on what we've described, is it a fair statement that you are at the side of the car and in possession of the car keys at 9:20 in the morning?

A    I think that'd be fair, yes.

Q    All right.  Now you mentioned certain people who were accompanying you that day.  Stasny, Liebsch, Farnan are the names I heard.  Is that right?

A    Yeah, there's -- I think there were some other officers there, too.

Q    All right.  They are inside the courthouse at this point to arrest Mr. Dixon, right?

A    Some of them.  So I don't remember who was outside with me, but I was not alone outside.  But they weren't right behind me or right with me, talking.  There (sic) might have been in a car, keeping an eye on me, just because I -- you don't leave

somebody alone.

Q    Fair enough.  But it's you and only you who's talking to Ms. Beverly?

A    Correct.

Q    All right.  You wanted to know what was in that trunk, didn't you?

A    I did.

Q    You thought that what was in that trunk might be important?

A    Yes.

Q    And you felt like you needed to know what was in that trunk before you could decide what to do next?

         MR. BOWERMAN:  Objection.  Vague.

         THE COURT:  Overruled.

         THE WITNESS:  I didn't think I had to know what was in the trunk before I decided what to do next.  I had a plan of what I was going to do --

         MR. BOLOGNA:  Okay.

         THE WITNESS:  -- regardless of how it was answered.

BY MR. BOLOGNA:

Q    Okay.  So you've participated in searches before?  Many searches.

A    Yes.

Q    There are searches that result in people giving consent, which are relatively quick, and you can go and search

immediately, right?

A    Yeah.

Q    And then there's also searches where property has to be seized.  For example, a car:  towed, impounded, search warrant, then searched, right?

A    Correct.

Q    There's consent, which is easy, and what I just described, which is much more time-consuming, right?

A    It is.

Q    And if you're going to do all the time-consuming stuff, you want to make sure you're doing it for a valid reason, right?  You're not wasting your time.

A    I think that'd be fair to say, yes.

Q    And all you needed to do to understand whether you were going to waste your time was just take a peek inside the trunk and know what's in there.

A    No.

Q    Well, wait a minute.  Wait a minute.  You told Her Honor on direct that when you spoke to Ms. Beverly -- I wrote this down -- you told Ms. Beverly, "We're going to search the car with consent, or we're going to hold the car, take possession of the car, tow it, search it", right?

A    Correct.

Q    You had decided you were going to do all that when you talked to Ms. Beverly about searching the car?

A    I was prepared to do that, yes.

Q    Okay.  In that conversation, when you spoke to her about that, had Mr. Dixon come out of the courthouse yet in handcuffs, when you told that to her?

A    I can't remember.  I think I did, because at that point, I told her why he was arrested.

Q    So you do or don't remember whether Mr. Dixon had come out of the courthouse before you had that conversation?

A    Like an episodic memory, that no.  But logically, I think I -- at that point, yes, I had told her.

Q    Okay.  So you think Mr. Dixon's a drug dealer, right?

A    Yes.

Q    And he had $785 of cash on his person, right?

A    Yes.

Q    That's a lot of money.

A    I think that's a relative term.  Director of Homeland Security had $3,000 in cash on her at a restaurant when it was stolen.

Q    I'm not trying to argue with you, sir.  I'm trying to ask you:  Do you believe that $785 cash on a person is a substantial amount of money?

MR. BOWERMAN:  Objection.  Asked and answered.

THE COURT:  Sustained.

BY MR. BOLOGNA:

Q    If you think that Mr. Dixon is a drug dealer and has $785

of cash on him, where'd you think he got that money?

A    I didn't think about it at the time.

Q    Okay.  You also told Her Honor that you told Ms. Beverly, if you don't give consent, I'm going to have to take the car, and you're going to have to find -- I think the words you used were alternate transportation home.  Is that what you said?

A    Correct.

Q    Do you know how far she had traveled to get to where she was?

A    I don't know specifically, but that area is about an hour from Center City.

Q    Okay.  And she had a 1-year-old with her, right?

A    She did.

Q    So you had two things, potentially, that were valuable to her.  You had the ability to let her leave in the car, and you had the ability to give her the money that her boyfriend had in his possession, right?

        MR. BOWERMAN:  Objection.  Calls for speculation. That's valuable to her.

        THE COURT:  That basis is overruled.

        THE WITNESS:  I would assume the child's valuable to her.  I don't know how much $785 is worth to her.

