# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

UNITED STATES OF AMERICA                :   CRIMINAL ACTION NO.
                                        :   23-0209
        v.                              :
                                        :   TRIAL DAY 2
RONALD BYRD                             :
SAIKEEN DIXON                          :
                                        :

_____

                                    James A. Byrne U.S. Courthouse
                                    601 Market Street
                                    Philadelphia, PA 19106
                                    June 4, 2025
                                    Commencing at 9:35 a.m.

_____

            BEFORE THE HONORABLE GAIL A. WEILHEIMER
                        AND JURY

_____


APPEARANCES:

FOR THE                 UNITED STATES ATTORNEY'S OFFICE, EDPA
GOVERNMENT:             BY:  ALEXANDER B. BOWERMAN, AUSA
                        BY:  TIMOTHY M. LANNI, AUSA
                        615 Chestnut Street, Suite 1250
                        Philadelphia, PA 19106
                        (215) 861-8200
                        alexander.bowerman@usdoj.gov
                        timothy.lanni@usdoj.gov


                            - - -

            Cherilyn M. McCollum, CCR-NJ, RPR
                Official Court Reporter
          Cherilyn_McCollum@paed.uscourts.gov




Proceedings taken stenographically and prepared utilizing
computer-aided transcription


────────────────*United States District Court*────────────────

the black Jeep used in the carjacking?

A.   Yes.

Q.   After that interview, did you investigate Alston's statements further?

A.   Yes.

Q.   What kinds of investigative steps did you take?

A.   Reviewed the video.  Took information from Alston.  Tried to develop it.  Based on information we got from him, we were reviewing video verifying his statements from that night.  We were trying to workup the identities of the people who had committed the carjacking.

Q.   So after that August 10th statement, were you also locating the vehicle used in the carjacking?

A.   Yes, of course.  So it was after August 10th that the Jeep Grand Cherokee was identified and recovered.  And it's during that time that the FedEx truck was processed for evidence as well.

Q.   After August 10th, do you have additional interviews with Alston?

A.   Yes.

Q.   Did you also have proffers?

A.   Yes.

Q.   Can you tell us what is the difference between an interview and a proffer?

A.   Proffer is a prearranged video.  Usually a defendant, in

this case Prince Alston, in agreement with his attorney, in agreement with the district attorney's office -- in this case it was the Philadelphia District Attorney's Office -- offers up evidence or information related to a crime to aid investigators in furtherance of that investigation.

Q. Did you conduct a proffer with Alston on September 23, 2022?

A. Yes.

Q. Did you speak with Alston more about Ty?

A. Yes.

Q. And what was your understanding of Ty after that meeting?

A. Mr. Alston, at that point, changed -- he identified Ty as "Bird" or "Bird Man." So he indicated that the person on August 8th that he referred to as Ty was "Bird" or "Bird Man."

Q. Let me ask you some more about this proffer. Was that one on video?

A. No.

Q. Were you taking notes during it?

A. Yes.

Q. Were those by hand or typed?

A. By hand.

Q. Did you later type up your notes?

A. Yes.

Q. Did you write a formal interview report from those notes?

A. Yes.

*United States District Court*

Q.    From those notes on September 23rd?

A.    Yes.

Q.    You wrote a formal report?

A.    Oh, specifically for just that date?

Q.    Yes.

A.    No, sir, I did not.

Q.    In your September 23, 2022 proffer, did Alston say that someone named Pop was in the black Jeep used in the carjacking?

A.    Not that I recall specifically.

Q.    Did you write in your notes that someone named Pop was in the Jeep?

A.    Yes.

Q.    Why did you write that down?

A.    During our conversation with Pop -- excuse me, with Prince Alston on that date, we had asked him who he knew who was involved with the recovery of the package, as well as with the subsequent carjacking that day.  He indicated that he knew two individuals who were involved in this process.  That was "Bird" or "Bird Man," as well as an individual named Pop.  He didn't provide any other information besides those two names.

In the context of the sequence of events as they occurred that morning, knowing there were two individuals who had committed the carjacking, Prince indicated he received a phone call from Pop immediately before the vehicle was carjacked or right at the time the carjacking was taking place, and that

*United States District Court*

phone call was from Pop and it was indicating or is telling him where the vehicle was located and to go to that location and recover the package.  I took that to mean that Pop was the second occupant of that Jeep Grand Cherokee.

Q.   Did you speak more with Alston about that after the September 23rd meeting?

A.   Yes.

Q.   Did you speak to him in an October 21, 2022 proffer?

A.   Yes.

Q.   Was that on video?

A.   Yes.

Q.   And did Alston say during that proffer that Pop was in the black Jeep?

A.   No.

Q.   What was your understanding about where Pop was after that conversation?

A.   At that moment when he received the phone call from Pop, he was at a different location.  That phone call took place over FaceTime, and he could tell that he wasn't in the Jeep, he was laying in bed or he was at home.  It just so happened that that FaceTime called occurred while the carjacking was occurring.

