# EXHIBIT E

1

                    IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                              -  -  -

 UNITED STATES OF AMERICA              :   CRIMINAL ACTION NO.
                                       :   23-0209
     v.                                :
                                       :   TRIAL DAY 4
 RONALD BYRD                           :
 SAIKEEN DIXON                         :
                                       :
_____

                                       James A. Byrne U.S. Courthouse
                                       601 Market Street
                                       Philadelphia, PA 19106
                                       June 9, 2025
                                       Commencing at 9:37 a.m.
_____

               BEFORE THE HONORABLE GAIL A. WEILHEIMER
                             AND JURY
_____


APPEARANCES:

FOR THE                UNITED STATES ATTORNEY'S OFFICE, EDPA
GOVERNMENT:            BY:  ALEXANDER B. BOWERMAN, AUSA
                      BY:  TIMOTHY M. LANNI, AUSA
                      615 Chestnut Street, Suite 1250
                      Philadelphia, PA 19106
                      (215) 861-8200
                      alexander.bowerman@usdoj.gov
                      timothy.lanni@usdoj.gov


                              -  -  -

               Cherilyn M. McCollum, CCR-NJ, RPR
                    Official Court Reporter
               Cherilyn_McCollum@paed.uscourts.gov




Proceedings taken stenographically and prepared utilizing
computer-aided transcription


                    *United States District Court*

evidence.

BY MR. BOWERMAN:

Q.   Is this the location information that was in that first message?

A.   Yes.

Q.   Does this show a location right by Temple Hospital?

A.   Yes.

Q.   Let's go back to 608X and look at the second message, please.

     Sir, is this the second message from that thread we were just looking at?

A.   Yes.

Q.   And what time is the second message?

A.   10:22 and 57 seconds on August 10, 2022.

Q.   And what kind of information was contained in this message?

A.   This is another location.

          MR. BOWERMAN:  Let's pull up Exhibit 904, please.

BY MR. BOWERMAN:

Q.   Is this the location from that second message?

A.   Yes.

Q.   What location does this show?

A.   It's also Temple Hospital.

Q.   Is that about a block south of the prior location?

A.   Yes.

*United States District Court*

Q.   And were these two messages sent to a number ending 6970?

A.   Yes.

Q.   Did we talk about that number on Thursday?

A.   We did.

Q.   Was that number assigned to a phone that you recovered during the arrest of Saikeen Dixon?

A.   Yes.

Q.   Based on the records and data that you reviewed, who did you determine used that 6970 number?

A.   Saikeen Dixon.

Q.   Agent Donahue, based on your review of Byrd's iCloud, did Byrd send his location near Temple Hospital to anyone else besides Saikeen Dixon on that day?

A.   No.

Q.   Based on your review of the iCloud, did Byrd send any other text messages between the time he sent these two location points and the time of the carjacking?

A.   No.

        MR. BOWERMAN:  Let's pull up Exhibit 611, please, which is in evidence.

BY MR. BOWERMAN:

Q.   Agent Donahue, is that the thread we looked at on Thursday between Dixon, Byrd, and then an 0705 number?

A.   Yes.

Q.   Did you investigate this 0705 number?

A.   Yes.

Q.   How did you do that?

A.   We subpoenaed subscriber records from the cell phone companies.

          MR. BOWERMAN:  Let's pull up Exhibit 507 and show it only to the witness, please.  Thank you.

BY MR. BOWERMAN:

Q.   Do you see Exhibit 507 on your screen, sir?

A.   I do.

Q.   Could you tell us what that document is?

A.   Subscriber records for that number that we just talked about.

Q.   Is that the number ending in 0705?

A.   (215) 740-0705.

Q.   Are these from AT&T?

A.   Yes.

          MR. BOWERMAN:  The government moves Exhibit 507 into evidence.

          THE COURT:  So moved, and you may publish.

          (Government Exhibit 507 admitted into evidence.)

BY MR. BOWERMAN:

Q.   Agent Donahue, who is the listed subscriber for that account?

A.   Sonata Mathis.

Q.   And who is Sonata Mathis?

A.    It's Pop's significant other.

Q.    Who is Pop?

A.    Ramon Hankins.

MR. BOWERMAN:  Let's pull up Exhibit 608 and show it only to the witness, please.

