**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 23-454** |
| **RONALD BYRD,** | : | |
| **HANEEF PALMER,** | | |
| **a/k/a "Lew,"** | : | |
| **MALIK PALMER,** | | |
| **a/k/a "Stacks,"** | : | |
| **a/k/a "Stezzo,"** | | |
| **SAIKEEN DIXON,** | : | |
| **a/k/a "SK,"** | | |
| **a/k/a "Killa,"** | : | |
| **a/k/a "Kil,"** | | |
| **DOUGLAS MATHIS,** | : | |
| **a/k/a "Ppg,"** | | |
| **AIKEEM PALMER,** | : | |
| **a/k/a "Haak,"** | | |
| **MORRIS KANNEH,** | : | |
| **a/k/a "Morris Kenneth,"** | | |
| **a/k/a "Slick,"** | : | |
| **SIRONDE DIXON,** | | |
| **a/k/a "Ronnie"** | : | |

## GOVERNMENT'S TRIAL MEMORANDUM

## I. THE SUPERSEDING INDICTMENT

On December 11, 2024, a grand jury sitting in the Eastern District of Pennsylvania returned a Superseding Indictment against defendants Rakeim Savage, Ronald Byrd, Haneef Palmer, Malik Palmer, Morris Kanneh, Douglas Mathis, Sironde Dixon, Aikeem Palmer, Salahudin Reddy, and Saikeen Dixon. *See* Dkt. No. 115. The trial concerns defendants Ronald Byrd, Malik Palmer, Morris Kanneh, Douglas Mathis, Sironde Dixon, Aikeem Palmer, and Saikeen Dixon. Those defendants are charged as follows:

- Count One, charging conspiracy, in violation of Title 18, United States Code, Section 371: all defendants (Ronald Byrd, Malik Palmer, Saikeen Dixon, Douglas Mathis, Aikeem Palmer, Morris Kanneh, and Sironde Dixon).
- Count Two, charging robbery which interfered with interstate commerce ("Hobbs Act robbery") and aiding and abetting, in violation of Title 18, United States Code, Sections 1951 and 2, arising from an April 1, 2023 robbery of a tractor trailer containing commercial refrigerators: Malik Palmer, Saikeen Dixon, Douglas Mathis, Aikeem Palmer, Morris Kanneh, and Sironde Dixon.
- Count Three, charging theft from interstate shipment and aiding and abetting, in violation of Title 18, United States Code, Sections 659 and 2, arising from the April 1, 2023 refrigerator theft: Malik Palmer, Saikeen Dixon, Douglas Mathis, Aikeem Palmer, Morris Kanneh, and Sironde Dixon.
- Count Four, charging theft from interstate shipment and aiding and abetting, in violation of Title 18, United States Code, Sections 659 and 2, arising from the April 13, 2023 theft of U.S. dimes: Malik Palmer, Saikeen Dixon, Douglas Mathis, Aikeem Palmer, Morris Kanneh, and Sironde Dixon.
- Count Five, charging theft of government money and aiding and abetting, in violation of Title 18, United States Code, Sections 641 and 2, arising from the April 13, 2023 theft of U.S. dimes: Malik Palmer, Saikeen Dixon, Douglas Mathis, Aikeem Palmer, Morris Kanneh, and Sironde Dixon.
- Count Six, charging receiving and retaining stolen government money and aiding and abetting, in violation of Title 18, United States Code, Sections 641 and 2, stemming from the April 13, 2023 theft of U.S. dimes: all defendants (Ronald Byrd, Malik

Palmer, Saikeen Dixon, Douglas Mathis, Aikeem Palmer, Morris Kanneh, and Sironde Dixon).

- Count Seven, charging possession of goods from interstate shipment theft and aiding and abetting, in violation of Title 18, United States Code, Sections 659 and 2, stemming from the April 13, 2023 theft of U.S. dimes: all defendants (Ronald Byrd, Malik Palmer, Saikeen Dixon, Douglas Mathis, Aikeem Palmer, Morris Kanneh, and Sironde Dixon).
- Count Eight, charging theft from interstate shipment and aiding and abetting, in violation of Title 18, United States Code, Sections 659 and 2, arising from the April 4, 2023 theft of frozen crab legs: Malik Palmer, Saikeen Dixon, Douglas Mathis, Aikeem Palmer, and Morris Kanneh.
- Count Nine, charging theft from interstate shipment and aiding and abetting, in violation of Title 18, United States Code, Sections 659 and 2, arising from the April 6, 2023 theft of frozen crab legs: Malik Palmer, Saikeen Dixon, Douglas Mathis, Aikeem Palmer, Morris Kanneh, and Sironde Dixon.
- Count Ten, charging theft from interstate shipment and aiding and abetting, in violation of Title 18, United States Code, Sections 659 and 2, arising from the April 10, 2023 theft of Samsung televisions: Ronald Byrd, Malik Palmer, Saikeen Dixon, Douglas Mathis, Aikeem Palmer, and Morris Kanneh.

## II. <u>FACTUAL BACKGROUND</u>

The charges against the defendants arise out of a large-scale cargo theft conspiracy. Between January 1 and July 31, 2023, the defendants conspired to steal goods moving as parts of interstate shipments located on tractor trailers around Philadelphia. While a trailer was

unattended overnight, or while the driver was asleep, the members of the conspiracy participating in the theft would use bolt cutters and other tools to break into the trailer and steal the goods inside. The members of the conspiracy would then offer the goods for sale to contacts around Philadelphia. Among other acts, the defendants committed the robbery of a tractor trailer carrying commercial refrigerators on April 1, 2023, during which members of the conspiracy attacked and injured the driver (Counts Two and Three); the theft of over $230,000 worth of U.S. dimes on April 13, 2023 (Counts Four and Five); thefts of tens of thousands of pounds of frozen crab legs on April 4 and 6, 2023 (Counts Eight and Nine); and the theft of more than 100 Samsung 75-inch televisions on April 10, 2023 (Count Ten). These five incidents are the subjects of the substantive counts in the Superseding Indictment. The members of the conspiracy also committed additional thefts that are identified as overt acts in Count One of the Superseding Indictment.

At trial, the government will present testimony of the victim drivers and responding police officers or detectives who responded to each theft. The government will also introduce surveillance footage from the thefts and rental car records pertaining to some of the vehicles used in the thefts. In addition, the government will call witnesses from Citadel Credit Union who witnessed defendants Ronald Byrd and Malik Palmer attempting to exchange large quantities of stolen dimes in May 2023.

The government recovered a significant amount of evidence from iCloud backup data belonging to Ronald Byrd and cellular phones belonging to multiple defendants, particularly Apple iPhones belonging to Saikeen Dixon. The evidence includes text messages between the defendants planning and debriefing the thefts they committed, text messages among the defendants and with third parties about reselling stolen goods, GPS location data showing the

defendants' locations during the thefts, and pictures of the defendants with stolen goods. The government also obtained cell-site location data for cell phones belonging to many of the members of the conspiracy.[1]

Evidence pertaining to each one of the substantively charged thefts is discussed below.