BY MR. BOLOGNA:

Q    Did you discuss the money with her?

A    I don't remember specifically discussing with her.  I

remember giving it back to her.

Q    You don't have any memory of talking about giving this money back to her?

A    I don't think it would've been a huge discussion because we had no intention of seizing the money, so it would've been just --

Q    Okay.

A    -- just -- Saikeen wants you to have this money, we're not taking it, here's the money.

Q    Okay.  I want you to take a look at what Government had previously marked.  I believe it's Exhibit 6 -- excuse me, Exhibit 5.  My apologies.  This is the first in your series of photos; am I right?

A    This is the -- Exhibit 5 is the screenshots I took using the information to show the dates and times.

Q    Right.  And this is the first chronologically of the photos that you took.  This is at 9:34 a.m.?

A    Correct.

Q    And what it's showing is a payment history for this car from Ms. Beverly, right?

A    Yes.

Q    And --

A    Some of these are just transactions in particular, because some other ones that, like, the $160 payment I don't think was, or the $40 payment.  But in particular, I took a shot of the

$350 payment on page 4.

Q    Okay, so pages 1, 2, 3, and 4, which are photos taken at 9:34, 9:34, 9:34, and 9:35, are screenshots of her phone showing that she was making payments and some of those payments were for this car, right?

A    Correct.

Q    All right.  And the reason you were doing that is to show that she was a lawful possessor of this car, right?

A    Correct.

Q    So that if you released the car to her, you were releasing it to a lawful possessor?

A    Also so that the person that I was getting consent from was able to give consent.

Q    Fair enough.  You wanted to make sure that she was going to give you consent that would stick up in court, right?

A    Yes.

Q    Okay.  Your testimony is that she gave you verbal consent first or second?

A    Verbal was first.

Q    Okay.

Q    And did she give you verbal consent before the picture at 9:34 in the morning?

A    I don't remember exactly.

Q    Okay.  Between taking these pictures, you then go, which would be USAO number 53910, and take a picture of the back of

the car; am I right?

A    Correct.

Q    That photo is taken at 9:38 in the morning?

A    Correct.

Q    She has established for you that she is in lawful possession of that car and she has given you verbal consent at that time; is that right?

A    It's possible it was at that point, but it could have been after.  It could -- it was before 9:43. I know that.

Q    There's a seven-minute gap between the photo that you took at 9:38, and the rest of the photos of the inside of the trunk; am I right?

A    Yes.

Q    That was your choice to take that photo at 9:38?

A    Yes.

Q    It's a photo the outside of the car, right?

A    It is.

Q    You already knew what the outside of the car looked like?

A    Correct.

Q    You already knew you were going to seize that car unless you got consent, right?

A    Yes.

Q    And you knew that you were going to go inside that car and take whatever Mr. Dixon had put in the trunk out, as part of your investigation?

A    I knew I was going to look in the trunk.  I didn't know if I was going to take it, because I didn't know what was in there.  Right.

Q    So you opened up the trunk and you looked?

A    After I got consent to search signed by Ms. Beverly.

A    All right.

Q    So you agree with me that Ms. Beverly signs the consent-to-search form, at least as it's written at 9:43 in the morning?

A    That's when she signed it and when she dated and timed it, yes.

Q    All right.  And you then, according to the photos, are looking inside the trunk.  The first photo you take would be the photo that is Bates stamp 53903; am I right?

A    Yes.

Q    All right.  You open up the trunk, you look inside, there's a bunch of stuff there, agreed?

A    The characterization of "bunch" I think is a little bit much, but if you look at my trunk, there's a lot more stuff.

Q    All right, well let's do it this way.  There's a pair of, I'll call them Crocs, white Crocs.  Do you see that?

A    Yes.

Q    There's a pair of sneakers?

A    Yes.

Q    There's a pair or either green shorts or a green bag?

A    Correct.

Q    And that could hold something; am I right?

A    Yes.

Q    There's a jacket.

A    Yes.

Q    And there appears to be, like, a cloth bag to the right-hand side; am I right?

A    Yes.

Q    And if I'm interpreting the shadows correctly, I see one, two, three shadows in that photo.  Do you see those three shadows?

A    Yes.

Q    I see what appears to the far right to be a person holding up a cell phone, taking a picture?

A    Yes.

Q    I see another person what appears to be in the middle?