Q.   Did Alston say Pop was in the Jeep or on the phone?

A.   On the phone.

Q.   Did he ever say to you that Pop was in the Jeep?

*United States District Court*

A.   No.

Q.   And I just want to ask you a question about notes.  To what extent do you edit or revise notes over the course of your investigation?

MR. BOLOGNA:  Objection.

THE COURT:  Overruled.

BY MR. BOWERMAN:

Q.   Do you understand the question?

A.   Well, when you say -- no.  Could you ask it again, please?

Q.   Sure.  So you mentioned that you took handwritten notes on September 23rd, right?

A.   Yes.

Q.   You also mentioned that you typed them up?

A.   At a later date.

Q.   At a later date?

A.   Yes, sir.

Q.   And then after typing your notes up, do you go back and edit your notes at any point?

A.   No.

Q.   What's the difference between notes and a formal report?

A.   A formal report would be -- well, notes that I take would be potentially any information gathered during the course of an investigation, some of it relevant and some of it may not be, during the course of an investigation.  This investigation in particular was months long by the time the FBI adopted the

case.  So there would be a lot of different notes potentially taken during the course of this investigation, as opposed to a typed statement which would be potentially offered up for direct evidence at any court proceedings.

Q.   Let me ask you, in the Philadelphia Police Department is there a particular form that you use for a witness statement?

A.   Yes.

Q.   Is that called a Form 483?

A.   Yes.

Q.   All right.  Did you ever complete any Form 483s for your proffers with Prince Alston?

A.   No.

Q.   Did you write an arrest warrant on the night that you arrested Prince Alston?

A.   Yes, I wrote an arrest report for Prince Alston.

Q.   Did you write an affidavit for his arrest?

A.   Yes, I did.

Q.   And did that reference his August 10th statements?

A.   Yes, it did.

Q.   Did you ever write another arrest warrant in this case?

A.   Never.

Q.   Did the federal government start investigating this case at some point?

A.   Yes.

Q.   Around when was that, to the best of your knowledge?

*United States District Court*

A.   Yes.

Q.   And did Byrd tell you why he wanted the driver's phone number?

A.   To offer him the money.

Q.   So what happened next after you told Danielle -- as you offered Danielle -- I'm sorry.  Let me back up.

You said your old supervisor.  What's her name?

A.   Danielle.

Q.   And did you offer her $5,000 after Byrd told you to?

A.   Yes.

Q.   What happened after you did that?

A.   She told me no.

Q.   Where did you speak to Danielle?

A.   At the loading dock.

Q.   What happened after you spoke with her?

A.   I told Byrd they wasn't giving me the package, you got to wait until tomorrow.  He refused, say we had to get the package today.

Q.   At some point did you leave Temple?

A.   After that, yeah, I left.  I pulled off to go home, but he called me back and said they were parked on -- I forgot the block -- and told me I had to offer and see whether she would give it to me again.

Q.   Was that near Shriners Hospital?

A.   Yes.

Q.   What happened?

A.   I walked up and asked them for the package again.  She told me no.

Q.   What happened after that?

A.   I got in my vehicle.  Pop said, Tell them that we got to take the car, we got to take that truck.  We need that package.

Q.   Where was Pop when he said this to you?

A.   I don't know where he was at.  We was on FaceTime together.

Q.   So were you speaking with Pop in person or speaking with him on the phone?

A.   On the phone.

Q.   What phone were you using to speak with Pop?

A.   The phone that they gave me the night before.

Q.   Were you speaking on a regular phone call or was it FaceTime?

A.   FaceTime.

Q.   Could you see where Pop was on the FaceTime call?

A.   No, sir.

Q.   At this point, were you leaving Shriners?

A.   Yes.

Q.   Where were you going?

A.   We were heading down Broad Street going south.

Q.   What car were you in?

A.   I was in my own vehicle.

Q.    What kind of car did you drive at that time?

A.    A gray Pathfinder.

Q.    And where was Byrd at this point?

A.    He was in the black Trackhawk.

Q.    And where was your car in relation to Byrd's?

A.    Like right next to it.

Q.    What could you see inside of that car as you were driving down Broad Street?

A.    He was just telling me I got to get that package.  I could see that he still had the gun.  He told me to follow him.  Pop told me to follow him.  We kept going south.  I realized we wasn't going to get the package, I made a right on Fairmount or Spring Garden.  I forget which one.