BY MR. BOWERMAN:

Q.    Do you have Exhibit 608 on your screen?

A.    Yes.

Q.    Is this the full thread from the two messages we were looking at before where Byrd sent this location info?

A.    Yes.

Q.    So this is a thread between Ronald Byrd and Saikeen Dixon?

A.    Yes.

Q.    Did you obtain this from Ronald Byrd's iCloud?

A.    I did.

Q.    What are the numbers that are the participants in this thread?

A.    There are four numbers that are participants.  The first is (267) 243-6970.  Number two is (267) 592-8813.  The third is (267) 804-1541.  And the last one is (267) 226-2972.

Q.    Now, you mentioned that the 6970 was on this thread.  Was that the number you identified for Saikeen Dixon?

A.    Yes.

Q.    And are the other numbers numbers that were found in Ronald Byrd's iCloud?

A.   Yes.

Q.   How can one text thread have multiple numbers on it?

A.   Because this is from the iCloud account which backs up multiple phone numbers.  There are going to be different phone numbers aggregated under that iCloud account carpideim1319.

MR. BOWERMAN:  The government moves Exhibit 608 into evidence.

THE COURT:  So moved.

(Government Exhibit 608 admitted into evidence.)

BY MR. BOWERMAN:

Q.   Agent Donahue, you also have a copy of this document in the binder marked 2 of 2 in front of you.  It may be easier to flip with that.  Can you tell us how many messages total are on this thread?

A.   I believe 1,074, according to the document there.

Q.   What's the time period covered by the thread?

A.   What exhibit number is this?

Q.   608.

THE COURT:  Counsel, you may need to reference 608A, B, or X, because 608 is a single page.

MR. BOWERMAN:  Yes, Your Honor.

BY MR. BOWERMAN:

Q.   Do you only have a single page there in the binder?

A.   Yes.

Q.   Let's turn to the last page of this exhibit on the screen.

believe, and it is number (267) 592-8813 calling (267) 243-6970.

Q.   And the 8813 number, is that the number for Ronald Byrd?

A.   Yes.

Q.   And the 6970 number, is that the number for Saikeen Dixon?

A.   Yes.

Q.   July 14, 2022, is that the day that Prince Alston testified about?

A.   Yes.

Q.   Is that the day that he picked up a package from Nick Copeland at Temple Hospital?

A.   Yes.

          MR. BOWERMAN:  Your Honor, at this point we believe that instruction would be appropriate.

          THE COURT:  Okay.  Ladies and gentlemen, you are about to hear evidence indicating that defendant Ronald Byrd was held in custody at the Federal Detention Center at a certain point before trial.  You should not consider the fact that he was detained as evidence of either defendant's guilt.  You should consider this evidence that Byrd was detained only for the purpose of providing context for certain communications you will hear, including recorded phone calls, and for determining who were the parties to the communications and not for any other purpose.

          With that, you may proceed.

*United States District Court*

MR. BOWERMAN:  Thank you, Your Honor.

BY MR. BOWERMAN:

Q.   Agent Donahue, did you obtain recorded jail calls as part of your investigation?

A.   Yes.

Q.   Did you obtain calls from the Federal Detention Center in Philadelphia?

A.   Yes.

Q.   Did you also obtain calls from the Pennsylvania Department of Corrections?

A.   Yes.

Q.   Do you often collect recorded jail calls as part of your investigations?

A.   I do.

Q.   How do inmate calls work at the Federal Detention Center in Philadelphia?

A.   So I've never made a personal call myself, but from listening to the calls, they have to say their name, they have to put in the number they are calling, they have to put in a unique PIN code, and then the call goes out.  When the call goes out, a prerecorded message telling the recipient where the call is coming from and who is calling is recorded.

Q.   And are all of the calls made by inmates recorded?

A.   They are.

Q.   Do inmates have their own accounts for making phone calls?

A.   Yes.

Q.   And I believe you mentioned.  Do the recordings themselves say that the calls are being recorded?

A.   They do.

Q.   And do the recordings also reference how prisoners have their own accounts?

A.   Yes.

Q.   Are the protocols similar in Pennsylvania state prisons?

A.   Yes.

            MR. BOWERMAN:  I'm going to have you pull up Exhibit 703.  And we can pull that up on the screen and show it only to the witness.