**A. April 1, 2023 Robbery**

As explained in a statement to police, on April 1, 2023, victim O.S., a truck driver, was asleep in his truck parked next to the L.A. Fitness at 9490 Blue Grass Road in Northeast Philadelphia. Around 2:40 a.m., he woke up because his truck was shaking and he heard voices. He got out of the truck and saw a white box truck backed up to the back of his trailer. He saw between five and seven Black men unloading refrigerators from his trailer. The victim yelled for help and for the police. Two men grabbed him and picked him up, and they put him underneath their truck. After the men finished unloading refrigerators, they told the victim to go into their truck. He said no and tried to hide under his truck. They told the victim to come out, but the victim refused. The men then told each other they had to leave. One man then went into the victim's truck and stole his wallet. The men then drove away. The victim suffered a large abrasion on his forearm.

Surveillance footage shows the robbery occurring. Multiple offenders are visible, and a Philadelphia Police Department ("PPD") officer familiar with Rakeim Savage recognized him in the footage. Multiple vehicles are also visible, including a Dodge Ram pickup truck and a large white box truck. Victim O.S. can also be seen in the video, appearing to be forced underneath the truck.

---

[1] Cell-site data was not available for the x8914 number used by Malik Palmer because the government could not identify a wireless carrier with call-detail records for that number.

The government will present evidence at trial linking these vehicles to the defendants. Rental car records indicate that at the time of the robbery, a Dodge Ram pickup truck was rented to Rakeim Savage's father. And text messages from Ronald Byrd's iCloud indicate that Byrd acquired the white box truck seen in the video (which bears Pennsylvania license plate license plate ZVT-6600) in March 2023, a few weeks before the robbery. After Byrd acquired the box truck, he sent a message to Savage saying, "Changing the truck game." Attached to the message was a video of the white box truck, captioned with the text: "Spent some money on me for a change."




Text messages from Saikeen Dixon's cell phone show that the defendants committed the robbery. Saikeen Dixon, Malik Palmer, Douglas Mathis, Morris Kanneh, and Aikeem Palmer (as well as Rakeim Savage and Haneef Palmer) were part of a seven-member group text thread containing thousands of text messages over the course of several months, including around the time of the April 1, 2023 robbery. For example, before the robbery, on March 31, 2023, the members started talking about going out to commit a theft that night:

- Malik Palmer (x8914) said: "I can't wait till tonight man. I was driving home just

laughing at what happen last night." (Earlier texts appeared to debrief a theft the night before.)

- Mathis (x0505) said: "Slick [i.e., Morris Kanneh] is back and ready to attack." Kanneh (x2277) "laughed" at that message.
- Mathis then said: "Yo we need 4 pair cutters 2 wire cutters." He went on to say: "Today we all linking up. . . . We gone fuck something over. Break that money down 7 ways. It's only right."
- Saikeen Dixon (x6970) later sent a video to the group showing gloves and cutters, saying: "Somebody gonna get fucked around bad tonight.":



Shortly after the April 1, 2023 robbery:

- Savage (x4295) sent images of stolen refrigerators (complete with serial numbers) and links to websites showing prices for the make and model of the stolen

refrigerators to the group chat to coordinate selling the refrigerators.




- The defendants talked about how to split the proceeds among the members of the conspiracy. Savage asked, “So how we taking care of Byrd.” Saikeen Dixon responded: “We all get one [i.e., a refrigerator] Byrd get one. . . . Ronnie [i.e., Sironde Dixon] get a bean [i.e., $100] of[f] everybody for look out.”
- The defendants also debriefed the robbery, including the following statements:
  - Savage: “I swore nobody was on that truck yo. We was making all that fucking noise.”
  - Malik Palmer: “Never seen so many gangsters run from a little ass Mexican wit nothing but draws [sic] on.”
  - Malik Palmer: “U got lew [i.e., Haneef Palmer] who parks his car next to the kick [sic] and leave his lights on then we not doing our position that was given to us it going come a time we need [n-words] to be on point . . . Why would u

leave your lights on so we can be notice make it make sense." (Surveillance video shows that one of the offenders' vehicles kept its lights on.)

- Haneef Palmer (x6839): "You Goofy Bro I Jumped Off The Truck & Chased Him With You Lame & You Be Tripping I Can Say Everybody Left Me But 4 & Shiz Tbh But I Don't Be On Thay"
- Malik Palmer: "You a bitch tbh I had to tell u to help me grab that bitch ass [n-word] u wasn't trying pick him up like u scary I'm not slandering no one name I just tell it like it is"

- Saikeen Dixon also circulated audio messages discussing the robbery, which were summarized in the government's motion *in limine* to admit audio recordings. Dkt. No. 418.[2]
- In the days following the robbery, the defendants shared pictures and videos showing Malik Palmer with the white box truck used in the robbery:

[2] As of the date of this filing, no defendant has opposed that motion.











Separate from this seven-member group thread, Saikeen Dixon texted with Sironde Dixon (x6035) about the April 1, 2023 robbery. Saikeen sent Sironde a message containing his location (marked by GPS coordinates 40.076360, -75.027811) which was adjacent to 9490 Bluegrass Road, where the robbery occurred. And Sironde sent Saikeen the picture shown above of a serial number matching one of the stolen refrigerators.

Cell-site location data indicates that cell phones used by Saikeen Dixon (x6970), Douglas Mathis (x0505), and Sironde Dixon (x6035) were in the area of the robbery around the time of the robbery, as was Haneef Palmer (x6839). Malik Palmer was in contact with multiple co-conspirators by phone around the time of the robbery, including Saikeen Dixon and Haneef Palmer.

Invoice and claim documents show that the stolen refrigerators had a value of over $1,000 and were traveling as part of an interstate shipment of freight.[3]

**B. April 13, 2023 Dime Theft**

As explained in statements to law enforcement, N.M., a truck driver, picked up a tractor trailer from the United States Mint in Philadelphia on the evening of April 12, 2023 with over $750,000 dollars' worth of newly minted 2023 U.S. dimes. The dimes were not yet in circulation, and were scheduled to be transported to Florida for distribution. The driver parked the trailer in a Walmart parking lot off of I-95 near 4301 Byberry Road. The driver left the trailer there and later went to sleep at his home in Philadelphia.

That night and into the early morning on April 13, 2023, A.S., another truck driver, saw a group of men use tire irons to break into the trailer and unload trash cans full of dimes. A.S. was scared to come out, but he took a video with his cell phone.

PPD responded to the scene and found thousands of dimes strewn about the parking lot after the theft. Over $230,000 worth of dimes were missing from the trailer. PPD issued a police bulletin for suspicious transactions involving dimes.

PPD identified suspects as the defendants attempted to deposit or exchange the stolen dimes. Malik Palmer opened an account with Citadel Credit Union on May 10, 2023, providing a

[3] As discussed below, the government has also proposed stipulations regarding these facts.

copy of his driver's license with a photo, and supplying his name, phone number, and address. Malik Palmer went on to deposit thousands of dimes at Citadel locations. His transactions are captured on surveillance video. Ronald Byrd also visited Citadel locations to attempt to exchange dimes. He did not open an account, but he showed his ID and provided his name and Social Security number at a Citadel location in Paoli before exchanging over $870 worth of dimes—that is, more than 8,700 dimes. Byrd's transactions are also captured on surveillance video.

A review of Byrd's iCloud revealed significant evidence of the dime theft:

- Shortly after the theft, Sironde Dixon sent Byrd a picture of a bucket of shiny new U.S. dimes:



- The day after the theft, on April 14, 2023, Malik Palmer sent Byrd a link to a "Money Weight Calculator," and Byrd then sent the link to Haneef Palmer and Savage.