A    Yes.

Q    And I see another person to the left?

A    Yes.

Q    Which one of those is you?

A    I took a photo, so it's going to be me on the right.

Q     Okay.  Who's to the left of you?

A    I don't remember.

Q    Who's to The left of that person?

A    I don't remember.

Q    Is Ms. Beverly outside the car as you're having the conversations that you're having with her that morning?

A    Initially, she was in the car and she got out and we were talking outside of the car.

Q    Okay, so she was in a position to see what was happening at the trunk of that car?

A    I don't remember where she was.  I can't say what she saw.

Q    Okay.  But she's outside the car as these things are taking place?

A    Yes.

Q    All right.  So you look in the back of the car; you see the things that we've just walked through.  You don't know what Mr. Dixon put in the trunk, right?

A    Correct.

Q    So you go and you search not only the Crocs, you search the shoes, right?

A    Yes.

Q    You searched the bag, right?

A    Yes.

Q    You searched the jacket, right?

A    Yes.

Q    You searched whatever that is, gray thing to the right, right?

A    Yes.

Q    You look underneath those things?

A    Yes.

Q    You look around those things?

A    Yes.

Q    And it takes time?

A    What do you mean by time?  How much time?

Q    Well, it doesn't happen in a second, does it?

A    Well, identifying the phones and the shoes, and taking pictures of them doesn't take very long, no.

Q    Okay.  So you would agree with me that there is seven minutes between the outside of the trunk and the first open trunk; am I right?

A    Yes.

Q    Plenty of time to think?

A    About what?

Q    What you're going to photograph when you open up the trunk?

A    No, that's when I was filling out the consent-to-search warrant.

Q    All right.

A    And that's when I was explaining the form to Ms. Beverly.

Q    All right.  So you think Mr. Dixon's a drug dealer.  We've already talked about that.  Did you search these things for drugs?

A    Yes.

Q    Did you search them for firearms?

A    Yes.

Q    So what did you look for first, because I understand. I have a brother who's a police officer.  Officer safety's a big deal, right?

A    Right, yeah.

Q    So you are going to want to make sure before you go in and start pulling stuff out that you have the leg of the land of what's in that trunk, right?

A    Not necessarily, no.

Q    You're not going to go rooting around if there's a loaded firearm underneath the jacket or underneath the bag, or behind the shoes, right?

A    Well, you'd have to find the firearm for it to discharge. And if I'm not touching stuff where it's in -- or if I'm just grabbing the phones from that Croc and taking a photo of them, which is what I did first before searching the rest of the car, I'm not concerned about that firearm.

Q    Don't you always, whenever you conduct a search, render the place safe before you go and you start seizing items? Isn't that what you're trained to do?

A    Safe of people that could hurt me.  A gun that's not in somebody's hand isn't going to hurt me.

Q    Okay.

A    For example, when I search a house and there's a firearm, I'm not securing that firearm immediately.  I'm making sure

there's nobody else in the house.  Then, I take a picture of that firearm and then I unload it.

Q    Right.  You take a picture of it, you render it safe, you remove it as a clip, you take anything out of the chamber, it's safe.  And now I'm here going to go about the rest of my business, right?

A    Correct.  But I take the items of evidence in the order that I find them, because if you dislodge something else and cover up the other items of evidence or you remove them and then you have to take a picture, things look like they have removed --

Q    Okay.

A    -- which is not the case.

Q    All right.  You talked before about members of the Dirty Block and the information you had.  You knew that members of the Dirty Block, according to what you were told, were involved in crimes of violence; am I right?

A    Yes.

Q    Things involving firearms, right?

A    Yes.

Q    Things involving drugs, right?

A    Yes.

Q    So it was a concern of yours that there might be a gun in that trunk?

A    There was a possibility, yes.

Q    Okay.  Did you look for one?

A    Yes.

Q    Okay.  Didn't find one?

A    No.

Q    In this case, did you ever receive confidential informant information, before your conversation with Prince Alston in April of 2023, about the Dirty Block?

A    Did I?

Q    Did anyone who you worked with?

A    I have no idea.  Well, you told Her Honor that you received information, at a debriefing approximately a month before the meeting with Prince Alston, in which members of law enforcement shared information with you about the Dirty Block and you began an investigation of his carjacking.  You remember that testimony?

A    I do.