Q.    You say you made a right off of Fairmount or Spring Garden.  Was that off of Broad Street?

A.    Yes.

Q.    Where was the FedEx truck at the time when you turned off?

A.    It was ahead of us probably -- I forgot.  Vine Street?

Q.    Now, were you still talking to Pop at that point?

A.    Yes.

Q.    Were you still talking to Byrd at this point?

A.    No.

Q.    What did Pop say was going to happen next?

A.    Pop say, They going to take that truck.  Follow them.  He just told me to follow them.

*United States District Court*

Q.   Was Pop in the Jeep when you were talking with him?

A.   No.

Q.   So what did you do next after you turned off?

A.   Pop told me they just took the truck.  I had to go open the door for them.  They didn't know how to open the doors.

MR. BOWERMAN:  I'd like to pull up Exhibit 114, please.

THE COURT:  That was not yet in evidence.

MR. BOWERMAN:  I believe it was, Your Honor.  It came in under Detective Maitland.

THE COURT:  I have through 113 into evidence.

MR. BOLOGNA:  I don't have any record of it being marked.

THE COURT:  You need to lay a foundation.

BY MR. BOWERMAN:

Q.   Sir, do you see on your screen a photo marked Government Exhibit 114?

A.   Yes.

Q.   Does that show a person inside of a FedEx truck?

A.   Yes.

Q.   Do you know who the person is in the orange shirt wearing the black ski mask in that photo?

A.   Yes.

Q.   Have you seen this photo before?

A.   Yes.

MR. BOWERMAN:  Your Honor, the government moves Exhibit 114 into evidence.

THE COURT:  So moved, and you may publish.

(Government Exhibit 114 admitted into evidence.)

MR. BOWERMAN:  Thank you, Your Honor.

BY MR. BOWERMAN:

Q.   Mr. Alston, who is the person in the orange shirt in this photo?

A.   That's Byrd.

Q.   When you saw Byrd on August 10, 2022, at Temple Hospital, was he wearing those clothes?

A.   Yes.

Q.   Are you able to recognize Byrd's face in this photograph?

A.   Yes.

Q.   How?

A.   His eyebrows.

Q.   Can you see a firearm in this photo?

A.   Yes.

Q.   Is that the same firearm you saw Byrd holding earlier?

A.   Yes.

MR. BOWERMAN:  Thank you.  We can take down that exhibit.

BY MR. BOWERMAN:

Q.   I think you started to get into it, but I just want to clarify the timeline.  Did you hear from Byrd or Pop after you

*United States District Court*

turned off of Broad Street?

A. Pop. Conversating with Pop.

Q. What did Pop tell you after you got onto Broad Street?

A. I have to go open the doors.

Q. And did you go down to try to find the truck.

A. Yes. I found it and it was by itself, but there was people surrounding it.

Q. Where did you see it?

A. I forgot name of the block.

Q. Was it somewhere in Southwest Philadelphia?

A. Yes.

Q. What happened when you saw the FedEx truck?

A. When I went down there, there was five -- five or six people surrounding it. I didn't get out of my car. I made a U-turn and the police came.

Q. When you saw the FedEx truck, was Byrd still in it?

A. No.

Q. Earlier on while you were at Temple and while at Shriners, did you see Jabari or Danielle take the package you were asking for off of the FedEx truck?

A. No.

Q. Did Byrd say that Jabari or Danielle had taken the package off the FedEx truck?

A. No.

Q. Did Pop say anything about the package being taken off the

FedEx truck?

A.   No.

Q.   When Pop told you to go to the truck at 47th and Woodland, did he tell you the package was still on the truck?

A.   Yes.

MR. BOWERMAN:  Your Honor, I think this is a good point for a break.

THE COURT:  Sure.  All right.  It is a quarter of 4:00.  We will take a 10-minute recess, and we're going to go for a true 10-minute recess.

Mr. Alston, when we take a break, you're welcome to step off the stand and take a personal break if you need one, but you are not to discuss your testimony with anyone.  Do you understand that?

THE WITNESS:  Yes.

THE COURT:  Very good.  And Agent Donahue, just to make sure we don't have anyone try to have conversations with Mr. Alston about his testimony, I would just like you to just make sure that doesn't happen for me.  Thank you.

All right.  All rise for the jury to exit.  Please leave your notepads.

(The jury exits at 3:49 p.m.)

THE COURT:  Everyone take a 10-minute recess.

Mr. Alston, you can step down if you chose.  If you want to stay there, you're welcome to.

(Recess at 3:49 p.m.)

(Resumed at 4:04 p.m.)

THE COURT:  With that, bring in the jury.

THE DEPUTY CLERK:  All rise for the jury.

(The jury enters at 4:06 p.m.)

THE COURT:  The jury entered the courtroom.  You may all be seated.

We are going to continue with the direct examination of Mr. Alston, and to manage expectations, we are going to go somewhere around 5:00 to a natural breaking point today.