BY MR. BOWERMAN:

Q.   Do you have 703 in front of you, sir, either in paper or on the screen?

A.   I do.

Q.   Is this a transcript of a May 22, 2023 phone call?

A.   Yes.

Q.   And was the call recorded by the Pennsylvania Department of Corrections?

A.   It was.

Q.   Was that at SCI Laurel Highlands?

A.   Yes.

Q.   Does SCI stand for State Correctional Institute?

A.   It does.

Q.    Was May 22, 2023, the day that Ronald Byrd was arrested?

A.    Yes.

Q.    Is this call from the account of Ramon Hankins, Jr.?

A.    Yes.

Q.    Is that the person that has been referred to as Pop?

A.    It is.

Q.    Agent Donahue, are you able to identify Ramon Hankins' voice?

A.    Yes.

Q.    Have you listened to recordings of his voice from the Pennsylvania Department of Corrections?

A.    I have.

Q.    Does this transcript identify any speakers besides Mr. Hankins?

A.    Yes.

Q.    Who else is identified as a speaker in the transcript?

A.    Saikeen Dixon.

Q.    Can you identify Saikeen Dixon's voice?

A.    Yes.

Q.    Have you heard Mr. Dixon's voice in person?

A.    Yes.

Q.    Have you also listened to recordings of Dixon's voice?

A.    I have.

Q.    Have you listened to this call that is reflected in this transcript?

A.   I have.

Q.   Is that transcript accurate?

A.   It is.

Q.   And does the transcript accurately identify the speakers?

A.   Yes.

MR. BOWERMAN:  Your Honor, the government moves Exhibit 703 and the accompanying audio recording, Exhibit 701, into evidence.

THE COURT:  So moved, and you may publish both.

(Government Exhibit 701, Government Exhibit 703 admitted into evidence.)

MR. BOWERMAN:  Let's pull up Exhibit 701 and play it for the jury.  The transcript will be synchronized with the audio.

(Audio played.)

MR. BOWERMAN:  Can you pause that to turn up the volume?

THE COURT:  Rich, we need to turn up the volume.

MR. BOWERMAN:  It's all the way up on that computer.

(Brief pause.)

(Audio played.)

BY MR. BOWERMAN:

Q.   Agent Donahue, I'd like you to turn to Exhibit 702.  Do you have that in front of you?

A.   Yes.

*United States District Court*

Q.   Is this a record from the Pennsylvania Department of Corrections for the calls that Ramon Hankins' account made?

A.   Yes.

Q.   Is row number 5 the call -- excuse me, the record that goes with the call we just listened to?

A.   Yes.

Q.   Does the record show what phone number was on the other end of that call?

A.   Yes.

          MR. BOWERMAN:  The government moves Exhibit 702 into evidence.

          THE COURT:  So moved.

          (Government Exhibit 702 admitted into evidence.)

BY MR. BOWERMAN:

Q.   Agent Donahue, what was the other number on the end of the call we just listened to?

A.   (215) 760-0705.

Q.   Is that the same 0705 number that we saw earlier?

A.   Yes.

Q.   Is that the one that is belongs to Sonata Mathis?

A.   Yes.

Q.   And is she Ramon Hankins' significant other?

A.   Yes.

Q.   I'd like you to turn to Exhibit 709 now.  Do you recognize that exhibit?

A.   Yes.

Q.   Is this a transcript of a May 25, 2023 call from the Federal Detention Center in Philadelphia?

A.   Yes.

Q.   And we sometimes say FDC for short?

A.   We do.

Q.   Is that a call from the account of Ronald Byrd?

A.   Yes.

Q.   Can you identify Ronald Byrd's voice?

A.   Yes.

Q.   Have you heard his voice in person?

A.   Yes.

Q.   Have you listened to the recordings of his voice from FDC Philadelphia?

A.   Yes.

Q.   Have you listened to recording that is marked as Exhibit 707 that goes with that transcript?

A.   I have.

Q.   Does Ronald Byrd identify himself on that recording?

A.   Yes.

Q.   Does the transcript identify anybody else?

A.   No.

Q.   Are there any other speakers identified on Exhibit 709?

A.   There is a male speaker and Saikeen Dixon.

Q.   Now, from your review of the call, is Ronald Byrd

Pop, right?

A.    Correct.

Q.    You also reviewed a third piece of information, a videotaped statement taken from Mr. Alston on the date of October 21, 2022?

A.    Yes.

Q.    Now, sandwiched between that statement and the October 21, 2022 video of Mr. Alston, there was actually another meeting between the detectives and Mr. Alston, right?