- A few weeks later, on or about May 7, 2023, Byrd directed someone to cash in dimes in Maryland. Byrd texted that day with a contact (ending in x2307). The contact sent Byrd pictures of five Coinstar receipts from Food Lion, Giant, and

Safeway supermarkets in Towson and Cockeysville, Maryland (near Baltimore), each for hundreds of dollars' worth of dimes, i.e., thousands of dimes:




- Byrd's contact said: "The 2 368 the one I gotta get at 7." Byrd replied: "That's not all of it. Wat u ain't do it all."

Text messages from Saikeen Dixon's cell phone also show that the defendants committed the dime theft. The morning after the theft, Savage sent an admission on the aforementioned group chat stating, "We made it!" with a screenshot of an Instagram post detailing the theft:




Malik Palmer then said to the group: "We going to live [i.e., Live! Casino & Hotel Philadelphia] tonight for a victory dinner WHO in." Aikeem Palmer (x0983) responded: "In."

In this same group chat, Douglas Mathis sent a text message to the group, showing a picture of Malik Palmer swimming in a truck bed of dimes. In the photo, Malik Palmer appears to be wearing the same clothing as one of the individuals unloading dimes from the tractor trailer (as captured on a video A.S.'s cell phone camera):



Shortly after Mathis circulated those pictures, Kanneh wrote to the group, “Sold over a million dimes still don’t give a fuck…” Then Kanneh wrote, “Aye stacks [i.e., Malik Palmer] nd 4 [i.e., Rakeim Savage] gotta remix that jawn call God blessing all da Heist [n-words] lol.”

Months after the dime theft, on July 18, 2023, Philadelphia police tracked the aforementioned white box truck bearing Pennsylvania license plate ZVT-6600 to a location on 61st street in the city. Police obtained a search warrant for the truck and found dozens of new 2023 U.S. dimes, which appeared to be unused, caught in the floorboards and other parts of the truck.

Cell-site location data indicates that cell phones used by Ronald Byrd (x1541), Saikeen Dixon (x6970), Douglas Mathis (x0505), Aikeem Palmer (x0983), and Sironde Dixon (x6035) were in the area of the theft around the time of the theft, as were Haneef Palmer (x6839) and Salahudin Reddy (x1144). Malik Palmer was in contact with multiple co-conspirators by phone

around the time of the theft, including Ronald Byrd, Saikeen Dixon, and Aikeem Palmer. Bill-of-lading and claim documents show that the stolen dimes had a value of over $1,000, were traveling as part of an interstate shipment of freight, and belonged to the United States at the time of the theft.[4]

### C. April 4, 2023 Crab Leg Theft

As law enforcement investigated the April 13, 2023 dime theft, investigators identified more and more crimes committed by the defendants' crew. On April 4, 2023, thousands of pounds of frozen snow crab legs were stolen from a trailer parked near 8501 Hegerman Street. As explained in statements to law enforcement, the driver, A.G., parked his vehicle there and left at approximately 8:40 p.m. By morning, the seal on trailer was broken, and the trailer had been ransacked.

Extensive text message evidence (again, recovered from Saikeen Dixon's cell phone) shows that the defendants committed this theft. After the theft, on the aforementioned group chat, Aikeem Palmer sent his co-defendants (including defendant Savage) a video showing a box of frozen crab legs. The box shown in the video matches the boxes shown in police photos from the crime scene:




[4] As discussed below, the government has also proposed stipulations regarding these facts.




In addition, the conspiracy group thread contains a spirited discussion starting just after midnight on April 4, 2023, in which the members of the conspiracy argue, by text and by audio messages (which were included in the government's motion in limine, *see* Dkt. No. 418), about whether other members of the conspiracy included them in thefts or tried to cut them out of splitting proceeds. Here are excerpts from the discussion:

- Dixon (x6970): "Lew [i.e., Haneef Palmer] just give up the key man"
- Savage (x4295): "Bro I was on the truck. Haak [i.e., Aikeem Palmer] and them right there."
- . . .
- Kanneh (x2277): "U like KOBE wit dis shet Dey don't call u 24 [i.e., Rakeim Savage] 4nothin lol"
- . . .
- Dixon: "I'm not going lie I'm not that mad since u found it but dnt slime ya boy out [snake emoji]"
- Savage: "[N-word] how I slime you out. I called everybody."
- Dixon: "Yes u did. . . . But we was waiting for the truck if not I was next ya went b4 me

wen I was looking out for security. And ya'll told me y'all wasn't going. Wen y'all rode past. . . . I feel like [n-words] tryna play me now treat me like a sucker."

- Malik Palmer (x8914): "[N-words] for they self"
- Aikeem Palmer (x0983): "Put a address we need to know who y'all talkin bout"
- Savage: "How tf is [n-words] for they self and I called everybody"
- . . .
- Savage: "Bro haak pulled up and seen the truck first time he pulled in"
- . . .
- Aikeem Palmer: "Basically they sayin lew lew ain't want to get tha key so 4 said fuck it if lew dnt want to do it"
- . . .
- Savage: "Fuck y'all want to break in his crib and get the key"
- Aikeem Palmer: "Bro lew is foul point blank if he did that"
- Dixon: "4 u around the [n-word] so it's like u condoning it bro"
- Savage: "Bro it's at his house. And he called Byrd. Ask Byrd that."

Cell-site location data indicates that cell phones used by Saikeen Dixon (x6970) and Aikeem Palmer (x0983) were in the area of the theft around the time of the theft, as were Haneef Palmer (x6839) and Salahudin Reddy (x1144). Malik Palmer was in contact with multiple co-conspirators by phone around the time of the theft, including Saikeen Dixon, Aikeem Palmer, and Salahudin Reddy.

Invoice and claim documents show that the stolen crab legs had a value of over $1,000 and were traveling as part of an interstate shipment of freight.

### D. April 6, 2023 Crab Leg Theft

Less than 48 hours later, the crew struck again. In the early morning hours of April 6, 2023, members of the conspiracy stole over 30,000 pounds of frozen crab legs from a trailer parked at 3601 Island Avenue in Philadelphia. As explained in statements to law enforcement, D.N., the driver of the vehicle, was parked and sleeping in his vehicle when he awoke to movement in his trailer, and he could tell his cargo was being removed. The driver called police and reported that about 12 to 15 people in 6 or 7 cars were removing thousands of pounds of crabs. The members of the conspiracy removed all of the crabs before police could arrive.

Shortly after the theft, police responded to a report of illegal short dumping on Gateway Drive in Philadelphia. Officers saw a white Chevrolet Suburban with the tailgate open and multiple individuals running from the car. The Suburban contained 115 boxes of frozen crabs taken from the trailer on Island Avenue. Inside the white Suburban, police recovered a set of bolt cutters and a Caesars Rewards card in the name of co-defendant Salahudin Reddy. A later search for records on the white Suburban revealed that Reddy had rented the vehicle. The day after the crab theft, Reddy reported the vehicle stolen.

Saikeen Dixon's cell phone contained evidence about this theft, too. Shortly after 9pm on April 5, Dixon (x6970) texted Mathis (x0505): "If u goin on the mission let me know . . . ." Mathis replied: "Yea we out. . . . We need the cutters and all are[sic] shit. You got are[sic] gloves."