Q    Did any confidential informant, either of the police department or federal law enforcement, share with you or anyone in your investigation, details about the Dirty Block?

A    I mean, there could have been information in those intelligent briefings, but I don't know what it was.  I can't remember.

Q    I'm talking about an informant.

A    Correct.

Q    Have you ever received information from the informant?

A    Not That I'm aware of.

Q    Have you ever received information from the informant about this ?

A    Outside of what Mr. Alston's given us, no.

Q    Okay.

MR. BOLOGNA:  Court's indulgence.

BY MR. BOLOGNA:

Q    Sir, I want to finish with one final area.  You are aware that Mr.  Alston testified in grand jury for the indictment of Mr. Byrd, but not for the indictment of Mr. Dixon; am I right?

A    Yes.

Q    Are you aware, sir, that when he testified, he was asked a question --

MR. BOLOGNA:  Excuse my back, Your Honor.

THE COURT:  Counsel, what is the date of the testimony?

MR. BOLOGNA:  Sure.  I'll get that, Your Honor.  The date of the testimony is May 10th of 2023.

THE COURT:  So before --

UNIDENTIFIED SPEAKER: Okay.

BY MR. BOLOGNA:

Q    You're aware that Mr. Alston was asked questions, when he testified on that date, about the carjacking, right?

A    Yes.

Q    Have you had a chance to review his testimony before you

testified today?

A    I have not reviewed his testimony, no.

Q    Okay.

MR. BOLOGNA:  Your Honor, I mark this as D-4.

BY MR. BOLOGNA:

Q    Sir, do you recognize that as Mr. Alston's testimony on that date?

A    Yes.

Q    Okay.  And this is Mr. Alston's one and only time testifying in front of the grand jury; am I right?

A    I believe so, yes.

Q    All right.  Could you please go to page 19?  Do you see that?

A    I'm on page 19.

Q    Do you see on the left-hand column line number 22?  See where I'm at?

A    Yes.

Q    Okay.  I want you to let me know if I read this accurately.

"Q    When "he", referring to the alleged armed carjacker, when he came back, was he in a car?

"A    Yes.  He was in a different car.

"Q    What was this other car?

"A    A black Track Hawk, I believe.

"Q    And is a Track Hawk a kind of Jeep?

"A    Yes.

"Q    Was he with anybody when he came back?

"A    Yes.

"Q    Could you see who he was with?

"A    No.

Did I read that accurately?

A    You did.

Q    Am I correct that this testimony on May 10th of 2023 was approximately one month after Mr. Alston had identified the photo of "SK"?

A    Correct.

Q    And it was your conclusion that "SK" was the driver of the Track Hawk; am I right?

A    We were investigating at the time, but ultimately, yes, that's what we concluded.

Q    Did you ever confront Mr. Alston ,after his sworn testimony to the grand jury, that he could not identify the other person in the black Track Hawk?  Did you ever say, Mr. Alston, why did you give that answer?

A    No.

Q    You know what it means to "go south", sir?

MR. BOWERMAN:  Objection.

THE WITNESS:  I'm sorry?

THE COURT:  Sustained.  We're focused on the motion only.

MR. BOLOGNA: Final point. Thank you, Your Honor.

BY MR. BOLOGNA:

Q   When you prepared your affidavit and submitted it to Judge Straw, that testimony that we just read is the only sworn testimony that existed from Prince Alston about the identity of the driver of the Track Hawk; is that correct?

A   Yes.

Q   And when someone is sworn, they take an oath to tell the truth, the whole truth and nothing but the truth, correct?

A   Yes.

Q   And Mr. Alston's sworn testimony was that he could not identify the driver?

A   Yes.

Q   Did you think that would be helpful to let Judge Straw know that fact?

A   I had reviewed his testimony at that time, so I was unaware that he was -- that was his testimony at the time I wrote the affidavit.

MR. BOLOGNA: I have no further questions. Thank you.

THE COURT: Any redirect?

MR. BOWERMAN: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. BOWERMAN:

Q   Agent Donahue, let's start off talking about Prince

Alston's testimony, since that's where we left off.  You were asked on cross-examination about Mr. Alston's statement to police in August of 2022, right?

A    Yes.

Q    You were asked about how Mr. Alston said he had never seen the driver of the black Jeep before; do you remember that testimony?

A    I do.

Q    We were also asked about how he said he wasn't paying attention to that person?

A    Yes.