BY MR. BOWERMAN:

Q.  Mr. Alston, you told us before that you went down to South Philadelphia and saw the FedEx truck; is that correct?

A.  Yes.

Q.  After you saw the FedEx truck, did you drive away from there?

A.  Yes.

Q.  Did you hear from Byrd again that day?

A.  Yes.

Q.  When did you hear from him again?

A.  Probably after 15 minutes later I had to meet him on Park Ave.

Q.  So did he call you or did you see him in person?

A.  Called him.

Q.  And then you went to meet him?

A.    Yes.

Q.    Have you seen this photograph before?

A.    Yes.

Q.    Were you asked questions about it by law enforcement?

A.    Yes.

MR. BOWERMAN:  Your Honor, government moves Exhibit 115 into evidence.

THE COURT:  So moved, and you may publish.

(Government Exhibit 115 admitted into evidence.)

MR. BOWERMAN:  Publish, please.

BY MR. BOWERMAN:

Q.    Sir, can you see the person in the yellow shirt on the screen?

A.    Yes.

Q.    Does that person look familiar to you?

A.    Yes.

Q.    Who does it look like to you?

A.    SK.

Q.    Why do you say that?

A.    From seeing him around the neighborhood.

Q.    What features of the person in the photo make you think that that's SK?

A.    His skin complexion.

Q.    Anything else?

A.    His build, height.

*United States District Court*

Q.   You told us before that you couldn't see who was driving the Jeep with Byrd at Temple Hospital.  Do you remember that testimony?

A.   Yes.

Q.   Are you able to see the person in the yellow shirt in this photograph?

A.   Yes.

Q.   You mentioned before that you gave a statement to police the night that you were arrested?

A.   Uh-huh.

Q.   Is that a yes, sir?

A.   Yes.

Q.   Did police on the night that you were arrested ask you about the driver of the black Jeep?

A.   I don't remember.  I don't recall.

Q.   Did they at some point ask you about the driver of the black Jeep?

A.   I don't recall.

Q.   Did you have other interviews with police besides the night you were arrested?

A.   Yes.

Q.   Did you have interviews with members of the district attorney's office?

A.   Yes.

Q.   Were some of those on video?

*United States District Court*

A.    Yes.

Q.    Was your attorney present for some of those interviews?

A.    Yes.  All of them, I believe.

Q.    Do you remember being asked by police about the driver of the black Jeep during your interviews with police?

A.    Yes.

Q.    Do you remember telling police at some point that you couldn't see the driver of the black Jeep?

A.    Yes.

Q.    Do you remember telling police at some point you weren't paying attention to the driver of the black Jeep?

A.    Yes.

Q.    Is that true that you weren't paying attention to the driver of the black Jeep?

A.    Yes, I wasn't paying attention to the driver.

Q.    Why weren't you paying attention to the driver?

A.    I was focusing on the gun that was on Byrd's lap.

Q.    Did you tell the police that you had never seen the driver of the black Jeep before?

A.    Yes, I believe so.

Q.    Why did you say that?

A.    Because I didn't know who was the driver.

Q.    Did you see the person well enough at Temple Hospital on the day of the carjacking --

A.    No.

Q.   -- to tell whether it was someone that you knew?

A.   No.

Q.   Was Pop driving the Jeep?

A.   No.

Q.   Did you ever tell police that Pop was driving the Jeep?

A.   No.

Q.   How would you compare Pop and SK in appearance?

A.   Skin complexion different.

Q.   Can you tell the difference between Pop and SK?

A.   Yes.

Q.   Sir, do you use an iPhone?

A.   Yes.

Q.   Do you have an Apple iCloud account?

A.   Yes.

Q.   Is your Apple iPhone account now prince.alston1@icloud.com?

A.   Yes.

Q.   Did you previously have another Apple iCloud account?

A.   Yes.

Q.   Was that prince33.alston@yahoo.com?

A.   Yes.

Q.   Did you use that account, the prince33.alston one, around the time of the August 10, 2022 carjacking?

A.   Yes, I believe so.

Q.   Did you provide those Apple IDs to the FBI during the

investigation of this case?

A.   Yes.

MR. BOWERMAN:  Thank you, sir.  I have no further questions at this time, Your Honor.

THE COURT:  All right.  I don't anticipate that we are going to finish cross-examination, but we are going to start and go until we get a natural breaking point somewhere around a half an hour.

So who is going first?

MS. MANN:  I will.

THE COURT:  Okay.  Ms. Mann.

CROSS-EXAMINATION

BY MS. MANN:

Q.   Good afternoon, Mr. Alston.

A.   How you doing?

Q.   I'm going to start with a couple of questions for you.

The government just was showing you text messages that was Exhibit 603.  Do you still have the book up in front of you, Mr. Alston?

A.   Yes.

THE COURT:  Mr. Alston, I'm just going to ask you to move the microphone a little closer to your mouth.

THE WITNESS:  Yes.

BY MS. MANN:

Q.   And these text messages, you indicated that you are the

*United States District Court*