A.    Yes.

Q.    And that's noted in the document you have in front of you, but the Philadelphia Police didn't write down anything that Alston said at that meeting about the carjacking, right?  It's on page 3.

A.    Yes.

Q.    All right.  I want you to highlight that for me as well. What did the police department write down about what Alston said at that meeting?  One sentence.

A.    So you want me to highlight what Prince said during that meeting?

Q.    Does it state right here, sir:  Went over some of the details of the robbery as discussed at the previous proffer?

A.    Correct.

Q.    Can you highlight that for me, please?

A.    (Witness complies.)

Q.   Thank you.  All right.  That's fine.

So that didn't really help you too much about any further information; am I right?

A.   Correct.

MR. BOLOGNA:  Max, could we please play the portion of the October 21, 2022 videotape in which Mr. Alston talks about the driver.  I want you to look at this again, sir.

(Video played.)

BY MR. BOLOGNA:

Q.   Did you hear that?

A.   Yes.

Q.   Did you review that?

A.   Yes.

Q.   In addition -- do you agree with me on the video Prince Alston says twice, "I cannot identify the driver"?

A.   Yes.

Q.   You are aware that one of the detectives in that interview is a detective by the name of Gallagher, right?

A.   Yes.

Q.   Did you ever get notes from Detective Gallagher about the meeting with Prince Alston on October 21st of 2022?

A.   I don't recall.

Q.   Okay.

MR. BOLOGNA:  Your Honor, I've marked as D-13 the handwritten note by Detective Gallagher.  Doing better, Your

Honor.  I remembered your copy again.

THE COURT:  Thank you very much.  I like following along.

BY MR. BOLOGNA:

Q.  Sir, I've handed you what's been marked as D-13.  Did you ever see that before in your life?

A.  This is the first time I'm seeing this.

Q.  Really?

A.  Yes.

Q.  I thought you told us that you reviewed the entirety of the Philadelphia Police Department folder when you first got this case?

A.  I did say that, yes.

Q.  That wasn't in there?

A.  I don't recall.

Q.  Well, let's see if there is anything important in there. Read down, since you've just seen it for the first time -- wait.  Let me stop.

These guys have never shown that to you, the two prosecutors in this case, they've never shown you that handwritten note?

MR. BOWERMAN:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't recall.

BY MR. BOLOGNA:

*United States District Court*

Q.    Why don't you read it, sir.

MR. BOWERMAN:  Objection.  It's an out-of-court statement.

THE COURT:  He can read it.  Overruled.

MR. BOWERMAN:  I'm saying he meant out loud or to himself.  Thank you, Your Honor.

THE COURT:  Read it to yourself and look up when you are done.

THE WITNESS:  Okay.

BY MR. BOLOGNA:

Q.    You had a chance to read it?

A.    Yes.

Q.    Is Pop's name mentioned in there?

A.    Yes.

Q.    Bottom of the first page, back with my highlighter.  Would you please highlight the parts where you see Pop's name is mentioned in there?

A.    (Witness complies.)

Q.    8/9 Byrd and Pop talked to me in the Gratz section of the city.

Did I read that accurately?

MR. BOWERMAN:  Objection.  Hearsay.

THE COURT:  Sustained.

BY MR. BOLOGNA:

Q.    How about this one?

THE COURT:  Counsel, it's going to be sustained for the same reason.

BY MR. BOLOGNA:

Q.   Okay.  Thank you for highlighting, sir.

A.   You're welcome.

Q.   You mentioned on direct -- excuse me, in response to questions on cross that you follow what you termed logical leads in this case; am I right?

A.   Yes.

Q.   Let's talk about logical leads.  Prince Alston was someone who was giving information to law enforcement, right?

A.   Yes.

Q.   Prince Alston identified Pop as being one of the people in the stolen Jeep, right?  According to the notes you reviewed.  You highlighted them for us, sir.

A.   According to the videos that I watched, no.

Q.   How about, when I gave you my blue highlighter, he told, according to Detective Maitland's notes, the detectives and others, Byrd and Pop were in the Trackhawk, right?

MR. BOWERMAN:  Objection.  Asked and answered.

THE COURT:  Overruled if that's your objection.

BY MR. BOLOGNA:

Q.   That's what he told you, right?

MR. BOWERMAN:  Objection.  Hearsay.