Around 10:18 p.m., Sironde Dixon (x6035) texted Saikeen Dixon: "Let me know if we going out bro." Saikeen replied about 30 minutes later: "Come to the block now. Train bout to pull off." Sironde replied: On my way I'm up uptown bro why u didn't call me." Then, around 1:47 a.m. on April 6, Saikeen and Sironde exchanged messages containing their GPS location.

Both sent messages indicating that their location was in the area of 3601 Island Avenue. Later, around 7:14 p.m. on April 6, Sironde sent Saikeen a message containing a screenshot of a chat with a contact about setting a price with a picture of crab legs




Byrd's iCloud contained evidence as well. On April 6, 2023, Byrd sent messages alerting a contact that other members of the conspiracy had stolen crab legs. Around 7:00 a.m., Byrd sent a contact (with a number ending in x0893) a message containing Saikeen Dixon's phone number (ending in x6970), and another message saying: "They got crabs." A few hours later, Byrd sent another message to the same contact containing a number belonging to Haneef Palmer (ending in x1106).

Cell-site location data indicates that cell phones used by Saikeen Dixon (x6970), Douglas Mathis (x0505), Aikeem Palmer (x0983), and Sironde Dixon (x6035) were in the area of the theft around the time of the theft, as were Haneef Palmer (x6839) and Salahudin Reddy (x1144). Malik Palmer was in contact with multiple co-conspirators by phone around the time of the theft, including Douglas Mathis and Aikeem Palmer.

Invoice and claim documents show that the stolen crab legs had a value of over $1,000 and were traveling as part of an interstate shipment of freight.

**E. April 10, 2023 Samsung TV Theft**

The crew committed another theft just a few days later. On the night of April 9 and morning of April 10, 2023, approximately 103 Samsung 75-inch televisions were stolen from a tractor trailer parked near 12285 McNulty Road. The offenders broke the metal seal off the trailer while the driver, X.C., was sleeping.

Text messages and phone records again reveal the defendants' participation in the theft, including evidence from co-defendant Byrd's iCloud. The night of the TV theft, co-defendant Saikeen Dixon said to co-defendant Ronald Byrd: "We need the keys to get the cutter s." Later, around 11:48 p.m., Byrd received a call from co-defendant Aikeem Palmer. Just after midnight, Byrd received a call from defendant Haneef Palmer. Around 1:10 a.m., Byrd texted Haneef Palmer: "We got something." Byrd received another call from Aikeem Palmer a few minutes later, and then several more over the next several hours. At 1:40 a.m., Byrd sent a message containing his location to co-defendant Douglas Mathis indicating Byrd was at 12285 McNulty Road. GPS data from Saikeen Dixon's cell phone likewise places him at 12285 McNulty Road around the time of the theft. Byrd's iCloud also contains a text containing his GPS location and multiple phone calls with a contact saved as "Stacks," i.e., Malik Palmer.

Text message evidence also shows the defendants attempting to sell the stolen TVs after the theft. Starting around 9:00 a.m. on April 10, 2023, Byrd started texting multiple contacts that he had 75-inch Samsung TV's for sale. Around 2:24 p.m., after the two communicated by call and text throughout the night, Morris Kanneh texted Byrd saying: "Yo bro I got a trap 4 the TVs 15 for 6000 hmu if interested… that's 400 a wop…." Saikeen Dixon likewise texted Douglas

Mathis and Mathis's sister: "We got TVs for sell."

Later that night, around 10:52 p.m., Byrd texted Savage a screenshot of a Tweet referencing the sale of both crabs and TVs:




Cell-site location data indicates that cell phones used by Ronald Byrd, Saikeen Dixon (x6970), Douglas Mathis (x0505), Aikeem Palmer (x0983), and Morris Kanneh (x2277) were in the area of the theft around the time of the theft, as were Haneef Palmer (x6839) and Salahudin Reddy (x1144).

Invoice and claim documents show that the stolen TVs had a value of over $1,000 and were traveling as part of an interstate shipment of freight.

### F. Additional Thefts

The government intends to introduce evidence regarding some, but not nearly all, of the additional thefts identified as Overt Acts in Count One, including the following.

**1. February 17, 2023 Air Conditioning Unit Theft**

Based on statements by M.D., a truck driver, to law enforcement, a group of thieves broke into M.D.'s tractor trailer parked near 12600 Townsend Road in Northeast Philadelphia in the early morning hours of February 17, 2023, and stole about $15,000 worth of air conditioning units. Text messages from Saikeen Dixon's phone show the members of the conspiracy committed this theft. Dixon and Kanneh began texting about meeting up around 1:28 a.m. on February 17. Haneef Palmer sent Dixon his GPS location around 3:00 a.m. showing that Palmer was in the area of 12600 Townsend Road. And cell-site location data shows that phones belonging to Saikeen Dixon (x6970), Aikeem Palmer (x0983), and Morris Kanneh (x2277) were in the area of the theft around the time of the theft, as was Haneef Palmer (x6839).

**2. March 7, 2023 Turkey Wing Theft**

Based on statements by Q.S., a truck driver, to law enforcement, a group of thieves broke into Q.S.'s tractor trailer parked near 2800 Charter Road in the early morning hours of March 7, 2023, and stole about 10,000 pounds of frozen turkey wings. Once again, evidence from Saikeen Dixon's cell phone links the members of the conspiracy to this theft. On the group thread mentioned above, the defendants texted about meeting up on the evening of March 6, 2023. Saikeen Dixon told the group, "I got the cutters." After the theft, the group traded messages (and jokes) about the theft of turkey wings. On March 7, after Haneef Palmer asked, "Wya [i.e., where you at]," Morris Kanneh responded: "I'm on the wing." On March 8, Haneef Palmer asked the group, "Ya'll Got More Wings." Douglas Mathis responded: "I ain't got no check for DOT. give him 35 boxes of turkey wings."

Mathis and Saikeen Dixon also texted about the turkey wing theft on a separate thread with Mathis's sister. Shortly after the theft on March 7, Mathis sent a GIF (that is, a Graphics

Interchange Format image, which is often used for a short looping animation) of a turkey with a human face dancing in an oven:




And Saikeen Dixon sent a short video showing a large pile of cardboard boxes, saying, "Who wants turkey wings," and then said in a text message, "They turkey wings I guess u gotta make us this so we gonna save u a box only thing you know how to coo[k]" (a reference to an earlier exchange where Mathis's sister said that turkey wings were "all I know how to make").

In addition, cell-site location data shows that phones belonging to Saikeen Dixon (x6970), Douglas Mathis (x0505), and Morris Kanneh (x2277) were in the area of the theft around the time of the theft.

## III. STATUTES CHARGED AND ELEMENTS OF THE OFFENSES

### A. Count One – Conspiracy (18 U.S.C. § 371)

To prove a defendant guilty of conspiracy, the government must prove the following elements beyond a reasonable doubt:

(1) Two or more persons agreed to commit an offense against the United States as charged in the indictment;

(2) The defendant was a party to or a member of that agreement;

(3) The defendant joined the agreement or conspiracy knowing of its objective to commit an offense against the United States and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that each defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to commit an offenses against the United States; and

(4) At some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

*See* Third Circuit Model Criminal Jury Instruction 6.18.371A; *see also United States v. Jenkins*, No. CR.A. 04-506-2, 2006 WL 3254528, at *2 (E.D. Pa. Nov. 9, 2006) ("To convict for conspiracy, the government must prove beyond a reasonable doubt: (1) an agreement to commit a substantive offense; and (2) an overt act.") (internal citations omitted)).