Q    Does whether or not somebody's paying attention to somebody affect whether or not they can tell if they know that person?

A    It is.

Q    You were asked about whether Alston made statements to police identifying two people, Byrd and Pop, in the black Jeep, on August 10th, 2022.  Do you remember being asked about that?

A    I remember that, yes.

Q    Now, is the evidence that you've seen, regarding a statement where Prince said Byrd and Pop were in a Jeep, is that from Philadelphia Police Department notes?

A    Yes.

MR. BOWERMAN:  Now, I'm going to hand a copy of what's been marked as Government Exhibit 15 to the defense, and

I have a copy for the Court as well and one for the witness.

BY MR. BOWERMAN:

Q    Agent Donahue, do you recognize this document?

A    I do.

Q    Could you tell us what it is?

A    It is a 302 Memorandum of investigation where I talked to Detective Christopher Maitland of the Philadelphia Police Department regarding some statements -- or some notes that he had written in the summary of property of Prince Alston on September 22nd, 2022.

Q    And so are the notes from Detective Maitland attached to your 302?

A    They are.

Q    And those notes in there, do they make reference to Prince Alston, saying that Bird and Pop were in the Jeep together?

A    Yes.

Q    Are those notes written by Detective Maitland or by Prince Alston?

A    Detective Maitland.

Q    Are they signed by Prince Alston?

A    No.

Q    Do you have any indication that they were reviewed by Prince Alston?

A    No.

Q    Did you speak with Detective Maitland about those notes?

A    I did.

Q    And did you document that in your 302 report?

A    I did.

Q    All right.  What did you learn about the notes during your conversation with Detective Maitland?

A    That his characterization in his notice of Byrd and Pop being in the car, it could have been a misunderstanding of his -- of what Mr. Alston said.

Q    On other occasions, did Prince talk about how he was speaking with Pop on the phone while Byrd was in the Jeep?

A    Correct.

Q    And as you testified on direct, did Prince give other statements that Byrd was in the Jeep with somebody else that he couldn't see driving?

A    Correct.

Q    All right.

Q    So in your affidavit to Judge Straw, you did talk about Prince Alston's identification of a person known as "SK", right?

A    Yes.

Q    Did you, in the affidavit, say anything about Prince identifying or not identifying the driver of the Jeep that he saw on August 10th, 2022?

A    In the affidavit to Judge Straw?  I'd have to look through it.

Q    Did you talk about Prince looking at a surveillance photo?

A    Yes.

Q     -- in the affidavit?

A    Yes.

Q    Did you say that Prince was capable of identifying the person he saw on the day of the carjacking, in the affidavit?

A    Yes.

Q    You did say in the affidavit that he could identify the person --

A    Oh, I'm sorry.

Q    -- that he saw?

A    For -- when he was at the side of the car, no.

Q    So let me just ask about those -- there's two different things.  In the affidavit, did you say that he identified somebody in a photo?

A    Yes.

Q    Did you say that he was capable of identifying somebody he saw on August 10th, 2022?

A    He did.  Right -- we're talking about the proffer.  I think I'm getting my time and dates confused.

Q    Yes.  So I'm asking you in the proffer --

A    Yes.

Q    -- and in Prince's prior statements, you told us he said he couldn't see who was driving the Jeep, right?

A    Correct.

Q    And you didn't say in the affidavit that he could see who was driving the Jeep, did you?

A    Correct.  I did not.

Q    You were asked about aliases on cross-examination.  Do you remember that testimony?

A    Yes.

Q    Where have you seen any references to aliases associated with Prince Alston?

A    I think it was just in his NCIC printout, his police criminal history.

Q    All right.  Do you know anything about how, when or why those aliases were used?

A    No.

Q    Can aliases show up in a criminal history report just because they appeared somewhere in police paperwork?

MR. BOLOGNA:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. BOWERMAN:

Q    Could you please turn to Exhibit 2?  Is that the criminal history report for Saikeen Dixon?

A    It is.

Q    Are there aliases listed at the top of the report for Mr. Dixon?

A    There are.

Q    What are they?

A    So there are numerous spellings of his name.  And then there's also one with a middle initial.  And there's also a Saikeen Washington.

Q    And to the best of your knowledge is Prince Alston's middle name Germaine?

A    Yes.

Q    You were asked on cross-examination about whether Prince Alston's statements to you were reliable.  Do you remember being asked about that?