MR. BOLOGNA:  Your Honor, it goes to the state of mind

*United States District Court*

of why he investigated what he --

THE COURT:  You are not backdooring in evidence I have already said is not coming in.  So if you want to limit it to Detective Maitland and the notes this agent knows about, that is fine.

MR. BOLOGNA:  That's what I asked him.

THE COURT:  You need to narrow your question.

BY MR. BOLOGNA:

Q.   Detective Maitland's notes indicate that Alston said Byrd and Pop were in the Trackhawk, correct?

A.   Yes.

Q.   True or false, Pop's real name is Ramon Hankins?

A.   True.

Q.   True or false, Ramon Hankins has a felony drug conviction?

A.   Yes.

Q.   True or false, the felony drug conviction is from the State of Pennsylvania?

A.   True.

Q.   True or false, you reviewed Ramon Hankins' criminal extract in Pennsylvania?

A.   Yes.

Q.   True or false, when you reviewed it, you saw that Ramon Hankins was convicted in Montgomery County, Pennsylvania and sentenced to 2 to 4 years in state prison for a felony drug offense?

BY MR. BOWERMAN:

Q.   Agent Donahue, you were just asked some questions about FBI 302s.  Do you remember those questions?

A.   Yes.

Q.   Could you just explain for us what's an FBI 302?

A.   It's a report that I write following an interview or a proffer.  It can also be other information that's discoverable for trial.  But typically when we talk about 302s, we talk about ones of a statement that somebody gave to us.  So it's a memo memorializing what that person said, but it's not their words exactly.  It's not like a Q and A like the police have a form where they do questions and answers and it's verbatim and they sign it.  It's something I produce.  It's not something they produce.  They don't review it.

Q.   That was my question.  If you get a witness statement and put it in a 302, does the witness look at it?

A.   No.

Q.   Do they sign it?

A.   No.

Q.   You were asked about Prince Alston's prior statements about Pop.  Do you remember those specific questions about those prior statements?

A.   Yes.

Q.   Did you look at the videos of Prince Alston's prior statements?

A.   Yes.

Q.   And have you spoken with Prince Alston about his statements over the course of this investigation?

A.   Yes.

Q.   And have you spoken with him about what he saw or didn't see during the August 10, 2022 carjacking?

A.   Yes.

Q.   And from your investigation, is it your understanding that Alston said that Pop was on the phone while Alston saw Byrd in a black Jeep?

A.   Correct.

Q.   You were asked some questions by both Ms. Mann and Mr. Bologna about who you interviewed during your investigation.  Do you remember those questions?

A.   Yes.

Q.   When you interview witnesses as part of an investigation, do they have to agree to speak with you?

A.   Yes.

Q.   Are they allowed to decline an interview with the FBI?

A.   They are allowed to decline, yes.

Q.   Is whether or not somebody is going to be willing to speak with investigators something you consider when deciding what interviews to conduct?

A.   That's one factor.

Q.   What are some other factors you consider?

A.    In talking to a witness, especially one that you think might be suspected of a crime, it can alert them to possibly being a suspect and taking efforts to destroy evidence, hide evidence, cover up their communications method with others, or collaborate with people, if they're in jail and somebody else isn't, to hinder the investigation.  So we tend to be careful as to who we talk to and when we talk to them.

Q.    Can conducting a witness interview put a cooperating witness in danger?

A.    Yes.

Q.    Is that something you consider when deciding who to interview?

A.    Yes.

Q.    What considerations did you think about when deciding whether or not to interview Jalisa Pearsall?

A.    We didn't know who else she would tell, and the fact that she was the, you know, the interest of Mr. Byrd's, if there was any communication that she would give to him about what's been said and what was asked, and that could put other cooperating witnesses in danger.

Q.    What about Dashanique Jones?

A.    It's the same thing.  We don't know who she would talk to.

Q.    What about Darren Sherman?

A.    Again, the same thing.

Q.    What about Pop?

*United States District Court*

A.   Again, the same thing.

Q.   Let's talk some about the GPS information that we had on the screen.  That was Exhibit 905, right?

A.   Yes.

Q.   Do you remember being asked about how it's about 1.9 miles from where the carjacking occurred to that GPS location at 48th and Brown?

     MR. BOLOGNA:  Objection.  That was not the question.  It was where the car was covered, not where the carjacking occurred.