**B. Count Two – Hobbs Act Robbery (18 U.S.C. § 1951(a))**

To prove a defendant guilty of Hobbs Act robbery, the government must prove the following elements beyond a reasonable doubt:

(1) The defendant obtained or took the personal property of another, or from the presence of another;

(2) the defendant did so knowingly and willfully by robbery; and

(3) As a result of the defendant's actions, interstate commerce, or any item moving in interstate commerce, was delayed, obstructed, or affected in any way or degree.

*See* Third Circuit Model Criminal Jury Instructions § 6.18.1951. "Robbery" is the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, whether immediately or in the future, to his person or property, or property in his custody or possession, or the person

or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining. *Id.* § 6.18.1951-1.

### C. Counts Three, Four, Seven, Eight, Nine, and Ten – Theft of and Possession of Goods from an Interstate Shipment (18 U.S.C. § 659)

To prove a defendant guilty of theft from an interstate shipment, the government must prove the following elements beyond a reasonable doubt:

(1) The defendant stole, embezzled, unlawfully took, carried away, concealed, or obtained through fraud or deception, the property described in the indictment from one of the locations specified in the statute—that is, any:

   a. "pipeline system, railroad car, wagon, ***motortruck, trailer, or other vehicle***, or from any tank or storage facility, station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air cargo container, air terminal, airport, aircraft terminal or air navigation facility, or from any intermodal container, trailer, container freight station, warehouse, or freight consolidation facility" (emphasis added);

(2) At that time, the property was moving as or a part of an interstate shipment of freight;

(3) The defendant knew the property was not his and had the intent to permanently deprive the owner of the use and benefit of the property; and

(4) The property then had a value of $1,000 or more.

Third Circuit Model Criminal Jury Instructions 6.18.659A; *see* 18 U.S.C. § 659.

To prove a defendant guilty of possessing stolen goods from an interstate shipment, the government must prove:

(1) Someone stole or embezzled, the property described in the indictment from one of the locations specified in the statute (set forth above);

(2) The defendant thereafter bought, received, or possessed such property knowing that it had been stolen (or embezzled.); and

(3) The property then had a value of $1,000 or more.

Third Circuit Model Criminal Jury Instructions 6.18.659B.

**D. Counts Five and Six – Theft of and Receiving Government Money (18 U.S.C. § 641)**

To prove a defendant guilty of theft of government money, the government must prove the following elements beyond a reasonable doubt:

(1) The defendant knowingly embezzled, stole, converted to the defendant's use, or converted to the use of another, money or property of value with the intention of depriving the owner of the use or benefit of the money or property;

(2) The money or property belonged to the United States; and

(3) The value of the money or property was more than $1,000.

Ninth Circuit Model Criminal Jury Instruction 23.1; *see also* Modern Federal Jury Instructions – Criminal ¶ 23A.01.

To prove a defendant guilty of receiving stolen government money, the government must prove:

(1) The defendant knowingly received, concealed, or retained money or property of value;

(2) The money or property belonged to the United States;

(3) The defendant knew that the money or property had been stolen, embezzled, or converted;

(4) The defendant intended to convert the money or property to his own use or gain; and

(5) The value of the money or property was more than $1,000.

Ninth Circuit Model Criminal Jury Instructions 23.2; *see also* Modern Federal Jury Instructions – Criminal ¶ 23A.02.

### E. Counts Two, Three, Four, Five, Six, Seven, Eight, Nine, and Ten – Aiding and Abetting (18 U.S.C. § 2)

To prove a defendant guilty of aiding and abetting, the government must prove:

(1) The principal committed the offense by committing each element of the offense;

(2) The defendant knew that the offense was being committed or was going to be committed by the principal;

(3) The defendant knowingly did some act for the purpose of aiding, assisting, facilitating, or encouraging the principal in committing the offense, and with the intent that the principal commit the offense; and

(4) The defendant performed an act in furtherance of the offense.

Third Circuit Model Criminal Jury Instruction § 7.02.

### F. Responsibility for Substantive Offenses Committed by Co-Conspirators (*Pinkerton* Liability)

To prove a defendant guilty of a substantive offense under the *Pinkerton* doctrine, the government must prove:

(1) The defendant was a member of the conspiracy charged in the indictment;

(2) While the defendant was still a member of the conspiracy, one or more of the other members of the conspiracy committed the offense charged in the substantive count of the indictment, by committing each of the elements of that offense;

(3) The other member(s) of the conspiracy committed this offense within the scope of the unlawful agreement and to help further or achieve the objective(s) of the conspiracy; and

(4) This offense was reasonably foreseeable to or reasonably anticipated by the defendant as a necessary or natural consequence of the unlawful agreement. The government does not have to prove that the defendant specifically agreed or knew that this offense would be committed. However, the government must prove that the offense was reasonably foreseeable to the defendant, as a member of the conspiracy, and within the scope of the agreement as the defendant understood it.

Third Circuit Model Criminal Jury Instruction § 7.03.

## IV. STIPULATIONS AND UNDISPUTED FACTS

To streamline the trial for the Court's and jury's convenience, the government has proposed to the defense a number of stipulations. These include stipulations regarding the interstate commerce elements of the offenses, the jurisdictional value requirements, and that the dimes from the U.S. Mint belonged to the United States. The government has also proposed a stipulation regarding the accuracy of data extraction reports for the iCloud and cell phone evidence produced in discovery. The defense has informed the government that there is a consensus to agree to these stipulations. Once the government confirms the positions of all defendants, the parties will finalize language for a formal stipulation to submit to the Court.

The government has also proposed that the following facts regarding the dates and locations of certain thefts charged in the Superseding Indictment are undisputed:

- On or about February 17, 2023, air conditioning units were stolen from a tractor trailer parked near 12600 Townsend Road in Philadelphia
- On or about March 7, 2023, frozen turkey wings were stolen from a tractor trailer parked near 2800 Charter Road in Philadelphia
- On or about April 1, 2023, refrigerators were stolen from a tractor trailer parked near

9490 Bluegrass Road in Philadelphia

- On or about April 4, 2023, frozen crab legs were stolen from a tractor trailer parked near 8501 Hegerman Street in Philadelphia
- On or about April 6, 2023, frozen crab legs were stolen from a tractor trailer parked near 3601 Island Avenue in Philadelphia
- On or about April 10, 2023, Samsung televisions were stolen from a tractor trailer parked near 12285 McNulty Road in Philadelphia
- On or about April 13, 2023, newly minted U.S. dimes were stolen from a tractor trailer parked near 4301 Byberry Road in Philadelphia

The government is confirming the position of all defendants, but as of this filing, multiple defendants have indicated that these facts are undisputed, and no defendant has indicated otherwise.

## V. POTENTIAL LEGAL ISSUES

### A. Co-Conspirator Statements

The government intends to introduce co-conspirator statements, primarily through text messages, audio messages, recorded jail calls, and electronic messages using FDC Philadelphia's inmate communications system. These communications will include statements made by co-conspirators who have pled guilty, including Rakeim Savage, Haneef Palmer, and Salahudin Reddy.