A    Yes.

Q    Did you include statements from Prince Alston, and information you learned from Prince Alston, in your affidavit to Judge Straw?

A    Yes.

Q    Did you believe that that information you put in the affidavit was reliable?

A    I did.

Q    What made you believe that that information was reliable?

A    Information that I believe is reliable and put into an affidavit is something that I can corroborate or something that's backed up by other facts.

Q    And how did you --

A    Through review of video cell phones, text messages, pictures, GPS data, pins that are dropped and texted, stuff

like that.

Q    And was that the kind of information you used to corroborate Prince Alston's statements--

A    Yes.

Q    -- that are in your affidavit?

A    Yes.

Q    Let's go back to the arrest of Mr. Dixon.  Before Mr. Dixon was arrested, did you get a warrant for GPS pings on Mr. Dixon's phone so you could locate him?

A    I think I did, yes.

Q    And was one of the numbers you got a ping for the number ending in 6970?

A    Yes.

Q    You mentioned that you spoke to Ms. Beverly in the car when you arrived at the Bucks County Courthouse that day; is that right?

A    Yes.

Q    And while you were speaking with her, where were the other agents who were with you that day?

A    Most of them were inside the courthouse and there was at least one or two people outside with me.

Q    And why do the agents go into the courthouse?

A    To arrest Mr. Dixon.  And then you mentioned that you spoke with Ms.  Beverly again about consent to search the car after those agents came out of the building; is that right?

MR. BOLOGNA:  Objection.  Misstates his testimony.

THE COURT:  Overruled. Court's recollection will control.

THE WITNESS:  Yeah.  I think it was after he came out that I talked to her about consent to search.

BY MR. BOWERMAN:

Q    And you spoke with the other agents when they came out, right?

A    Yes.

Q    Was it your testimony that you spoke with them and then you spoke with Ms. Beverly?

A    Yes.  And I was speaking with Ms. Beverly throughout, but when they came out, they gave me information about what was said inside.

Q    So as you were preparing to search the car, did you do a sneak peek of the trunk?

A    No.

Q    Did you open the trunk before Ms. Beverly signed the consent form?

A    No.

Q    And when did you search the other items that we saw in the photo of the trunk, besides the cell phones?

A    I searched the entire car, too.  So what initially happened was the trunk was open, I saw the phones.  Mr. Dixon was not in the trunk for very long, so I figured that must have

been what he put in there.  So I immediately took pictures, pulled those phones out, and then I continued searching the rest of the car.  The main cabin was searched, too, with nothing else of interest found.

Q    So you took the photos of the phones first and then searched the other items?

A    Correct.  To preserve the record of where they were found and what condition they were in.

Q    And I just have one more question about the surveillance photo that you showed Mr. Alston.  You were asked on cross-examination about how the person in the yellow shirt is wearing a balaclava; do you remember that testimony?

A    Yes.

Q    What other features besides facial features can somebody use in making an identification?

A    You can use skin tone, height, weight, shapes of faces, shapes of muscles.

Q    Thank you, sir.

        MR. BOWERMAN:  I have no further questions, Your Honor.

        THE COURT:  Before you step down, you were asked Questions both on cross and redirect, regarding about phone number ending in 6970.  What is your typical practice when investigating -- what's your typical method that you use to identify the number related to a seized phone?

THE WITNESS:  So typically what we'll do is when that phone is seized, we will bring it to our regional computer forensics laboratory, and they will plug it into a computer to unlock it.  And that information from the phone and the SIM card will then be compared in a forensic report,  and that's how we can determine what number is actually assigned to that phone.

THE COURT:  In this particular case where the four phones that we've been discussing, was that done prior to obtaining approval of the warrant by Judge Straw?

THE WITNESS:  No, we won't plug that phone in.  And the RCFL staff won't even plug that phone in until we have an warrant.

THE COURT:  So prior to requesting a warrant from Judge Straw regarding these four phones, did you have any identifying information regarding the phone numbers associated with each of the four?

THE WITNESS:  Not regarding the phone numbers, no.

THE COURT:  So Bowerman, any questions based on what I asked?

MR. BOWERMAN:  No, your Honor.

THE COURT:  Okay.

Mr.  Bologna, any questions based on either what Mr. Bowerman asked on redirect or what I asked?

MR. BOLOGNA:  No, your Honor.  Thank you.

THE COURT: Okay, thank you.