     MR. BOWERMAN:  I apologize, Your Honor.  I'll rephrase.

BY MR. BOWERMAN:

Q.   Do you remember being asked it's about 1.9 miles from where the FedEx truck was recovered to that location near 48th and Brown?

A.   Yes.

Q.   Let's pull up Exhibit 908.  This is the timeline demonstrative, right?

     Do you have that on your screen, Exhibit 908?

A.   I do.

Q.   I believe it's on page 2 that has the time that this GPS marker was sent; is that right?

A.   Yes.

Q.   What time was the GPS marker at 48th and Brown sent?

A.    11:29 a.m.

Q.    About what time was the carjacking?

A.    11:15 a.m.

Q.    And is that about 14 minutes between the time of the carjacking and the time that that GPS marker was sent?

A.    Yes.

Q.    Is that sufficient time to drive from 3600 Grays Ferry Avenue to 47th and Linmore and then up to 48th and Brown?

A.    Yes.

Q.    You were asked some questions about your interview with Prince Alston in April of 2023.  Do you remember that questioning?

A.    Yes.

Q.    Do you remember being asked about how Prince Alston identified a photograph of the surveillance footage from the day of the carjacking?

A.    Yes.

Q.    Do you remember being asked about whether you asked Prince Alston about how long he had known SK and questions like that?

A.    I don't remember, no.

Q.    Do you remember being asked those questions on cross-examination?

A.    I remember that, yes.

Q.    Did you have more interviews with Prince Alston after that April 2023 one?

A.   Yes.

Q.   And did you speak with him in other interviews about how long he's known SK?

A.   I did.

Q.   Did you speak with him about how he met SK in other interviews?

A.   Yes.

Q.   And did he testify about those subjects in court?

A.   He did.

Q.   Do you remember being asked on cross-examination about how Prince Alston said to police the night he was arrested he was working with someone named Ty?

A.   Yes.

Q.   And is it your understanding that Prince Alston later said that Ty was really Byrd?

A.   Yes.

Q.   How did you weigh the fact that Prince Alston originally said Ty in your investigation?

A.   I didn't take much weight of him saying Ty because he had just been arrested for a serious crime, he had a gun displayed and waved at him about trying to get the drugs back, so he was scared for his life.

Q.   Did you consider whether people are afraid of retaliation when evaluating the statements of a witness?

A.   Yes.

Q.   Do you remember being asked on cross-examination whether you identified a phone number for Pop?

A.   Yes.

Q.   What factors make it hard to identify a phone number for someone who is involved in an investigation?

A.   They can change their phone numbers frequently.  They can use services that don't register with the cell phone companies.  So while I can send a subpoena or a search warrant to T-Mobile, Apple, AT&T -- or T-Mobile or AT&T and they have these very clear records of what numbers are being called, if they used FaceTime, if they used WhatsApp, if they used Telegram, if they only go through Instagram, I won't be able to determine what phone number they're using, and those are most likely ways and the cell phone companies themselves -- AT&T, T-Mobile, Verizon -- those are the ways we get best information where to locate a phone during the time of a crime.

Q.   Now, do you remember Mr. Bologna showing you his arm while you were on cross-examination?

A.   Yes.

Q.   Was that after discussion of how you looked for a scar in photos of Saikeen Dixon?

A.   Yes.

Q.   Did you compare other physical features of Saikeen Dixon to the carjacker in the surveillance footage besides just the scar?

*United States District Court*

A.   Yes.

Q.   What were some of those?

MR. BOLOGNA:  Objection.  Beyond the scope.

THE COURT:  Overruled.

BY MR. BOWERMAN:

Q.   What were some of those physical features?

A.   Height, weight, skin tone.

Q.   I want to go back to Ms. Mann's questioning.  Do you remember that earlier this afternoon?

A.   Yes.

Q.   Do you remember being asked about other packages being sent to Philadelphia by a company called Caliber Consulting?

A.   Yes.

Q.   Were you asked about statements about such packages in an affidavit you wrote?

A.   Yes.

Q.   And were those packages that were sent in May of 2023?

A.   Yes.

Q.   Were those sent to Temple Hospital or other places in Philadelphia?

A.   Other places.

Q.   Did you learn about any other packages besides the July and the August 2022 packages sent from Caliber Consulting to Temple Hospital?

A.   No, there were none.  None others.