Federal Rule of Evidence 801(d)(2)(E) provides that a statement that was made by the party's co-conspirator during and in furtherance of the conspiracy is not hearsay and may be admitted as evidence against a co-conspirator. In order for a court to admit the co-conspirator statements, the government must prove: (1) that a conspiracy existed; (2) that the declarant and

the defendant were both members of the conspiracy; (3) that the statements were made in the course of the conspiracy; and (4) that the statements were made in furtherance of the conspiracy. *United States v. Bourjaily*, 483 U.S. 171, 175 (1987); *United States v. McGlory*, 968 F.2d 309, 333-34 (3d Cir. 1992). The determination of whether to admit co-conspirator statements into evidence is left to the sound discretion of the trial court and will not be disturbed on appeal absent a showing of clear error. *See United States v. Gambino*, 926 F.2d 1355 (3d Cir. 1991).

In making a preliminary factual determination as to the existence of a conspiracy and the defendant's participation in it, courts may consider the offered hearsay statement itself. *Bourjaily*, 483 U.S. at 180-81. "[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." *Id.*; *see also McGlory*, 968 F.2d at 334. Moreover, the district court may consider the totality of the circumstances when deciding on the admissibility of such evidence. "The circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement is made, or evidence corroborating the contents of the statement," should be considered by the trial court. *See* Fed. R. Evid. 801(d)(2) (Advisory Committee Notes). Furthermore, the existence of the conspiracy and the party's participation in that conspiracy need only be proved by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 175. "The threshold for establishing that a statement was made in furtherance of a conspiracy is not high: the in furtherance requirement is usually given a broad interpretation." *United States v. Duka*, 671 F.3d 329, 348 (3d Cir. 2011) (statements identifying defendant as co-conspirator and discussing defendant's role were made "in furtherance"); *see also United States v. Rodriguez-Sanchez*, 197 F. App'x 191, 195 (3d Cir. 2006) (unpublished) (finding that admission of co-conspirator statements subject to later motion to strike was

acceptable); *United States v. Continental Grp.*, 603 F.2d 444, 458-59 (government could introduce co-conspirator statements without a prior showing of a conspiracy rooted in independent evidence, as long as the government made such a showing by the close of its case). While mere narratives of past events or mere idle chatter that has no current purpose are not generally deemed to occur in furtherance of the conspiracy, statements that "provide reassurance, serve to maintain trust and cohesiveness among co-conspirators, or inform each other of the current status of the conspiracy" further the conspiracy. *Id.*, at 252; *see United States v. Harris*, 908 F.2d 728, 737 (11th Cir. 1990); *United States v. Hudson*, 970 F.2d 948, 958-59 (1st Cir. 1992). For example, statements which are relevant to the distribution of the proceeds of the conspiracy are considered in furtherance of the conspiracy. *Ammar*, 714 F.2d at 253. In order for statements to be deemed "in furtherance of the conspiracy," they need not actually "further" the conspiracy; it is sufficient that a statement was intended to promote the conspiracy, even if it did not actually do so. *See United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993); *United States v. Mayes*, 917 F.2d 457, 464 (10th Cir. 1990).

Moreover, although the "in the course of" and "in furtherance" requirements do not overlap entirely, they are closely related. *United States v. Ammar*, 714 F.2d 238, 253 (3d Cir. 1983). In determining whether a particular statement was made during and in furtherance of the conspiracy, the trial court should examine the circumstances under which the statement was made. *See United States v. Traitz*, 871 F.2d 368, 399 (3d. Cir. 1989). Moreover, for statements to be deemed "in furtherance of the conspiracy," they need not necessarily further the conspiracy; rather, it is sufficient that a statement was intended to promote the conspiracy even if it did not actually do so. *See United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993); *United States v. Mayes*, 917 F.2d 457, 464 (10th Cir. 1990). Statements "made for the purpose of concealing a

conspiracy," including statements made after a co-conspirators arrest (e.g., recorded jail calls), "can further the conspiracy." *United States v. Weaver*, 507 F.3d 178, 186 (3d Cir. 2007); *see also, e.g.*, *United States v. Mayfield*, 909 F.3d 956, 962 (8th Cir. 2018).

The trial court may admit statements pursuant to the rule even if the statements relate to a conspiracy not charged in the indictment. *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir. 1998); *United States v. Trowery*, 542 F.2d 623, 626 (3d Cir. 1976). The rationale for this rule is that the co-conspirator provision in Rule 801(d)(2)(E) is merely a rule of evidence founded on the theory "that a person who has authorized another to speak or act to some joint end will be held responsible for what is later said or done by his agent . . ." *Trowery*, 542 F.2d at 626. Furthermore, the trial court may admit statements by co-conspirators even if they were not charged. *See United States v. Nixon*, 418 U.S. 683, 701 (1974) (citing *Dutton v. Evans*, 400 U.S. 74, 81-82 (1970), for the proposition that statements of unindicted co-conspirators are admissible against defendants in a criminal trial).

Finally, some co-conspirator statements may also be admissible for additional reasons besides Rule 801(d)(2)(E). For instance, a "command or instruction to others to do something" is "not hearsay" because it is not a "declaration[] of fact and therefore [is] not capable of being true or false." *Travillion v. Wetzel*, No. 24-1763, 2025 WL 971669, at *3 (3d Cir. Apr. 1, 2025) (quotation marks omitted) (quoting *United States v. Reilly*, 33 F.3d 1396, 1410 (3d Cir. 1994)). Moreover, the statements of people with whom the defendants are corresponding would not be hearsay if not offered for the truth of the matter asserted, but to provide proper context for the defendants' statements. Without the other side of the conversations, the defendants' own statements would be incomprehensible.[5] *See United States v. Hendricks*, 395 F.3d 173, 183-84

[5] In such cases, the jury should be properly instructed regarding the admissibility of the

(3d Cir. 2005) (holding that recorded conversations with an unavailable informant were admissible as party opponent statements and coconspirator statements, and as context for defendant's statements).

**B. Defense Use of Defendant's Statements**

As mentioned, the government in this case will present a variety of evidence as co-conspirator statements and admissions of a party opponent under Fed. R. Evid. 801(d)(2). Such evidence is, by definition, not hearsay as to that party. Fed. R. Evid. 801(d). Thus, for example, emails or texts may be admitted against the party who wrote them, *United States v. Siddiqui*, 235 F.3d 1318, 1323 (11th Cir. 2000), and confessions may be admitted against the party who gave them. *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005). Such statements, however, may not be admitted by the party who gave them, because Rule 801(d)(2) does not allow a party "to introduce his or her *own* statements through the testimony of other witnesses." *Id.* (emphasis in original). Indeed, if such statements were admissible, "parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *Id.*; *see also United States v. Palow*, 777 F.2d 52, 56 (1st Cir. 1985) (Rule 801(d)(2)(A) requires that an admission at issue be contrary to a party's position at trial, and that the requirement that an admission be offered against a party is designed to exclude the introduction of self-serving statements by the party making them); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) (a party's statement, if offered against him, is not hearsay under Rule 801(d)(2)(A), but is hearsay and not admissible if offered by the party himself).

---

statements.