Sir, you may step down.

Counsel, it is my goal that we finish the testimony for this before we take a lunch break, but anyone need a personal break now?

MR. BOLOGNA: If I can have 30 seconds, that would be great.

THE COURT: You can have more than 30 seconds. Why don't we take just a quick 5 to 10-minute personal break, and we'll need one. Marhsall, if you can figure out with the gentlemen if they need a personal break, and then we will continue with the testimony.

THE WITNESS: Your Honor, would you like me sequestered from Ms. Beverly?

THE COURT: No. You don't need to -- once your counterpart has testified, you're sequestration is dissolved for you.

THE WITNESS: Thank you.

MR. BOWERMAN: Thank you, Your Honor.

(Recess at 11:39 a.m., recommencing at 11:56 a.m.)

THE BAILIFF: All rise. Court is now in session.

THE COURT: All right. You may be seated. Thank you.

Okay. Does the Government have any additional witnesses to present?

motion in limine by Mr. Dixon to produce notes from Philadelphia Police Department, FBI, and communications between the Philadelphia Police Department and the FBI.  So we're going to address all of those on the record at this time.

The Defense and Government jointly agreed that the testimony presented as it relates to the motions to suppress would be submitted -- presented jointly.  The Court has considered all of the evidence that was submitted on these two motions and will rule accordingly.  Let me just make sure I have my notes.

The first question that the Court is going to address is the motion in limine to submit -- I'm sorry -- the motion to suppress the identification of the photograph by Prince Alston. The Court has considered the testimony that was presented in this case and the purpose of a motion to suppress is to preclude the Government from using evidence that was obtained improperly, and in this case the argument is that it was unduly suggestive.  In looking at the totality of the evidence, this is not a circumstance in which Mr. Alston was given a suggestive photo or told who to -- who to identify.  Throughout the course of the FBI's investigation they were looking into who committed the crime on October 10th.  They didn't know who committed the crime.  And in the course of their investigation they showed a photograph to Prince Alston that showed two people in balaclavas, one of whom was in a yellow shirt.  When

showing Mr. Alston that photo, they did not say, is this SK or is this Saikeen Dixon?  They said, who is this?  And as a result Prince Alston said that's SK.  There was nothing suggestive about the effort that the FBI made at that moment.

The argument that Mr. -- that the perpetrator's face was covered with a balaclava and therefore it is not reliable is an issue that is subject to cross-examination at trial.  The Court is able to use common sense and my own personal experiences, and if in fact Mr. Alston does know Mr. Dixon as the testimony has been presented, he may be easily -- may be able to easily identify him regardless of whether or not portions of his face are covered.  I say that in thinking about it in the context of my own life.  My kids are snowboarders. They wear balaclavas all the time when they snowboard.  I still know who they are because I know them even if I can only see their eyes and their nose.  The testimony in this matter was that Mr. Dixon was known to Mr. Alston in advance of this identification.  When shown the photograph, he said that's SK. The FBI then looked into the people who are known associates of Mr. Byrd and through the Dirty gang -- am I getting it right?

UNIDENTIFIED SPEAKER:  Dirty Block.

THE COURT:  Dirty Block.  Thank you.  D-block. Through the Dirty Block and brought out someone who may -- who fit the SK description.  Likewise, they did not suggest to Mr. Alston whether or not this is the correct person; they said is

this SK?  That gives them the opportunity to say yes or no.  We know subsequent to this that SK was identified through a number of other mechanisms.  But for the purpose of this motion, there was nothing unduly suggestive or improper by the action of the law enforcement agents, and the motion to suppress this identification is denied.

Going to the motion to suppress the cell phones, there are two stages for this identification -- for this motion.  The first one is whether or not the trunk was properly searched -- of the vehicle.  And number two, whether or not after cell phones were obtained from the trunk, whether or not there was an appropriate basis for probable cause that justified Magistrate Judge Straw in issuing the warrant.

Quite frankly I thought this was going to be -- from reading the motion, I thought this would be a more difficult decision.  The issue as it relates to the search of the trunk is one that comes down to credibility.  When the Court considers credibility it considers not only the testimony presented on the record, but it also considers -- excuse me -- it considers the testimony on the record and the motivation for the testimony that is provided.  What motivation does someone have to tell the truth and what motivation does someone have to tell less than the truth?