In this case, the conversations containing statements of the defendants will be introduced by the government. This does not mean that the defendants will be able to do likewise. Statements that the defendants made are not admissible by the defendants. It does not matter whether the information that the party seeks to admit is inculpatory or exculpatory. In either case, a party simply cannot admit his or her own statements as admissions of a party opponent. *See United States v. Kapp*, 781 F.2d 1008 (3d Cir. 1986) (upholding district court's ruling that tape recording of a conversation between a codefendant and a government informant that defendant considered exculpatory on the issue of his knowledge of illegality was inadmissible because it was not offered "against a party" as required by Rule 801(d)(2)); *McDaniel*, 398 F.3d at 545 & n.2. Simply put, a defendant's own purportedly exculpatory statements are inadmissible hearsay. Fed. R. Evid. 802.

The defendants cannot make an end-run around these hearsay rules by citing the Rule of Completeness. For example, the government will not present the entirety of every text thread or recorded conversation among the defendants, so as to make the presentation of the government's case more efficient, and to avoid jury confusion. In those instances, the defendants cannot introduce all of the remaining portions of the conversations by citing the Rule of Completeness, as set forth in Federal Rule of Evidence 106, which provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." *United States v. Hoffecker*, 530 F.3d 137, 192 (3d Cir. 2008). In *Hoffecker*, the Third Circuit upheld, under Rule 801(d)(2), the exclusion of portions of an audiotape in which the defendant made exculpatory statements, even though the

government had played a portion of the recording in its case-in-chief. The Court found that the Rule of Completeness did not compel a different result. *Id.* at 192.

This principle applies to both recorded conversations as well as witness testimony that contains statements of the defendant; even if only a portion of the conversation or statement is played or presented by the government, the defendant may not present his statements that were not introduced unless he testifies. *See United States v. Lentz*, 524 F.3d 501, 526 (4th Cir. 2008) ("Rule 106 does not ... render admissible the evidence which is otherwise inadmissible under the hearsay rules, [n]or does it require the admission of self-serving, exculpatory statements made by a party which are being sought for admission by that same party") (internal quotations and citations omitted); *United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007) (defendant was properly precluded from eliciting, on cross-examination of government agents, exculpatory statements that he had made during interviews with agents, since those statements were inadmissible hearsay); *United States v. Rivera*, 61 F.3d 131, 136 (2d Cir. 1995) ("Rule 106 does not render admissible evidence that is otherwise inadmissible"); *United States v. Mahaffy*, 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007) ("A court may ... exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible hearsay") (internal quotations omitted).

Similarly, in *United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000), the court affirmed the district court's decision precluding the defendant from eliciting his own exculpatory statements on cross-examination of a law enforcement officer, holding that the defendant's statements were inadmissible hearsay. *Id.* at 682. The court recognized that any other ruling would have allowed the defendant to put his own statements before the jury without having to take the stand himself—the precise situation the hearsay rule forbids. *Id.* at 682. In reaching its decision, the

*Ortega* court distinguished the defendant's attempt to elicit his own exculpatory statements from the government's use of the defendant's inculpatory statements, noting that only the latter constitute "admissions by a party opponent and . . . therefore not hearsay," and noted that the Rule of Completeness did not apply. *Id.* at 681-682.

The Third Circuit in *Hoffecker* identified a narrowly-drawn exception to the general rule that a defendant may not present his statements that were not introduced unless he testifies. In that case, the Third Circuit noted that additional portions of a recording may be played "if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) ensure a fair and impartial understanding." *Hoffecker*, 530 F.3d at 192 (citing *United States v. Soures*, 736 F.2d 87, 91 (3d Cir.1984) (citing *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982)). The Third Circuit cautioned that "[t]he Rule does not require introduction of portions of a statement that are neither explanatory of nor relevant to the passages that have been admitted." *Id.*; *see Marin*, 669 F.2d at 84; *United States v. Bailey*, 322 F. Supp. 3d 661, 675 (D. Md. 2017) ("Neither Rule 106 nor the common-law rule of completeness is triggered unless some clearly identifiably unfairness would exist without allowing the party that would be prejudiced the opportunity to offer information that would clarify or explain"). That an omitted portion of a conversation merely deals with the same subject matter as a published portion is not enough. In *Hoffecker*, the Court rejected a Rule 106 claim where the defendant sought to admit his statements from one conversation to explain his statements during another conversation, where the prior statements were not necessary to avoid misleading the jury or to ensure a fair and impartial understanding. 530 F.3d at 192.

If any defendant seeks to introduce any of his prior statements under Rule 106, the defendant must specify the particular passages that he believes are necessary for purposes of

Rule 106 completeness and, for each passage, set forth why the admission of the prior statements are necessary to avoid misleading the jury or to ensure a fair and impartial understanding. *United States v. Price*, 516 F.3d 597, 604-05 (7th Cir. 2008) (as the party seeking to admit the additional evidence, the defendant must establish both that the evidence is relevant to the issues in the case and that it clarifies or explains the portion offered by the government).

**C. Cell Phone and iCloud Cellebrite Reports**

As discussed, investigators recovered evidence from multiple cell phones during this investigation. Subsequently, pursuant to search warrants, law enforcement conducted physical extractions of the cell phone data using a Cellebrite Universal Forensic Extraction Device ("Cellebrite"). The physical extraction is a mechanical download of the contents of the cellular phone through a mechanical process using the Cellebrite device. The download creates an extraction report of the contacts, call logs, text messaging, photographs, and videos contained inside the phone itself. Similarly, law enforcement executed search warrants for the iCloud accounts associated with defendant Ronald Byrd. Law enforcement then took the raw data and placed it into Cellebrite, which parsed the data into a readable format and created extraction reports. The government made the raw data, full Cellebrite extraction files, and pertinent excerpts available to the defense in discovery.

The FBI case agent, Special Agent Donovan Miles, has extensive experience working with Cellebrite extractions, and no expert testimony is required to authenticate the Cellebrite extraction reports from the cellular telephones or iCloud backups in this case. *See United States v. Williams*, 83 F.4th 994, 997-98 (5th Cir. 2023) (holding that no expert testimony required to interpret a Cellebrite report); *United States v. Chavez-Lopez*, 767 F.App'x 431, 434 (4th Cir. 2019); *United States v. Marsh*, 568 Fed. Appx. 15, 16 (2d Cir. 2014) (Summary Order); *see also*

*Sec. & Exch. Comm'n v. Sabrdaran*, No. 14-CV-04825-JSC, 2016 WL 7826653, at *1 (N.D. Cal. Oct. 20, 2016) (denying defense motion to exclude testimony about Cellebrite extraction).[6]

**D. Case Agent as Background and Summary Witness**

The government may call a law enforcement witness to provide an introductory overview witness at the beginning of its case-in-chief and a summary witness at the end of its case-in-chief. At the beginning of the case, the witness would testify about steps taken in this investigation. The introductory overview testimony would help the jury understand the evidence that will be presented through the other witnesses that will testify at trial. At the end of the case, the witness would not only introduce additional evidence that will only make sense to discuss *after* the jury has already heard from other witnesses, but he would also help summarize and "connect the dots" between the substantial evidence that will be admitted at trial.