In this matter, -- make sure I get the names correct -- Ms. Beverly testified on behalf of her paramour, Mr. Dixon

in this case.  Now Ms. Beverly's testimony in and of itself may be suspect because she wants her paramour to be home and to be home with their children, which is understandable.  Now that in and of itself does not make her testimony incredible.  But what does make her testimony incredible is the actual testimony that she presented here in Court.  The testimony that she didn't sign the consent form; she signed something else and her signature must have been imposed on the consent form is not a credible statement.  It is not credible her argument about what was in the trunk -- that red sneakers were in the trunk and somehow they were put there is not credible.  Likewise, when we consider her testimony that the document she signed -- the trunk was -- the trunk was closed when she signed the document, but the trunk was never closed again after opening it is belied by the facts presented by others.

The Court finds that law enforcement officers who testified were credible, but their testimony also makes sense.  What would be the motivation to tell less than the truth under these circumstances when it would be very easy just to impound the car, hold it, get a warrant, and search the trunk?  Law enforcement did that with Mr. Byrd and there would be no reason that they could not do that here.  So for those -- so the Court finds that Ms. Beverly was not credible as it relates to the premature search of the trunk.  The Court finds the testimony of law enforcement credible in this regard, that there was a

consensual search of the trunk provided by Ms. Beverly, and as a result of the consensual search three cell phones were found.

When we look at the search of the cell phones themselves, one found on Mr. Dixon after his arrest, and the three found in the trunk, the question for the Court then becomes whether or not probable cause existed that justified the approval of the search warrant that was provided to Judge Straw.  The Court has reviewed again all of the testimony presented and reviewed again the documents and in detail, the search warrant provided.  Now I'm going to connect this back to the identification by Alston of the name SK.  If that was the only basis for connecting Mr. Dixon to this crime, that may be a concern in the way that Mr. Bologna argued on Mr. Dixon's behalf, that somehow other information should have been provided to the Magistrate Judge about the areas that were suspect about Mr. Alston's identification.  But that is not what happened here.  Mr. Alston's identification of SK is one very small aspect of the collective investigation that was conducted by law enforcement when providing the foundation for probable cause for the search.

Counsel, you both appropriately cited the law, but for the purposes of my position I do want to just state again for the record probable cause exists when viewing the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular

place.  Probable cause is a practical and commonsensical standard turning on the assessment of probabilities in particular factual contexts and requiring only the kind of fair probability on which reasonable and prudent people, not legal technicians, act.  When looking at the search warrant and the totality of the evidence included in the search warrant that was provided to Judge Straw, there is probable cause.  Even considering the argument of counsel of what maybe should have been provided to the magistrate, the Court does not find that that is applicable for the reasons I stated as the identification by Alston of SK is one very small part of the investigation, the totality of which is listed here in the search warrant.

So the Court's obligation is to review the Magistrate Judge's finding of probable cause, and my review of a magistrate is not a rubberstamp; it's deferential though and I needed to ensure that the Magistrate Judge had a substantial basis for concluding that probable cause existed.  And in doing so I do find -- and when I did that, I had to confine myself to the facts that were before the Magistrate Judge and not consider information from other portions of the record unless I need to get to the good faith standard.

The Third Circuit has made it very clear that preference should be accorded to the warrants approved by the magistrates.  But looking at the Magistrate Judge's findings

for the reasons I've stated, there is clear probable cause that supports Judge Straw's decision in granting the warrant to search the phones.  And as a result, the motion to suppress the search, the obtaining the phone based on the consent, and the subsequent search of all four phones is denied.

Let's next go to -- let's go to the easier one first and that is -- the Court has done an in camera review of some, not all -- I have to do the rest of them -- of some of the documents that were requested by counsel related to notes that were taken by the Philadelphia Police Department and the FBI. The Court has done an in camera review of those notes.  I still have to finish going through what seems to be a couple hundred pages of emails between the FBI and the police department and I will do that.  And after my review of these records, I do find that there are two documents that do not appear to have been provided previously to the Defense, and may have relevance under -- that could either be used -- that could be used to impeach at trial.  So my question for the Government is I have identified which two these are but I have written on them for myself so I need to let you know so you get a clean copy to counsel.  So how would you like me to do that?

MR. BOWERMAN:  I suppose we could either take it now or you could send us an email with -- or an order --

THE COURT:  I mean, I can show you what --

MR. BOWERMAN:  -- with what the documents are.