In *United States v. Lacerda*, 958 F.3d 196, 208 (3d Cir. 2020), the Third Circuit held that introductory overview testimony from a law enforcement officer was proper. The Court explained that "an officer who is familiar with an investigation or was personally involved may tell the story of that investigation—how the investigation began, who was involved, and what techniques were used. In addition, with proper foundation, he may offer lay opinion testimony and testify about matters within his personal knowledge." A law enforcement officer may further state "his personal observations, and his beliefs of what the evidence showed based on what he saw and heard and did." *Id.* at 210. The Third Circuit has consistently held, since *Lacerda*, that such overview testimony by a case agent is admissible. *See e.g.*, *United States v. Parnell*, 2020 WL 4736038, at *6 (3d Cir. Aug. 14, 2020) (federal agent's overview testimony was proper

[6] As mentioned, the government has also proposed a stipulation consistent with these facts and legal principles.

because it was limited to matters within his personal knowledge); *United States v. Wadley*, 2022 WL 1011693, at *4, n. 11 (3d Cir. Apr. 5, 2022) (same); *United States v. Jarmon*, 14 F.4th 268, 273 (3d Cir. 2021) (case agents may provide overview testimony that describes the structure of a group, and their activities, where the testimony is based on what the agent learned in their investigation and their beliefs of what the evidence showed). The Court may also give a limiting instruction to the jury about the agent's role and testimony.

A case agent may also testify at the conclusion of a government's case-in-chief as a summary witness. Summary testimony is also appropriate under Rule 611(a) if the evidence would aid the jury in ascertaining the truth and would not be overly prejudicial to the defendant. The Court and jury are entitled to have a witness "organize and evaluate evidence which is factually complex and fragmentally revealed." *United States v. Shirley*, 884 F.2d 1130, 1133-34 (9th Cir. 1989) (agent's testimony regarding her review of various telephone records, rental receipts, and other previously offered testimony held to be proper summary evidence, as it helped jury organize and evaluate evidence; summary charts properly admitted); *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983). A summary witness may rely on the analysis of others where he has sufficient experience to judge another person's work and incorporate as his own the fact of its expertise. The use of other persons in the preparation of summary evidence goes to its weight, not its admissibility. *United States v. Soulard*, 730 F.2d 1292, 1299 (9th Cir. 1984); *see Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co.*, 466 F.2d 722, 727 (7th Cir. 1972) ("It is not necessary . . . that every person who assisted in the preparation of the original records or the summaries be brought to the witness stand").

Along the same lines, during the trial, the government may recall the case agent, FBI Special Agent Donovan Miles, to the witness stand during its case in chief to address a number

of different subjects. While it would be possible for the agent to testify about several of these topics in a single appearance on the witness stand, such an unnatural constraint would not promote an efficient or clear presentation of the case. Instead, the government intends to recall the case agent so that his testimony can be provided in parts, either by subject matter or chronologically.

The procedure of recalling a witness has been widely endorsed in conspiracy cases. *See United States v. Edelin*, 128 F. Supp. 2d 23, 47 (D.D.C. 2001) (collecting cases involving complex conspiracies or activities occurring over a long period of time that have approved of the practice of recalling witnesses to testify to discrete incidents; noting that Federal Rule of Evidence 611(a) authorizes the Court to control the order of interrogation and the presentation of evidence); *see also United States v. Coleman*, 805 F.2d 474, 482 (3d Cir. 1986) ("The district court has discretion to allow the recall of a witness, even if the witness has consulted with the prosecutor in the interim."); *United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982) (district court had discretion under Rule 611(a) to permit case agent to take the stand on four separate occasions to describe events in chronological order); *United States v. Jackson*, 549 F.2d 517, 528 (8th Cir. 1977) (praising the district court's exercise of its discretion as lending "a praiseworthy degree of order to this complicated trial"); *United States v. Rodgers*, 2014 WL 3735585, at *2 (W.D. Pa. July 28, 2014) (permitting recall of certain law enforcement witnesses so the government may present its evidence chronologically); *United States v. Dimora*, 843 F. Supp. 2d 799, 822-23 (N.D. Ohio 2012) (approving the recalling of a government witness because it will provide a clear and orderly trial and aid the jury's understanding of the evidence) *United States v. Bacon*, 2012 WL 5381415, at *1 (W.D. Pa. Oct. 31, 2012) (permitting recall of police detective so the government may present its evidence chronologically); *United States v.*

*Johnson*, 434 F. Supp. 2d 301, 305-06 (D. Del. 2006) (recall of a DEA chemist was appropriate). Given the specific circumstances of this case, the government submits that a similar procedure should be permitted here.

**E. Prohibition of Using Agents' Reports to Cross-Examine Witnesses**

As part of its Jencks Act production, the government intends to provide the defense with reports of witness interviews by government agents. To the extent that the agents who prepared the reports testify, those reports, if materially inconsistent, provide an appropriate basis for impeachment of the agents. However, under the Federal Rules of Evidence, those reports may not be used to impeach the subject of the underlying interview unless the subject has somehow adopted those reports. *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992).

In *Almonte*, a DEA agent testified at trial about the post-arrest statements that he had obtained from two defendants. *Id*. at 28. One defendant sought to cross-examine the agent with interview notes taken by an Assistant U.S. Attorney who had interviewed the agent. *Id*. at 28-29. The district court rejected the effort and the Second Circuit affirmed, holding that the AUSA's notes were not the agent's statement, but merely a "third party's characterization" of the agent's statement, and therefore irrelevant to impeachment and consequently inadmissible:

> We have held, however, that a "third party's characterization" of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization. . . . Thus, in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words. The problem, in essence, is one of relevancy. If a third party's notes reflect only that note taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.

*Id*. at 29 (citation omitted).

As a matter of evidence, the burden of proving that reports or notes reflect the witness's own words rather than the note taker's characterization falls on the party seeking to introduce the

notes. *Id*. Thus, a party seeking to use a report to impeach bears the burden of proving a rational basis for concluding that the report either was adopted by the witness or represents the verbatim transcript of the witness's statement. *See id*. at 30. In the absence of such proof, cross-examination from such reports or notes should be carefully scrutinized so that a statement that is otherwise inadmissible is not back-doored into evidence and read into the record. *See United States v. Shoenborn*, 4 F.3d 1424, 1427-28 & n.3 (7th Cir. 1993). In this case, the defendants should not be permitted to admit reports to impeach the underlying subjects of those interviews or cross-examine witnesses using any portion of the reports. *See United States v. Barile*, 286 F.3d 749, 757-58 (4th Cir. 2002); *United States v. Adames*, 56 F.3d 737, 744-45 (7th Cir. 1995); *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993).

### F. Summary Charts

The government intends to introduce various summary charts into evidence to summarize text messages, phone records, and other matters pursuant to Rule 1006 of the Federal Rules of Evidence. Notably, there is no requirement that all of the voluminous evidence supporting a chart or graph be introduced into evidence as a precondition to the introduction of those charts. *United States v. Strissel*, 920 F.2d 1162, 1163 (4th Cir. 1990).

## VI. WITNESSES AND EXPECTED LENGTH OF TRIAL

The Government will submit an unredacted witness list to the Court and counsel. The government expects that the presentation of its case will take approximately two weeks, depending on the number and length of the defense's cross examinations.

The government reserves the right to supplement this memorandum and its witness list as may be required.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Alexander B. Bowerman*
ALEXANDER B. BOWERMAN
CHRISTOPHER DIVINY
JARETT A. ROVNER
Assistant United States Attorneys

Date: October 9, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Amended Trial Memorandum has been served by electronic filing on all counsel of record.

*/s/ Alexander B. Bowerman*
ALEXANDER B. BOWERMAN
CHRISTOPHER DIVINY
JARETT A. ROVNER
Assistant United States Attorney

Date: October 9, 2026